131QJAV1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

FLORENCIO MENDOZA JAVA,

                Plaintiff,

        v.                              16 Civ. 6691 (JLC)
                                        Bench Trial

EL AGUILA BAR RESTAURANT
CORP., LAS BENDERAS SPORTS BAR
CATERING LOUNGE CORP..,
SANTIAGO ALMONTE and JUAN
ALMONTE,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        March 1, 2018
                                        9:30 a.m.

Before:

                    HON. JAMES L. COTT,

                                        Magistrate Judge

                        APPEARANCES

MICHAEL FAILLACE & ASSOCIATES PC
     Attorneys for Plaintiff Java
BY:  SARA J. ISAACSON
     SHAWN R. CLARK


DELMAS A. COSTIN JR
     Attorney for Defendants



-Also Present-
XXX, Interpreter (Spanish)
xxx, Interpreter (Spanish)

131QJAV1

```
 1              (Case called)
 2              MS. ISAACSON:  Good morning, your Honor.
 3              Sara Isaacson for Florencio Mendoza Java, the
 4    plaintiff, and I have today with me Shawn Clark.
 5              THE COURT:  Good morning, Ms. Isaacson.  Good morning
 6    Mr. Clark.
 7              And this is your client?
 8              MS. ISAACSON:  Yes, your Honor.
 9              THE COURT:  Good morning, Mr. Mendoza.  You may be
10    seated.
11              MR. COSTIN:  Delmas Costin for the defendant, Juan
12    Almonte an El Aguila Bar Restaurant.
13              THE COURT:  Good morning, Mr. Costin.
14              Good morning, Mr. Almonte.  You may be seated as well.
15              Why do I have defendant's exhibits sitting in front of
16    me?  We're a little ahead of the game.  They haven't been
17    offered or received in evidence yet.  Why don't you hold on to
18    them until we get there?
19              MR. COSTIN:  Yes, your Honor.
20              THE COURT:  I think the first order of business is to
21    address the question of Mr. Santiago Almonte and the scope of
22    his testimony in light of the letters that I asked counsel to
23    submit.
24              I have reviewed those letters, the February 20 letter
25    from Ms. Isaacson and the February 20 letter from Mr. Costin
```

131QJAV1

that are Docket Nos. 51 and 52 in the case and conducted some

independent research as well.

And my conclusion is that Mr. Santiago Almonte's

testimony should be limited to damages.  I say that because my

understanding of the law is that the general rule in situations

in which a defaulting and a non-defaulting defendant are

subject to joint and several liability is that it would be

appropriate to enter a default as against Mr. Santiago Almonte

and the other corporate defendant, the Las Banderas Sports Bar

because they have never appeared in this action, and they are,

in fact, in default, it would be appropriate to enter a default

pursuant to Rule 55(a) but not a judgment, and the reason that

I encourage plaintiffs from forestalling any formal motion

practice with respect to those defaulting defendants is to

ensure that there wouldn't be any inconsistent judgments.

What I mean in a nutshell is a Rule 55(a) default

could and should be entered with respect to those two

defendants but a Rule 55(b) default judgment should not yet be

entered as to those defendants because if the appearing

defendants prevail at this trial, then my understanding of the

law would be that all defendants, including the defaulting

defendants, effectively would be exonerated.

So that is where I come out in that regard.  If,

Mr. Costin, you wish to call Mr. Santiago Almonte as a witness

at this proceeding, I would treat his testimony as the

131QJAV1

1    equivalent of any submission you would make on an inquest such

2    that he would be testifying about damages and damages only.

3    Liability will be assumed as against him and the corporate

4    defendant as they have not yet appeared.

5              So, if the remaining defendants prevail, Mr. Santiago

6    Almonte and Las Banderas Sports Bar will be exonerated, but if

7    Mr. Mendoza prevails on the merits, then judgment is going to

8    be entered as to all defendants, and part of our proceeding

9    today will, of course, address damages both with respect to

10   testimony from Mr. Mendoza and the appearing defendants.  And

11   to the extent, Mr. Costin, you wish to call the defaulting

12   defendants, you may do so, but only for the purposes of their

13   disputing damages.

14             So that is where I come out.  Is that clear to

15   everybody in terms of how we're proceeding?

16             Ms. Isaacson?

17             MS. ISAACSON:  Yes, your Honor.

18             THE COURT:  Mr. Costin, is that clear?

19             MR. COSTIN:  Yes, your Honor.

20             THE COURT:  OK.  So, that is by way of at least one

21   preliminary.

22             Are there any other preliminary issues that counsel

23   want to raise before we proceed?

24             MR. COSTIN:  Yes, your Honor.  I have one question.

25   Mr. Santiago Almonte is present in the courtroom.  During the

131QJAV1

1    testimony, is he allowed to stay in the courtroom since he is a

2    defendant in this matter?

3              THE COURT:  Do you have any objection to that?

4              MS. ISAACSON:  We don't necessarily have an objection

5    as to Santiago, but with respect to the third-party witness

6    Mr. Pichardo, who is sitting here, we would ask that he leave

7    the courtroom before any testimony begins.

8              MR. COSTIN:  I agree with that, your Honor.

9              THE COURT:  Mr. Santiago Almonte can remain for the

10   duration of all proceedings, but the non-party witnesses should

11   be excluded consistent with what I think is general practice in

12   this courthouse.

13             MR. COSTIN:  Yes.

14             THE COURT:  OK.  Any other preliminaries?

15             MR. COSTIN:  And the other matter is Ms. Carasquillo,

16   I guess we can address it later --

17             THE COURT:  Why don't we see where we are at the end

18   of the day, if we are otherwise finished or we're not, and

19   we're coming back tomorrow and you're reporting to me on where

20   all that stands.  Let's take all the other testimony first and

21   then we'll address it.  Of course, I'm aware of the issue with

22   you, but let's see how the trial shakes out.  You may decide

23   you want to call her; you may decide you don't want to call

24   her, and we'll deal with that.

25             MR. COSTIN:  Thank you, your Honor.

131QJAV1

|    |                                                                                    |
|----|------------------------------------------------------------------------------------|
| 1  | THE COURT:  Ms. Isaacson or Mr. Clark, do you have any                              |
| 2  | other preliminary issues you want to raise?                                         |
| 3  | MS. ISAACSON:  Not at this time, your Honor.                                        |
| 4  | THE COURT:  Can I just ask for purposes of how we're                               |
| 5  | proceeding, because I think there was some inquiry to the Court                     |
| 6  | and, that is, the interpreters that are present today, are they                    |
| 7  | certified in some fashion or what sort of voir dire, if any,                        |
| 8  | should I conduct to satisfy myself that they are appropriately                      |
| 9  | trained, certified, and/or appropriate to perform the function                     |
| 10 | that they both are.                                                                 |
| 11 | MS. ISAACSON:  They are court certified, your Honor.                                |
| 12 | We agreed with the cost so that we could have the certified                         |
| 13 | interpreters.                                                                       |
| 14 | THE COURT:  So the interpreters here today are                                     |
| 15 | certified and the parties have worked together to ensure --                         |
| 16 | MR. COSTIN:  That's correct, your Honor.                                            |
| 17 | THE COURT:  Do you all want to make opening statements                             |
| 18 | of any kind at the bench trial?  I'm happy to have them if                          |
| 19 | they're short, but you're not obligated to.  I'm much more                          |
| 20 | interested in taking testimony because that's what the case is                      |
| 21 | ultimately about, but whatever you prefer in that regard.                           |
| 22 | Ms. Isaacson, what is your pleasure?                                                |
| 23 | MS. ISAACSON:  If Mr. Costin is willing to waive                                    |
| 24 | opening statements, then we will as well.  If he is going to                        |
| 25 | make an opening statement, then we would.                                           |

131QJAV1                          Java - Direct

1            THE COURT:  Do you both want to or do you both want to

2     waive them?

3            MR. COSTIN:  Your Honor, I'll waive it.

4            THE COURT:  Ms. Isaacson, call your first witness.

5            MS. ISAACSON:  Your Honor, we'd like to call

6     Mr. Florence Mendoza Java.

7            THE COURT:  Mr. Java, please come forward to the

8     witness stand.

9            Yes, Mr. Pichardo should leave at this time.

10     FLORENCIO MENDOZA JAVA,

11         called as a witness by the Plaintiff,

12         having been duly sworn, testified through the interpreters

13            as follows:

14     DIRECT EXAMINATION

15     BY MS. ISAACSON:

16            THE COURT:  You may be seated.

17            Ms. Isaacson, you may proceed

18     Q.  Good morning, Mr. Mendoza Java.  Did you ever work at a

19     place called El Aguila?

20     A.  I'm sorry, counselor.  Can you repeat the question?

21     Q.  Yes.  Did you ever work at a place called El Aguila?

22     A.  Yes.

23     Q.  What kind of business was El Aguila?

24     A.  A restaurant bar and exotic dancers.

25     Q.  Where was El Aguila located?

131QJAV1                        Java - Direct

1   A.   In the Bronx in New York.

2   Q.   What kind of items did El Aguila offer for sale?

3   A.   Food and liquor.

4   Q.   When did you begin working at El Aguila?

5   A.   2008.

6   Q.   When did you stop working at El Aguila?

7   A.   July of 2016.

8   Q.   What did you do at El Aguila?

9   A.   Cleaning, cooking, doing deliveries.

10  Q.   Did you ever work anywhere else besides El Aguila at that

11  time?

12  A.   Yes.

13  Q.   Where else did you work at that time?

14  A.   I worked at Las Banderas at the end of 2015 until July of

15  2016.

16  Q.   What kind of business was Las Banderas?

17  A.   A restaurant bar.

18  Q.   Where was Las Banderas located?

19  A.   In the Bronx, New York.

20  Q.   What did you do at Las Banderas?

21  A.   Cleaning, and receiving deliveries.

22  Q.   How did you get your job at El Aguila?

23  A.   I was out looking for work, and I went inside the El Aguila

24  Restaurant, and I asked a woman there.

25          THE COURT:  Can I interrupt?  Just go back for a

1   minute.  You said you began working at Las Banderas at the end

2   of 2015.  Can you be more specific?  Do you remember what

3   month, for example, you began working there?

4             THE WITNESS:  The end of 2015.

5             THE COURT:  Does that mean December?

6             THE WITNESS:  Yes.

7             THE COURT:  All right.  And when you were working

8   there, were you working at both El Aguila and Las Banderas at

9   the same time or did you change employers?

10            THE WITNESS:  No.  I was working at El Aguila from

11  10:00 until 8:00, six days a week, and then one day a week I

12  was working from 10:00 until 4:00 at El Aguila, and from 4:00

13  until 9:00 at Las Banderas.

14            THE COURT:  So he was working seven days a week during

15  this period of time?

16            THE WITNESS:  No, six days.

17            THE COURT:  I thought he just said six days a week

18  from 10:00 to 8:00, and then one day from 10:00 to 4:00 and the

19  other 4:00 to 9:00 was at Las Banderas.  Did I misunderstand?

20            THE WITNESS:  No, five days.  While I was working six

21  days.

22            THE COURT:  All right.

23            THE WITNESS:  But one day -- I was working the same

24  schedule, but one day I was working from 10:00 to 4:00 at

25  El Aguila and then 4:00 to 9:00 at Las Banderas.

131QJAV1                          Java - Direct

1            THE COURT:  Is the 4:00 to 9:00 period of time that

2    you worked at Las Banderas the only time you worked there?

3            THE WITNESS:  Yes.

4            THE COURT:  So you worked at Las Banderas for five

5    hours during the course of a week and you did that from

6    December 2015 until July 2016?

7            THE WITNESS:  Yes.

8            THE COURT:  All right.  Very well.  Thank you.

9            You may proceed, Ms. Isaacson.

10   Q.  I believe you were in the middle of answering how you got

11   your job at El Aguila.

12   A.  Yes.  Well, I was out looking for work, and I went inside

13   the El Aguila Restaurant.  So I went and asked the person that

14   was inside of there or, as we say, the girl in there, and then

15   I was interviewed by Santiago Almonte.

16   Q.  How did you get your job at Las Banderas?

17   A.  Through Santiago Almonte.

18   Q.  What do you mean by through Santiago Almonte?

19   A.  Because he supervised or was in charge the of Banderas, and

20   he would send me to do cleanup and receive purchases.

21   Q.  Who is Santiago Almonte?

22   A.  He was my employer.

23   Q.  What were his responsibilities as your employer?

24   A.  He was a supervisor, and he was in charge of paying me and

25   giving me my schedules.

131QJAV1                          Java - Direct

1    Q.  Who is Juan Almonte?

2    A.  Juan Almonte is Santiago Almonte's brother, and they are

3    partners, and he is also my employer or was my employer.

4    Q.  And what were his responsibilities as your employer?

5           THE INTERPRETER:  The interpreter would like to

6    clarify a term.

7    A.  He was in charge of paying me and in charge of finances;

8    that is, that he was managing things.

9    Q.  Who was in charge of El Aguila?

10   A.  Santiago and Juan Almonte.

11   Q.  Who was in charge of Las Banderas?

12   A.  Santiago Almonte.

13   Q.  Who set your schedules while you worked at El Aguila?

14   A.  Santiago Almonte.

15   Q.  Who paid you while you worked at El Aguila?

16   A.  Santiago and Juan Almonte.

17   Q.  Who set your schedules while you worked at Las Banderas?

18   A.  Santiago Almonte.

19   Q.  Who paid you while you worked at Las Banderas?

20   A.  Santiago and Juan Almonte.

21   Q.  What hours did you work at El Aguila in August 2010?

22   A.  From 8:00 till 8:00.

23   Q.  Is that 8:00 a.m. till 8:00 p.m. or something else?

24   A.  From 8:00 a.m. till 8:00 p.m.

25   Q.  How many days a week did you work in August of 2010?

131QJAV1                          Java - Direct

1   A.  Six days.

2   Q.  Did the hours that you worked at El Aguila ever change

3   after August of 2010?

4   A.  Yes.

5   Q.  When did the hours that you worked at El Aguila change

6   after August 2010?

7   A.  In around July of 2012 working six days a week, five I was

8   working during the day and one I was working at night.

9   Q.  And in July 2012 when you worked five days, during the day

10  what hours did you work at El Aguila?

11  A.  From 8:00 till 8:00.

12  Q.  And in July 2012 when the hours that you worked changed,

13  what hours did you work when you worked at night at El Aguila?

14  A.  From 7:00 p.m. until 5:00 a.m.

15  Q.  Did the hours that you worked at El Aguila ever change

16  again after July 2012?

17  A.  Yes, July of 2013.

18  Q.  How many days per week did you work when your hours changed

19  in July 2013?

20          THE INTERPRETER:  I'm sorry, counsel.  How many days a

21  week?

22  Q.  How many days per week?

23  A.  Six days.

24  Q.  What hours did you work at El Aguila when your hours

25  changed in July 2013?

1   A.  From 8:00 till 8:00.

2   Q.  Is that 8:00 a.m. till 8:00 p.m. or something else?

3   A.  From 8:00 a.m. until 8:00 p.m.

4   Q.  Did the hours that you work at El Aguila ever change again

5   after July 2013?

6   A.  Yes.

7   Q.  When did the hours that you worked at El Aguila change

8   again after July 2013?

9   A.  At the end of 2015, yes.  December, right?

10  Q.  And what hours did you work when your hours changed at the

11  end of 2015?

12  A.  I was working six days a week and from 10:00 until 8:00.

13  Q.  When you say 10:00 until 8:00, is that 10:00 a.m. until

14  8:00 p.m.?

15  A.  Yes.  Yes.  I was working six days, five days from 10:00

16  till 8:00 at El Aguila and one day from 10:00 till 4:00 at

17  El Aguila and from 4:00 till 9:00 at Las Banderas.

18  Q.  Was there any sort of time system at El Aguila to record

19  when you came in in the morning?

20  A.  No.

21  Q.  Was there any sort of time system at El Aguila to record

22  when you left work at the end of the day?

23  A.  No.

24  Q.  When you worked at El Aguila, did you have to keep a record

25  of your time?

131QJAV1                          Java - Direct

```
 1   A.  No.

 2   Q.  When you worked at El Aguila, did you write by hand into a

 3   book or paper the time of your arrival?

 4   A.  No.

 5   Q.  Was there any sort of time system at Las Banderas Sports

 6   Bar to record when you came in in the morning?

 7   A.  No.

 8   Q.  Was there any sort of time system at Las Banderas Sports

 9   Bar to record when you left work at the end of the day?

10   A.  No.

11   Q.  When you worked at Las Banderas Sports Bar, did you have to

12   keep a record of your time?

13   A.  No.

14   Q.  When you worked at Las Banderas Sports Bar, did you write

15   by hand into a book or paper the time of your arrival?

16   A.  No.

17   Q.  At the time of departure when you were ready to go home,

18   did you punch in a card?

19   A.  No.

20   Q.  Did anyone ever discuss pay with you when you first started

21   working at El Aguila in 2008?

22   A.  Yes, Santiago Almonte.

23   Q.  What did Santiago Almonte tell you when he spoke to you

24   about your pay?

25   A.  That he was going to give me 225 a week.
```

131QJAV1                              Java – Direct

1    Q.   Did you actually receive $225 a week when you started

2    working in 2008?

3    A.   225?

4    Q.   Yes.

5    A.   Yes.

6    Q.   How were you paid when you first started working in 2008,

7    by check or cash?

8    A.   In cash.

9    Q.   Did your salary ever change after 2008?

10   A.   Yes, in 2010.

11   Q.   How did your salary change in 2010?

12   A.   60 a day.

13   Q.   Is that $60 a day?

14   A.   Yes.

15   Q.   How were you paid when your salary changed in 2010, by cash

16   or check?

17   A.   In cash.

18   Q.   Did your salary ever change again after 2010?

19   A.   Yes, in 2012 in July.

20   Q.   How did your salary change in July 2012?

21   A.   I was making 65 a day and 80 at night.

22   Q.   And how were you paid when your salary changed in

23   July 2012, by check or cash?

24   A.   In cash.

25            THE COURT:   What do you mean by 80 at night?

1           THE WITNESS:  When I worked one day at night.

2           THE COURT:  Do you want to follow up with some

3    questions about that?  I don't quite understand what it means

4    to make 65 a day and 80 at night.  What does that mean?

5           MS. ISAACSON:  Sure.

6    BY MS. ISAACSON:

7    Q.  When you say you were paid $65 per day in July 2012, which

8    days were you paid $65 per day and which days were you paid $80

9    a day?

10   A.  On Sundays when I would cook.

11   Q.  On Sundays when you would cook, what would you receive in

12   salary?

13   A.  80 per night.

14   Q.  OK.  And the other days a week that you worked in

15   July 2012, what did you receive in salary?

16   A.  65 per day.

17          THE COURT:  So was there one day a week where you made

18   $80 and the other days you made $65?  Is that what this means?

19          THE WITNESS:  Yes.

20          THE COURT:  Very well.  Thank you.

21   Q.  How were you paid when your salary changed in July 2012, by

22   check or cash?

23   A.  In cash.

24   Q.  Did your salary ever change again after July 2012?

25   A.  Yes, in 2013.

131QJAV1                          Java - Direct

1   Q.   What month in 2013?

2   A.   July.

3   Q.   How did your salary change in July 2013?

4   A.   I was making 65 per day.

5   Q.   And $65 per day?

6   A.   Yes.

7   Q.   How were you paid when your salary changed in July 2013, by

8   cash or check?

9   A.   Cash.

10  Q.   Did your salary ever change again after July 2013?

11  A.   Yes, in 2015 towards the end.

12  Q.   How did your salary change at the end of 2015?

13  A.   Yes.  I was getting paid 30 hours by check, 8.75 an hour

14  for 30 hours a week and $95 cash.

15           THE COURT:  I'm sorry to interrupt, but I just want to

16  be clear for the record.

17           Mr. Mendoza, there was a period of time where you made

18  $65 per day except one day a week where you made $80 a day, but

19  that stopped and then you were just making $65 a day for every

20  day that you worked.  Is that correct?

21           THE WITNESS:  Yes.

22           THE COURT:  When did you stop having the one day where

23  you made $80 a day?

24           THE WITNESS:  In July 2013.

25           THE COURT:  All right.  Thank you.

131QJAV1                              Java - Direct

1    BY MS. ISAACSON:

2    Q.  When you said you received $95 in addition to the 8.75 per

3    hour for the first 30 hours per week, that was $95 per week,

4    correct?

5    A.  Yes.

6    Q.  Who paid you?

7    A.  Santiago and Juan Almonte.

8    Q.  Did you have to sign a document showing that you received

9    money?

10   A.  No.

11   Q.  Did you receive tips from customers for deliveries you

12   made?

13   A.  Yes.

14   Q.  How often did you make deliveries?

15   A.  I would usually do 20 deliveries per week.

16   Q.  Approximately how long would each delivery take you to

17   make?

18   A.  10 to 15 minutes.

19   Q.  Did anyone tell you that the tips were supposed to offset

20   your wages?

21   A.  No.

22   Q.  Did you report the amount of cash you made every day to the

23   manager or owner of the restaurant?

24   A.  No.

25   Q.  As far as you know, did the restaurant keep track of the

1   tips you made?

2   A.  No.

3   Q.  Did anyone explain to you at all about something called the

4   tip credit?

5   A.  No.

6   Q.  When you worked at El Aguila, did you receive any documents

7   saying how many hours you worked and how you were being paid?

8   A.  No.

9   Q.  When you worked at Las Banderas, did you receive any

10  document saying how many hours you worked and how you were

11  being paid?

12  A.  No.

13          THE COURT:  May I ask a question, Mr. Mendoza.  You

14  said you made about 20 deliveries per week.  Is that right?

15          THE WITNESS:  Yes.

16          THE COURT:  Did you do that from 2008 until July of

17  2016 or something else?

18          THE WITNESS:  Yes, all the time.

19          THE COURT:  All right.

20  BY MS. ISAACSON:

21  Q.  Were you given a document when you started working at

22  El Aguila stating what your pay rate would be?

23  A.  No.

24  Q.  Were you given a document when you started working at Las

25  Banderas stating what your pay rate would be?

131QJAV1                        Java – Cross

1    A.  No.

2    Q.  Were you given such a document at any point while working

3    at El Aguila?

4    A.  No.

5    Q.  Were you given any such document at any point while working

6    at Las Banderas?

7    A.  No.

8              MS. ISAACSON:  No further questions.

9              THE COURT:  All right.  Mr. Costin.

10             MR. COSTIN:  May I have one moment, your Honor?

11             THE COURT:  Yes.

12   CROSS-EXAMINATION

13   BY MR. COSTIN:

14             THE COURT:  Ready to proceed?

15             MR. COSTIN:  Yes, your Honor.  Thank you.

16             THE COURT:  You may do so.

17             MR. COSTIN:  Thank you, your Honor.

18   Q.  Good morning, sir.

19   A.  Good morning.

20   Q.  When you first went to El Aguila, you stated that you

21   interviewed with Mr. Santiago Almonte.  Is that right?

22   A.  Yes.

23   Q.  What did you understand your job duties to be?  What did

24   you expect to do?

25   A.  Cleaning, deliveries in 2008, and to receive purchases.

131QJAV1                              Java - Cross

1   Q.  Prior to working at El Aguila, did you work anywhere else?

2   Had you worked anywhere else in New York City?

3   A.  Yes.

4   Q.  Where did you work, sir?

5   A.  Near Yankees Stadium.

6   Q.  What did you do?

7   A.  Cook.

8   Q.  Where?

9   A.  La Taverna, that's the name.

10  Q.  Is that on 149th Street?

11  A.  No, near Yankee Stadium.

12  Q.  Where near Yankee Stadium?

13  A.  It's Walton Street and 161st Street.

14  Q.  How long did you work there?

15          THE INTERPRETER:  For the interpreter, how long?

16          MR. COSTIN:  Yes.

17          MS. ISAACSON:  Objection, your Honor.

18          THE COURT:  What's the objection?

19          MS. ISAACSON:  It's beyond the scope, and it's unclear

20  where Mr. Costin is going.

21          THE COURT:  I'm going to give him a little latitude,

22  but you'd better bring it to connection in the next minute or

23  two, Mr. Costin.

24          MR. COSTIN:  Yes, sir.

25  A.  Yes, what?

1              MR. COSTIN:  Repeat my question, please?

2              THE COURT:  How long did you work at this place,

3    La Taverna?

4              THE WITNESS:  Approximately one year.

5    Q.  When you worked at El Aguila, did anyone else have the same

6    job title you had?

7    A.  No.

8    Q.  What was your job title?  We didn't ask that.

9    A.  I was in charge of cleaning, maintenance, receiving

10   purchases and little by little work increased.

11   Q.  Did anyone else have those duties besides you?

12   A.  No.

13   Q.  So is it fair to say that your job was important to

14   El Aguila?

15   A.  Right.

16   Q.  And would El Aguila be able to function if you weren't

17   there to do your job?

18   A.  Yes.

19   Q.  And you recognize that.  You knew it was important for you

20   to do your job to the best of your ability.  Is that fair?

21   A.  Yes.

22   Q.  And you enjoyed doing your job because you stayed there for

23   so long.  You were there for at least eight years, right?

24   A.  Right.

25   Q.  Santiago Almonte trusted you to do your job.  Would you

1  agree with that?

2  A.  Yes.

3  Q.  And what about Juan Almonte, did he trust you to do your

4  job?

5  A.  Yes.

6  Q.  And you did your job to the best of your ability.  Is that

7  true, or would you agree with that statement?

8  A.  Of course, I did my job.

9  Q.  And why is that, sir?

10  A.  Because it was my obligation to be there and work.

11  Q.  While you were there, did anyone else do deliveries that

12  you're aware of at El Aguila?

13  A.  Yes.

14  Q.  Who?

15  A.  Was hmm, what's his name.  I do not remember the name.

16  Q.  How many people besides you ever accepted deliveries at

17  El Aguila while you worked there?

18  A.  One, one more.

19  Q.  I'm sorry, is that a total of two or a total of one other

20  person?

21  A.  Only one more person.

22  Q.  Was this person a manager or was he a non-manager?

23  A.  No.  He would just make deliveries.

24  Q.  He made deliveries or he accepted deliveries?

25  A.  He would make them.

1   Q.  Did he work for El Aguila?

2   A.  Yes.

3   Q.  What else did this person do besides make deliveries?

4   A.  He was somewhat -- he was in charge somewhat of helping me

5   with the cleaning.

6   Q.  When did this person work with you?

7   A.  That was around 2013.

8   Q.  When did this person stop working there?

9   A.  Until it closed down.

10  Q.  You had a nickname while you worked there, right?

11  A.  Yes.

12  Q.  What was your nickname?

13  A.  Mexico.

14  Q.  Who is Pedro Pichardo?

15  A.  He was a person in charge in 2008, the manager.

16  Q.  And he was in -- when did he work, do you know?

17  A.  From -- do you mean the schedule or the dates?

18  Q.  I want to know the years that he worked there.

19  A.  He worked there from about 2008 till 2014.

20  Q.  What was his schedule?

21  A.  It was 8:00 in the morning to 8:00 at night.

22  Q.  Was that his schedule from 2008 to 2014?

23  A.  Yes.

24  Q.  Did he supervise you directly?

25  A.  Yes.

1  Q.  Do you know if he kept track of your hours?

2  A.  No.

3  Q.  No you don't know if he kept track of your hours or no, he

4  did not?

5  A.  No, he did not.

6  Q.  Why do you say that?

7  A.  Because I never had a record of when I came in and when I

8  left.

9  Q.  What type of things -- when you say you never had a record,

10  what do you mean by that?

11          THE INTERPRETER:  The interpreter needs clarification

12  as to a noun witness is using.

13

14  A.  That I did not record the schedule of -- the time that I

15  came in or the time that I would leave.

16  Q.  What type of things did Mr. Pichardo ask you to do?

17  A.  Cleaning and to receive purchases.  That was it.

18  Q.  How many people worked at El Aguila in 2008, if you know?

19  A.  During the day, four of us worked there.  And I don't have

20  the number for the night.

21  Q.  What did four people do during the day?

22  A.  One person did the cooking.  Another person would serve.  I

23  used to do the cleaning, and the manager who was in charge of

24  making orders and being there.

25  Q.  During the day time, how would you -- what are the hours

```
 1    during the day time?
 2              MS. ISAACSON:  Objection.  Can we clarify what year
 3    and what he means by during the same time?
 4              THE COURT:  Yes.  Clarify your question.  It's a
 5    little imprecise.
 6    Q.  Sure.  We're still talking about 2008 you said there were
 7    four people who worked during the day time.  What hours do you
 8    consider to be daytime?
 9    A.  From 8:00 -- they worked from 8:00 to 5:00, and I used to
10    work from 8:00 to 8:00.
11    Q.  So a daytime shift is what you -- a daytime shift is 8:00
12    to 5:00, 8:00 a.m. to 5:00 p.m.  Is that what you're saying?
13    A.  8:00 to 5:00.
14              THE COURT:  Can I just ask a question?  Mr. Mendoza,
15    what time would the restaurant open to the public each day?
16              THE WITNESS:  At 11:00.
17              THE COURT:  So when you would come in at 8:00 in the
18    morning, what would you be doing from 8:00 a.m. to 11:00 a.m.
19    before the restaurant was open to the public?
20              THE WITNESS:  Cleaning.  Yes, that.
21              THE COURT:  So your job was to do cleaning from
22    8:00 a.m. to 11:00 a.m. each day?
23              THE WITNESS:  No.  Throughout the entire day, there
24    were other things to do.
25              THE COURT:  You may proceed, Mr. Costin.
```

1   BY MR. COSTIN:

2   Q.  What time did the restaurant close for business in 2008?

3   What time of day?

4   A.  4:00 in the morning.

5   Q.  Did other people come into work at 5:00 at the restaurant.

6   Withdrawn.  Withdrawn.

7           When did other employees come into work at El Aguila

8   in 2008, other than the four people you just mentioned?

9   A.  5:00 in the afternoon.

10  Q.  How many people came in at 5:00 in the afternoon?

11  A.  I don't know exactly how many people.

12  Q.  Was it more than two?

13  A.  Yes.

14  Q.  More than five?

15  A.  Yes.

16  Q.  More than ten?

17  A.  Yes.

18  Q.  More than 15?

19  A.  Yes.

20  Q.  More than 20?

21  A.  I would think so.

22          MS. ISAACSON:  Objection.  Can you clarify if he's

23  talking about employees or customers?

24          THE COURT:  You're talking about customers, aren't

25  you?

1           MR. COSTIN:  No, I'm talking about employees.  Talking

2     about employees.

3           THE COURT:  He may not have understood.

4           MR. COSTIN:  Yes, OK.  Fair.

5     BY MR. COSTIN:

6     Q.  I'm talking about employees.  How many employees would come

7     in to work other than the four people you mentioned to work in

8     El Aguila in 2008.

9     A.  About 15 people.

10    Q.  What time would they come in?

11    A.  They would start coming in at 5:00 in the afternoon until

12    8:00 at night.

13    Q.  Would they leave at 8:00 -- are you saying they would leave

14    at 8:00, those 15 employees?

15    A.  No.  They used to work at night.

16    Q.  Do you know what time they would stop working?

17    A.  At 4:00 in the morning.

18    Q.  How do you know that?

19    A.  Because the restaurant would open at 8:00 in the morning,

20    and it would close at 4:00 in the morning.

21    Q.  Were you present at 4:00 in the morning when these people

22    in the restaurant closed?

23    A.  Yes.  Whenever I worked at night.

24    Q.  So you would stay until 4:00 in the morning?

25          MS. ISAACSON:  Objection.  Can he specify what day

1    he's talking about?

2              THE COURT:  I'm sorry.

3              MS. ISAACSON:  Can he specify what date he's talking

4    about when he says he worked till 4:00 in the morning?

5              THE COURT:  You mean in terms of a time frame?

6              MS. ISAACSON:  Yes, your Honor.

7              THE COURT:  Well, he'll get to that.  I think we're

8    talking more generically first, and then he'll say whether that

9    was in one year or all years, whatever.

10             Let me have the question back to you, Mr. Mendoza.

11             The question is:  Were you present at 4:00 in the

12   morning when the restaurant closed?  Was that the question?

13             MR. COSTIN:  Yes, your Honor.

14             THE WITNESS:  Yes.  Only one day.

15             THE COURT:  One day in all the time you worked there

16   or one day a week?

17             THE WITNESS:  One day a week during the year.

18             THE COURT:  One day a week during a year?  Can you

19   explain what you mean by that?

20             THE WITNESS:  When I was cooking at night.

21             MR. COSTIN:  Going back to -- I'm going back to 2008.

22   I just want you to focus on that.  Actually, let's make it

23   2010.  I believe that you testified in 2010 that you worked

24   from 8:00 a.m. to 8:00 p.m. six days a week.  Is that correct?

25   A.  Yes.

131QJAV1                          Java - Cross

1    Q.  Were you ever in the restaurant at 4:00 in the morning?

2    That's my question.

3              THE COURT:  In 2010?

4              MR. COSTIN:  Yes, in 2010.

5    A.  No.

6    Q.  Did you ever see a written schedule at El Aguila in 2010?

7    A.  No.

8              THE COURT:  When you say written schedule, do you mean

9    a schedule for employees?

10             MR. COSTIN:  For employees, that is correct.

11   A.  No.

12   Q.  How did employees know when they were supposed to work in

13   2010?

14   A.  That I don't know.  Our employers would give us our

15   schedule.

16   Q.  How would your employers give you and your coworkers your

17   schedule in 2010?

18   A.  I was working from 8:00 a.m. until 8:00 p.m.  And the next

19   shift would start at 5:00 p.m.

20   Q.  Do you know how your coworkers would know when they were

21   scheduled to work?

22   A.  No.

23   Q.  Did your coworkers in 2010 tell you that they stayed there

24   until 4:00 the morning, assuming they started at 5:00 p.m.?

25   A.  Yes, that was the time the restaurant would close.

1   Q.  Did anyone tell you that they worked from 5:00 p.m. until

2   4:00 a.m. in 2010?  That's my question, sir.  Did anyone--

3              MS. ISAACSON:  Objection.  Hearsay.

4              THE COURT:  Overruled.

5   A.  No.

6   Q.  Besides the fact that you stated the restaurant closed at

7   4:00 a.m. and you assumed that people worked from 5:00 p.m.

8   till 4:00 a.m., do you have any other basis for believing that

9   people worked those hours in 2010?

10  A.  Yes.

11  Q.  What other basis do you have to reach that conclusion?

12  A.  Why?  Because they were working nights.  They were working

13  nights.

14  Q.  So it's just an assumption on your part.  Is that correct?

15  A.  No, it's not an assumption.

16  Q.  And just one last time.  Any other information that you can

17  give me besides what you just told me to help me understand why

18  you believe your employees worked from 5:00 p.m. until

19  4:00 a.m. in 2010?

20  A.  Yes.  Because that was a disco, and performers would go

21  there, and the rhythm was to be there at night.

22  Q.  Do you know if any employees at El Aguila signed in and

23  signed out during any time that you worked there to report

24  their hours?

25  A.  No.

131QJAV1                          Java - Cross

1    Q.  And your coworkers, between 2010 and 2016, do you know if

2    their schedules varied from week to week or changed from week

3    to week?

4    A.  No.

5    Q.  So that means you're saying that you -- are you saying your

6    schedules were the same week to week or you don't know if the

7    schedules changed?  That's my question.

8    A.  No, I don't know.

9    Q.  Why not?

10   A.  Because I regularly worked more during the day and I don't

11   know who was coming at night.

12   Q.  Now you indicated there was a time between 4:00 -- that you

13   worked from 5:00 p.m. until -- I'm sorry.

14          On direct examination you indicated that there were

15   sometimes that you worked from 7:00 p.m. until 5:00 a.m.  Do

16   you recall that?  In 2012.

17   A.  Yes, from July of 2012 to July of 2013.

18   Q.  Do you recall the names of anyone else that worked the same

19   hours that you worked during that time period?

20          MS. ISAACSON:  Objection.  Can you clarify if he is

21   speaking about the night shift or the day shift during that

22   time?

23          THE COURT:  That time period, the antecedent time

24   period was 7:00 p.m. to 5:00 a.m.  That the question you are

25   asking.  Is that not right?

1          MR. COSTIN:  That's correct, during the next shift.

2     Yes, your Honor.

3          THE COURT:  Do you understand the question,

4     Mr. Mendoza?

5          THE WITNESS:  Yes.

6          THE COURT:  Then please answer it.

7     A.  Well, that schedule was only when I was working one day at

8     night.

9     Q.  I appreciate that.  Thank you.  But my question is did

10    anyone else work that same schedule with you?

11    A.  Yes.

12    Q.  Who?

13    A.  Oh, I don't remember all the names.

14    Q.  Can you tell me some?

15    A.  It might have been Evelyn.  Could have been Desiree.  A lot

16    of people whose names I don't remember.

17    Q.  What did those people do?

18    A.  Serving people, bringing them food and drinks.

19    Q.  Do you know if any of those employees worked any other day

20    besides Sunday?

21    A.  No, I don't know.  I don't know their schedules.

22    Q.  Do you recall seeing them during the weeks when you worked

23    the day shift from time you would come in?

24    A.  Yes.

25    Q.  How many times a week would you see them?

1   A.  One regularly.

2   Q.  So you would see them at least one other time during the

3   course of the week.  Is that what you're saying?

4   A.  Yes.

5   Q.  Would you see them twice, two other days during the week

6   besides that -- withdrawn.  Let me put it a little simpler.

7           You would see them in the restaurant twice during the

8   week once at night when you worked with them and once during

9   the day shift.  Is my understanding correct?

10  A.  No, because usually they, the night people would come in at

11  night.

12  Q.  When you left there, when the night people would come in --

13  excuse me.  When you worked during the day between 20 -- in

14  2012 and 2013, you would see the night people come in.  Is that

15  fair to say?

16  A.  Yes.

17  Q.  So my question to you is, you worked five days during the

18  week -- you worked five days during the week during the day

19  shift, right, in 2012?

20  A.  Yes.

21  Q.  How many times would you see people who worked the night

22  shift with you on Sunday during the day shift?  Actually,

23  withdrawn.  Let me make it a little clearer.

24          How many times during the course of a week would you

25  see the night shift people coming who worked with you in the

1    restaurant?

2    A.   During the year that I worked nights?

3    Q.   Yes, during the year that you worked nights, how often

4    would you see your coworkers who worked a full night shift with

5    you on another day that you worked?

6    A.   One day a week.

7    Q.   One day a week and that would --

8              THE COURT:  Mr. Costin, how much more do you have,

9    would you say ballpark, for your cross?

10             MR. COSTIN:  If I don't get bogged down, Judge, it

11   might just be a little while.

12             THE COURT:  I don't know what that means.

13             MR. COSTIN:  Yeah, I know.

14             THE COURT:  If you don't get bogged down, it will take

15   you a little while; but if you do get bogged down, then it

16   won't take you a little while?  That doesn't make any sense.

17             MR. COSTIN:  Yes, totally superfluous, Judge.

18             THE COURT:  Ten minutes?  A half an hour?  I'm trying

19   to figure out when we should take our morning break.  If you

20   are going to be done in 10 or 15 minutes, I will let you

21   finish.  If you have a half an hour or more, we will take a

22   break now.

23             MR. COSTIN:  I have more than that, your Honor.

24             THE COURT:  You have more than what?

25             MR. COSTIN:  I have more than half an hour, your

131QJAV1                          Java - Cross

1    Honor.

2              THE COURT:  You have more than half an hour?

3              MR. COSTIN:  I think so.

4              THE COURT:  OK.  I'll be interested to hear because

5    you can't go too far outside the scope of direct, right?

6              All right.  Let's take our morning recess.

7              (Recess)

8              THE COURT:  You may proceed, Mr. Costin.

9              MR. COSTIN:  Sure.

10   BY MR. COSTIN:

11   Q.  During the time that you worked at El Aguila, are you aware

12   of any employee that received overtime?

13   A.  No.

14             THE COURT:  When you say "received overtime," can you

15   be a little bit more precise with the question?

16   Q.  Are you aware of anyone at any time during the time that

17   you worked at El Aguila that worked more than 40 hours in a

18   one-week period?

19   A.  No.

20   Q.  Santiago Almonte was a manager during the time you worked

21   at El Aguila.  Is that correct?

22   A.  Yes.

23   Q.  Did he ever give you specific work instructions?

24   A.  Yes.

25   Q.  What did he tell you to do during the time that you worked

131QJAV1                          Java - Cross

1   at El Aguila?

2   A.  What I had to do as my job and the schedules and my pay,

3   the pay.

4   Q.  You indicated that Santiago and Juan Almonte were partners.

5   Is that right?

6   A.  Yes.

7   Q.  How do you know that?

8   A.  Because Santiago told me that Juan was his brother and his

9   partner.

10  Q.  When did he tell you that?

11  A.  When Juan Almonte came to work at El Aguila.

12  Q.  How many times did Santiago Almonte tell you that he was an

13  owner or partner with Juan Almonte?

14  A.  Once.

15  Q.  What year?

16  A.  Might be in 2013, yes.

17  Q.  Did you see any of the business paperwork that would

18  indicate who the owners of the business actually are?

19  A.  No.

20  Q.  When did Santiago Almonte tend to be in the business

21  between 2010 and 2016?  When would he be inside of El Aguila?

22          THE INTERPRETER:  For the interpreter, did you say

23  Santiago Almonte?

24          MR. COSTIN:  Yes.

25  A.  He was usually there at night.  During the day sometimes

1    twice a week.

2    Q.  In El Aguila, did you ever see a poster that talked about

3    the minimum wage?

4    A.  Yes.

5    Q.  Where was that poster, sir?

6    A.  On the wall.

7    Q.  The wall where?  Which wall?  Be more specific, please.

8    A.  Across from the bar.

9    Q.  Did you ever look at it?

10   A.  Yes.

11   Q.  Was it in Spanish?

12   A.  No.

13   Q.  What language was it in, sir?

14   A.  In English.

15   Q.  How do you know it was a minimum wage poster?

16   A.  Because I read some English, and I used to clean the frame.

17   Q.  Did you understand what the poster was saying, sir?

18   A.  Almost all of it.

19   Q.  When was the first time you saw that minimum wage poster?

20   A.  I believe it was in 2013.

21   Q.  In 2013 when you saw that poster, did you believe you were

22   being paid properly?

23   A.  No.

24   Q.  Did you say anything to anyone about that?

25   A.  No.

1    Q.  Did you do anything to correct the improper wages you

2    believed you were receiving?

3    A.  No.

4    Q.  Did you see that poster in 2014, sir?

5    A.  Yes.

6    Q.  And did you see it in 2015 and 2016, sir?

7    A.  Yes.

8    Q.  During that four-year time frame, did you believe that you

9    were not being paid properly?

10   A.  Yes.

11   Q.  Did you speak to anyone about that?

12   A.  No.

13   Q.  Now, isn't it true that during the time that you didn't

14   work -- isn't it true that in 2010 right before 2010, 2009,

15   2010, you were not an employee of El Aguila?

16   A.  No, I was an employee.

17   Q.  Didn't you leave El Aguila for about a year to work

18   someplace else in about 2009?

19   A.  Yes.

20   Q.  Where did you go, sir, do you recall?

21          MS. ISAACSON:  Objection to this line of questioning

22   as irrelevant as it is before the statute of limitations.

23          THE COURT:  It is before the statute of limitations,

24   Mr. Costin, right?  Isn't the statute of limitations 2010 here?

25          MR. COSTIN:  Yes, it is, your Honor.

1          THE COURT:  What difference does it make where he
2    worked in 2009?
3          MR. COSTIN:  Your Honor, just two questions, and I
4    will move on, if I might.
5          THE COURT:  Two questions.  I'm going to count them.
6          MR. COSTIN:  No problem.
7    Q.  What was my last question?
8          THE COURT:  Where did you go?
9    Q.  Where did you work?
10         THE COURT:  Where did you work?
11   A.  I worked in -- around here in Manhattan.
12         MR. COSTIN:  I'll move on, your Honor.
13   Q.  Isn't it true that after you got off of work from
14   El Aguila, you would sit at the bar and drink beer?
15         MS. ISAACSON:  Objection.  Irrelevant, and it's beyond
16   the scope of direct.
17         THE COURT:  Overruled.
18         MS. ISAACSON:  And also what time period is he
19   speaking about?
20         THE COURT:  Overruled.  Please answer the question.
21         THE INTERPRETER:  May the interpreter interpret the
22   question, your Honor?
23         THE COURT:  Yes.
24         (Question interpreted)
25   A.  Yes.

131QJAV1                        Java - Cross

1   Q.  How many beers would you consume after you got off from

2   work while sitting at the bar?

3   A.  Maybe six?

4           THE COURT:  When are we talking about?

5           MR. COSTIN:  That was going to be my next question.

6   Q.  What time period are we talking about?  Did you do this in

7   2010?

8   A.  No.

9   Q.  When were you drinking six beers at the bar after work,

10  what years?

11  A.  From 2013 to 2016.

12  Q.  And you would do this six days a week or every day after

13  work, correct?

14  A.  No.

15  Q.  How long would you stay at the bar after you -- how long

16  would you stay in the bar after you finished work in 2013 to

17  2016?

18  A.  20 to half an hour.

19  Q.  Would you drink beer during the day during your shift at

20  any time you worked at El Aguila?

21  A.  Yes.

22  Q.  What years did you drink beer while you were at work?

23  A.  In 2013.

24  Q.  Are there any other years besides 2013 that you would drink

25  beer while you were working?

131QJAV1                          Java - Cross

1    A.  Yes, in 2015.

2    Q.  What about 2014?

3    A.  I wouldn't regularly do it.

4          THE COURT:  You wouldn't regularly do it in 2014?  Is

5    that what your testimony is?

6          Because Mr. Costin's question was specifically about

7    2014.  You just said -- you testified in 2013 and 2015 that you

8    drank beer while you worked.  What about 2014?

9          THE WITNESS:  Because I was under medical treatment.

10   I was under a lot of medication.

11         THE COURT:  In 2014?

12         THE WITNESS:  Mmm-hmm.

13         THE COURT:  So you drank beer regularly during your

14   job during 2013 and 2015 but not in 2014 because of a medical

15   condition?

16         THE WITNESS:  Yes.

17         THE COURT:  What about 2014 until July when you left?

18         THE WITNESS:  Then too.

19         THE COURT:  "Then too" meaning you drank beer while

20   you were working during that period, 2014?

21         THE WITNESS:  After work.

22         THE COURT:  No.  Mr. Costin was asking several

23   questions of you about drinking beer while you were on the job.

24   Did you not understand that?

25         THE WITNESS:  Yes.

131QJAV1                          Java – Cross

1                  THE COURT:  You understood that?

2                  THE WITNESS:  Yes.

3                  THE COURT:  So what about 2016?  Did you drink beer

4    while you were on the job in 2016?

5                  THE WITNESS:  Yes.

6                  THE COURT:  All right, Mr. Costin, go ahead.

7    BY MR. COSTIN:

8    Q.  What about 2012, did you drink beer while you were working

9    in 2012?

10   A.  No.

11   Q.  What about 2011?

12   A.  Not then either.

13   Q.  What about 2010?

14   A.  Not then either.

15   Q.  How many beers would you drink in 2013 while you were at

16   work?

17                 THE COURT:  You mean on a given day?

18                 MR. COSTIN:  On a given day, yes.

19   A.  Three max.

20   Q.  Where would you go -- where would you drink the beer on any

21   given day in 2013?

22   A.  Right there at the bar.

23   Q.  You would sit at the bar while you were at work and drink

24   beer?

25   A.  No, not while at work.

131QJAV1                          Java - Cross

1    Q.  You testified a few moments ago that during your workday in

2    2013, you would consume three beers.  My question, to you, sir,

3    is at what point in time while you were supposed to be at work

4    were you drinking beers?

5    A.  When people would come to eat lunch.

6    Q.  And you're saying you would sit down at the bar and consume

7    three beers while people -- while customers were in the

8    restaurant eating lunch?

9    A.  I would never sit there.

10   Q.  Then please explain to me where you physically consumed the

11   beers when you were supposed to be at work.  That's my

12   question.

13   A.  I would have the beer at the bar because many people would

14   come in, taxi drivers and people that I had gotten to know.  So

15   they would invite me to a beer, but I would drink it while

16   walking and working.

17   Q.  Are you aware of any other employees at El Aguila that

18   would walk around and drink beer while they were working?

19   A.  Yes.

20   Q.  Who?

21   A.  There was Pedro Pichardo.  There was one that they used to

22   call Chago or someone else, they call him Chago.

23   Q.  Pedro Pichardo is a manager, correct?

24   A.  Yes.

25   Q.  And Chago, what does Chago do?

1    A.  Night manager.

2    Q.  Are you aware of anyone else besides those two that walked

3    around while they were supposed to be working and drink beer?

4    A.  Yes, usually everyone.

5    Q.  You're saying that at any given -- that you saw at least

6    every employee that worked at El Aguila drink a beer while they

7    were scheduled to be working?

8    A.  Yes.

9    Q.  Did all employees drink beer frequently -- how often in the

10   course of a day would you see an employee drink beer while

11   they're supposed to be working?

12   A.  Regularly, it was every day.

13   Q.  Do you know if they paid for these beers?

14        THE INTERPRETER:  For the interpreter, do you know if

15   they paid for these beers?

16        MR. COSTIN:  Yes.

17   A.  No, they did not pay.

18   Q.  Did you pay for your beers?

19   A.  No.  Those that invited me to one would pay for it.

20   Q.  Any idea how many beers your coworkers would drink during

21   their work shifts?

22   A.  No, I honestly don't.

23   Q.  Now, you said you also cooked for El Aguila, correct?

24   A.  Yes.

25   Q.  And I believe you said it was when you worked at night.

131QJAV1                          Java - Cross

```
 1    A.  Yes, only at night.

 2    Q.  Were you ever -- did you ever receive a certificate from

 3    the New York City Department of Health to cook or prepare food?

 4    A.  No.

 5    Q.  Were there any other cooks working at night with you?

 6    A.  Yes.

 7    Q.  Who?

 8    A.  Several that went through there.  Many cooks.

 9    Q.  Can you give me the name of someone?

10    A.  One is called Rafael -- two were called Rafael.  Another

11    one is Antonio.  Another one used to be called El Nene and --

12    Q.  Did you ever cook for taxicab drivers?

13    A.  Yes.

14    Q.  Did you make special food just for them?

15    A.  Yes.

16    Q.  And this is food that wasn't on the menu, right?

17    A.  Right.

18    Q.  And this is food that the El Aguila did not -- El Aguila

19    did not receive any money for the food that you gave to these

20    cab drivers.  Is that right?

21    A.  They would pay.

22    Q.  Who would they pay?

23            THE INTERPRETER:  Whom did they --

24    Q.  Who did they pay?

25    A.  To those that collected payment.
```

1   Q.  And you bought in ingredients to make the food, right?  You

2   brought in ingredients to make the food for the cab drivers?

3   A.  Sometimes.

4   Q.  How many times were you sent home because you were

5   intoxicated at work?

6   A.  Never.

7   Q.  How many times were you ever sent home by any manager for

8   any reason during your time at El Aguila?

9   A.  Never.

10  Q.  Did Pedro Pichardo ever send you home early?

11  A.  Once he did.

12  Q.  Why?

13          THE INTERPRETER:  Why?

14          THE COURT:  I thought you said when, right?  Did you

15  say when or why?

16          MR. COSTIN:  Just now I said why.

17          THE COURT:  I'm sorry, why?

18          THE INTERPRETER:  May the interpreter confer with her

19  colleague, please, your Honor?

20          (Interpreters confer)

21          THE INTERPRETER:  Your Honor, the interpreter needs to

22  clarify a term that the witness has used.  May the interpreter

23  confer with the witness?

24          THE COURT:  Yes.

25  A.  He was up all night -- and the witness has used a term that

1    if interpreter verbatim means he was electrical and as the

2    interpreter has conferred with the witness, the witness has

3    explained that he was hung over.

4    Q.  When was that, sir?

5    A.  I don't quite recall.  2012?

6    Q.  Did Santiago Almonte ever send you home for any reason?

7    A.  No.

8    Q.  And what about Juan Almonte?  Did he ever send you home for

9    any reason at any time during your employment?

10   A.  No.

11   Q.  Did any manager -- did any other manager ever send you home

12   for any reason at any time during your employment with

13   El Aguila?

14   A.  No.

15   Q.  And were you ever suspended at all during your time at

16   El Aguila?

17   A.  No.

18              THE COURT:  I have a question.  Did you have any

19   vacations while you worked for El Aguila from 2010 to 2016?

20              THE WITNESS:  No.

21              THE COURT:  Did you have any days off for holidays?

22              THE WITNESS:  No.

23              THE COURT:  Was the restaurant open on Thanksgiving

24   Day, for example?

25              THE WITNESS:  Yes.

131QJAV1                           Java - Cross

1              THE COURT:  Was it open on Christmas Day?

2              THE WITNESS:  Yes.

3              THE COURT:  And you worked on both of those days?

4              THE WITNESS:  Yes.

5              THE COURT:  And New Year's Day as well?

6              THE WITNESS:  Yes.

7              THE COURT:  So your testimony is that in six years,

8    from 2010 to 2016, you never had a day off for a holiday or for

9    a vacation?

10             THE WITNESS:  Only when I got sick.

11             THE COURT:  When was that?

12             THE WITNESS:  In 2015.

13             THE COURT:  How long were you out due to medical

14   reasons?

15             THE WITNESS:  One week.

16             THE COURT:  You may proceed, Mr. Costin.

17   BY MR. COSTIN:

18   Q.  Isn't it true that you missed time from work in 2016

19   because you were shot?

20             THE INTERPRETER:  Because you were --

21   Q.  Shot by a gun.

22   A.  2015.

23   Q.  You were shot in 2015?

24   A.  Yes.

25   Q.  Now, you indicated earlier that in 2014 you were under

1    medical treatment.  Did you miss time from work in 2014 due to

2    your health issue?

3    A.  No.

4    Q.  Were you ever late coming to work?

5    A.  No.

6    Q.  Did your managers every express concern to you about not

7    being able to find you during the workday?

8    A.  No.

9    Q.  Sir, your testimony is that Pedro Pichardo, Santiago

10   Almonte and Juan Almonte never talked to you about not being

11   able to find you during the work day?

12   A.  No.

13   Q.  Who is Margarita Carasquillo?

14   A.  She's a customer.

15           THE COURT:  A customer of the restaurant?

16           THE WITNESS:  Yes.

17   Q.  At El Aguila specifically, is that right?

18   A.  Yes.

19   Q.  Did you ever see her outside of the restaurant, El Aguila?

20   A.  Yes.

21   Q.  When did you see her?  Let me rephrase.  Under what

22   circumstances would you see her?

23   A.  When she was bringing the --

24           THE INTERPRETER:  The interpreter would like to

25   clarify.

1              Interpreter's correction.  When I was bringing

2     deliveries to her house.

3     Q.  When were you bringing deliveries to her house?

4     A.  At lunchtime.

5     Q.  Is this a house or an apartment?

6     A.  An apartment.

7     Q.  And this is the apartment right next to El Aguila, correct?

8     A.  Yes.

9     Q.  How long would it take for you to make that delivery?

10    A.  From 10 to 15 minutes.

11    Q.  How long would you stay inside the apartment where

12    Ms. Carasquillo lived?

13    A.  For ten to 15 minutes.

14    Q.  What years did you make these deliveries?

15    A.  2014.

16    Q.  Any other years besides 2014, sir?

17    A.  No.

18    Q.  Would you ever see her in the restaurant -- what years did

19    you see her inside the restaurant, if any?

20    A.  Like from 2010 until 2016.

21    Q.  How many days a week would you see her inside of the

22    restaurant during that time period?

23    A.  Almost every day.

24    Q.  What was your cell number in 2010 and 2016, if you recall?

25              MS. ISAACSON:  Objection.  What's the relevance of

```
 1   this?

 2            THE COURT:  Overruled.  Subject to connection, I'll

 3   allow it.

 4   A.  My phone number?

 5   Q.  Yes, sir.

 6   A.  It's the same one I have now.

 7   Q.  What number is that, sir?

 8   A.  (347) 337-8536.

 9   Q.  Did you call Ms. Carasquillo using your cell phone?

10   A.  Yes.

11   Q.  Why, sir?

12   A.  Because we had a friendship.

13   Q.  What do you mean by friendship?

14   A.  A friendship which ended in love.

15   Q.  What do you mean by that, sir?

16   A.  Sexual relations.

17   Q.  And when did this occur?

18   A.  In 2014.

19   Q.  When else did it occur?

20   A.  Just then.

21   Q.  When would you see Ms. Carasquillo in 2014 socially?

22   A.  At lunch time.

23   Q.  How long would you be with Ms. Carasquillo at lunchtime?

24   A.  For 10 to 15 minutes.

25   Q.  Now, you said that this was a sexual relationship, correct?
```

1   A.  Yes.

2   Q.  How long would you spend -- when would you spend -- when

3   would you have sex with Ms. Carasquillo?

4   A.  When or at what time?

5   Q.  Well, what time?  What time of day?

6   A.  At lunchtime.

7   Q.  And that would last about 10 to 15 minutes?

8   A.  Yes.

9   Q.  Would you bring Ms. Carasquillo things besides yourself and

10  food during lunchtime in 2014?

11  A.  Yes.

12  Q.  What else would you bring?

13  A.  Toilet paper and drinks.

14  Q.  What type of drinks, sir?

15  A.  Beer.

16  Q.  Would you consume any beer while you were with her?

17  A.  No.

18  Q.  Did you give her cash?

19  A.  Yes.

20  Q.  How much money would you give her?

21  A.  $20.

22  Q.  Would you bring her a MetroCard?

23  A.  No.

24  Q.  Would you bring these things -- how many times a week would

25  you see her in 2014 in a social setting?

1    A.  Once a month.

2    Q.  How often would you have sex with Ms. Carasquillo in 2014?

3    How many times in the course of a month?

4    A.  Once.

5    Q.  Once a month?

6    A.  Yes.

7    Q.  Where would you -- and where would you have sex?  Would it

8    be in her apartment or someplace else?

9    A.  In her apartment.

10   Q.  Why did the relationship end?  Actually, withdrawn.  Did

11   the relationship end?

12   A.  Yes.

13   Q.  Why?

14   A.  Because she was difficult.

15   Q.  Who is Melena?

16   A.  That's my wife.

17   Q.  When did you marry her?

18          MS. ISAACSON:  Objection.  When is the relevance of

19   when he married his wife?

20          THE COURT:  Yes, I think we're getting a little far

21   afield here, Mr. Costin.

22          MR. COSTIN:  I will ask one more question instead.

23          THE COURT:  You don't have to answer the question

24   that's pending.

25          Ask a different question.  Get to whatever you're

1   getting to in the next question.

2   BY MR. COSTIN:

3   Q.  Did your wife and Ms. Carasquillo have an argument about --

4            MS. ISAACSON:  Objection.  What is the relevance?

5            THE COURT:  I really don't know.  I really don't know.

6            MR. COSTIN:  That's the only question, Judge, I have

7   on this matter, but I'll move on, your Honor.

8            THE COURT:  Why don't you move on.  I don't think it

9   sheds enough light to warrant our going down this road any

10  further than you have.

11           MR. COSTIN:  Yes, sir.

12           THE COURT:  Next.

13  BY MR. COSTIN:

14  Q.  The work that you did at Las Banderas, that consisted of --

15  tell me what you did at Las Banderas, please.

16  A.  I did cleaning and I received purchases.

17  Q.  When you say received purchases, you mean deliveries for

18  the bar and restaurant for Las Banderas?

19  A.  Yes.

20           THE COURT:  Are we getting close, Mr. Costin?  It's

21  been another 45 minutes.  Your cross has tripled the length of

22  the direct.

23           MR. COSTIN:  Your Honor, believe it or not, you read

24  my mind.  Just give me one moment.  I just want to talk to my

25  client.  Thank you for your patience.

```
 1              THE COURT:  OK.
 2              (Pause)
 3   Q.  I have a question.  Is it possible to go from the basement
 4   of El Aguila to -- is there a back door connected to the
 5   basement of El Aguila that leads to the back of the building?
 6   A.  Yes.
 7   Q.  And that leads to parking lot, correct?
 8   A.  Yes.
 9   Q.  And Ms. Carasquillo's apartment is directly accessible from
10   the parking lot, is that correct?
11              MS. ISAACSON:  Objection again.  I don't know why that
12   is relevance.
13   A.  Yes.
14              THE COURT:  Hold on a second.  Let me just say
15   something going forward.  We have a question.  We have an
16   interpreter interpreting, and if you're objecting while she's
17   interpreting, I can't hear everything, OK?  So when the
18   interpreter finishes interpreting, then object before he
19   answers, not while the interpreter is interpreting.  What's the
20   objection.
21              MS. ISAACSON:  Why is it relevant where is the
22   location or how to get to Ms. Carasquillo's apartment from the
23   parking lot?
24              THE COURT:  Overruled.  You must answer.
25              THE INTERPRETER:  The interpreter is not sure if the
```

1    entire question got interpreted.  I can see it from the

2    screen -- actually, the interpreter would request the question

3    be repeated, please.

4              MR. COSTIN:  Can you read it pack, please.

5              THE COURT:  I'll read it.

6              "Is it possible to go from the basement of El Aguila,

7    is there a back door connected to the basement" -- no you

8    answered that one.  I'm sorry.

9              "Is Ms. Carasquillo's apartment directly accessible

10   from the parking lot?"

11             THE WITNESS:  No.

12             MR. COSTIN:  No further questions, your Honor.

13             THE COURT:  All right.  Redirect.

14             MS. ISAACSON:  No further questions.

15             THE COURT:  All right.

16             Mr. Mendoza, you may step down.

17             (Witness excused)

18             THE COURT:  Any other witnesses, Ms. Isaacson?

19             MS. ISAACSON:  No, your Honor.  Plaintiff closes.

20             THE COURT:  Plaintiff what?

21             MS. ISAACSON:  Closes.

22             THE COURT:  You mean you rest?

23             MS. ISAACSON:  Yes, we rest.

24             THE COURT:  You might be closing later, but you're

25   resting now.

1           Mr. Costin, your turn.

2           MR. COSTIN:  I'd like to make a motion to dismiss at

3    this time, your Honor.  I believe the plaintiff has not met its

4    burden at trial.

5           THE COURT:  I'm happy to hear the argument, but I'm

6    not sure why you think that is so.  Go ahead.

7           MR. COSTIN:  Sure, your Honor.

8           The plaintiff has not indicated -- I'll withdraw.

9    I'll withdraw, your Honor.  I'll withdraw.  I'm not sure I can

10   make -- I'm not going to waste your time with this.

11          THE COURT:  Very well.  Then call your witness.

12          MR. COSTIN:  Pedro Pichardo, your Honor.  He's out in

13   the hallway.  May I get him, please?

14          THE COURT:  Yes.

15    PEDRO W. PICHARDO,

16        called as a witness by the Defendant,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. COSTIN:

20          THE COURT:  You may be seated.

21          Mr. Costin, you may proceed.

22   Q.  Did you ever work for a business called El Aguila Bar and

23   Restaurant?

24   A.  Yes.

25   Q.  When did you work there, sir?

1    A.  I worked there from 2008 until 2014.

2    Q.  What was your job title?

3    A.  Manager.  Day manager.

4    Q.  What were your job duties?

5    A.  My duties were to make purchases, to pay for the purchases,

6    to place orders, and to supervise the morning employees.

7    Q.  What hours -- did you have -- what was your schedule in

8    2010?

9    A.  9:00 to 5:00.

10   Q.  Did your schedule change at any time between 2010 and 2016?

11          THE COURT:  Well, he said he only worked until 2014.

12          MR. COSTIN:  2014.  Thank you, Judge.

13   A.  I think it was only -- it only changed in March more or

14   less for two weeks when I worked nights in 2014.

15   Q.  What days of the week did you -- generally what days of the

16   week did you work besides that night shift?

17   A.  Well, I worked on Mondays -- well, that is five days a

18   week.

19   Q.  What days did you not work?

20   A.  On Tuesdays and sometimes Wednesdays, but that changed

21   starting in 2012.

22          MR. COSTIN:  One moment, your Honor, please.

23          (Pause)

24   Q.  What happened in 2012?

25   A.  Well, that's because in 2012, Mexico -- that's what we

131QJAV1                          Pichardo - Direct

1    called Florencio, we called him Mexico -- he had been working

2    Mondays and then -- Mexico was working Sunday nights, so then I

3    started working on Mondays.

4              THE COURT:  Hold on one second.  I'd like the

5    interpreter to tell the witness that he needs to speak in short

6    phrases or sentences so that it's easier for you to interpret.

7    And he can't talk too fast, otherwise, you won't be able to

8    keep track of him.

9              Do you understand, sir?  Thank you.

10             You may proceed.

11

12   BY MR. COSTIN:

13   Q.  Do you know Florence Mendoza Java?

14   A.  Yes.

15   Q.  Is he seated in this courtroom right now?

16   A.  Yes.

17   Q.  Just identify an article of clothing he is wearing.

18   A.  Well, he has a shirt and he has a kind of beige-colored

19   jacket and a purple shirt.

20             THE COURT:  I don't think there is any issue that he's

21   identifying the plaintiff, is there?

22             MS. ISAACSON:  No.

23             THE COURT:  The record should reflect the witness

24   identified the plaintiff as the plaintiff.

25   BY MR. COSTIN:

1   Q.  Did Mr. Java work with you?

2   A.  Yes.

3   Q.  What was your work relationship -- were you his supervisor?

4   A.  Yes.

5   Q.  What type of things did you instruct Mr. Java to do?

6   A.  His duties were to clean the ballroom from 9:00 until -- or

7   the barroom from 9:00 until 11:00.  And after that, like after

8   12:00 to do deliveries.  And sometimes when there were things

9   missing or that had run out in the kitchen, the cook would send

10  him down to the basement to get something.

11  Q.  Did he ever cook during the time that he was working with

12  you during the day?

13  A.  Sometimes he would make like appetizers, like Mexican food,

14  and he would give it to you to taste, and there were also some

15  taxi drivers he would give that to.  No one gave him orders to

16  do it.  He would just do it to make me happy and -- and the

17  taxi drivers.  Nobody ordered him to do any of that.

18  Q.  Did El Aguila make any money whenever he gave this food to

19  the taxi drivers?

20  A.  No.

21  Q.  Do you know if any sales were rung up every time he gave

22  money to the taxicab drivers?

23          THE COURT:  Every time he gave what to the taxicab

24  drivers?

25  Q.  Every time he gave food.  Excuse me.  Every time he gave

1   food to the taxicab drivers.

2   A.  No.

3   Q.  Basic question I should have asked earlier:  What were the

4   hours of operation of El Aguila in 2010?

5   A.  It would open to the public sometimes between 10:00 and

6   11:00 a.m. until 4:00 a.m.

7   Q.  What time would you expect Mr. Java to be there?

8   A.  Please repeat that question.

9              (Question repeated)

10  A.  He came in at 8:00.

11  Q.  What time was he supposed to leave?

12  A.  4:00.

13  Q.  Was that his schedule in 2010?

14  A.  Yes.

15  Q.  Did his schedule ever change during the time that you

16  worked there?

17  A.  After 2012.

18  Q.  When he came in at 8:00, was he always supposed to leave at

19  4:00 p.m.?

20  A.  Yes.

21  Q.  Do you know why?

22  A.  That's what they, Mr. Juan Almonte, told all of us when we

23  started to work for the company.

24  Q.  When you say "they," who did Mr. Juan Almonte say this to?

25  A.  He told me.  Mr. Juan Almonte told me what my schedule

1    would be when I started working, and he also told Mr. Mendoza

2    what his schedule would be when he started working, and he also

3    told me the schedule.

4    Q.  Was the schedule ever written down?

5    A.  No.

6    Q.  Did everyone have a fixed schedule?

7    A.  Yes.

8    Q.  When I say everyone, I'm talking about people that worked

9    with you between the hours of 8:00 a.m. and 4:00 p.m.

10   A.  Yes.

11   Q.  Do you know if the employees signed in and out when they

12   came to work?

13   A.  Not in the beginning of 2010.

14   Q.  Did there ever come a time that employees signed in and

15   out?

16   A.  Yes, but by then I wasn't at the company.

17   Q.  Do you know if any employees during the time that you

18   worked for El Aguila worked more than 40 hours in the course of

19   a week?

20   A.  No.

21   Q.  Did you ever discipline Mr. Java Mendoza?

22   A.  Yes.

23   Q.  Please tell us about that.

24   A.  Well, he liked to drink.  Sometimes when he would go to the

25   basement, he would drink in hiding downstairs.  And sometimes

1  also in the bathrooms he would drink, and he would hide the

2  beers in the bathrooms.  In fact, even Mr. Juan Almonte, I had

3  told him this, and he also discovered his bottles sometimes.

4  Q.  So did you discipline him for this?

5  A.  Yes.  Sometimes whenever I sensed that he was drunk, I'd

6  send him home because he was somewhat aggressive, and he -- he

7  would use foul language.

8  Q.  Between 2010 and 2014, about how many times did you send

9  him home because he was drunk?

10         THE INTERPRETER:  2010 and 2000 --

11         MR. COSTIN:  14.

12  A.  I don't have an exact amount.

13  Q.  More than ten times?

14         THE INTERPRETER:  Interpreter needs clarification.

15  A.  Well, it -- I could say perhaps less than 20 times.

16  Q.  More than 15 times?

17  A.  I would not be able to specify.

18         THE COURT:  Is there anything in writing that you're

19  aware of that would reflect the times that you sent him home?

20         THE WITNESS:  That's exactly why I do not know because

21  it was never in writing.

22         THE COURT:  So this is just based on your memory?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  You may proceed, Mr. Costin.

25  BY MR. COSTIN:

131QJAV1                        Pichardo - Direct

1    Q.   Would you see Mr. Java in the restaurant after he got off

2    of work at 4:00 p.m.?

3    A.   Yes.

4    Q.   What would he be doing, sir?

5    A.   He would grab a beer from the refrigerator, and he would

6    drink it.

7    Q.   Where would he drink the beer?

8            THE INTERPRETER:   The interpreter needs clarification.

9    A.   At the counter.  At the counter.  You see, there's the bar

10   and there are chairs there.

11   Q.   How long would he stay at the bar?

12   A.   He'd stay there for a while.  Sometimes he'd leave and then

13   come back.

14   Q.   When you say "awhile," can you give us an idea in terms of

15   amount of time?

16   A.   Time as to hours or days?

17   Q.   Well, why don't we talk about hours.

18   A.   He would have a couple, and then he would leave, and then

19   he would come back, and since I lived near the restaurant, I

20   would then see him again at 5:00 or so.  He would come back, he

21   would come back and he was drunk.

22   Q.   How late would he stay at the bar?

23   A.   Hmm, I wouldn't be able to say exactly because sometimes

24   I'd leave.

25   Q.   Did you ever see him at the bar at 6:00?

1    A.  Yes.

2    Q.  Did you ever see him at the bar at 7:00 at night?

3    A.  Yes.

4    Q.  What about 8:00 at night?

5    A.  I could say that sometimes.

6    Q.  What about 9:00, 9:00 at night?

7    A.  9:00, I don't believe so.

8    Q.  How many days a week would you see him at the bar after

9    work?

10   A.  Three to four times.

11   Q.  Did this behavior occur in 2010?

12   A.  Not that many times.

13   Q.  What about 2011?

14   A.  Then too.

15   Q.  Meaning not too many times in 2011?

16   A.  Yes.

17   Q.  What about 2012?

18   A.  Well, that's when it started to change.  He used to drink.

19   He would drink every day.

20   Q.  In 2012, he began to drink every day?

21   A.  Yes.

22   Q.  What about 2013?

23   A.  Then too.

24   Q.  What about 2014?

25   A.  Then too.

1   Q.  And do you recall approximately when he began to drink

2   every day in 2012?

3   A.  He used to drink from the moment he would start going

4   downstairs to the basement.  Sometimes he would come upstairs,

5   and he smelled like beer but he wasn't drunk.

6   Q.  Did he ever drink at the bar during the working hours?

7   A.  Yes.

8   Q.  So he would sit at the bar and drink during the hours he

9   was scheduled to work?

10  A.  Yes, because sometimes, you see, with the taxi drivers, you

11  know, he would prepare the pico de gallo and they would order

12  and --

13          THE INTERPRETER:  The interpreter needs to clarify a

14  term.

15  A.  They would ask for a six-pack, and since everyone there

16  was, you know, like a family, they would just share it.

17  Q.  Do you recall seeing any other employees drinking beer

18  during their scheduled work hours between the hours of

19  8:00 a.m. and 5:00 p.m.?

20  A.  Yes.

21  Q.  Did Mr. Java's drinking get worse when he started working

22  nights in 2012?

23  A.  One could say so.

24  Q.  Do you know how El Aguila employees were paid during the

25  time that you worked at El Aguila?

131QJAV1                        Pichardo - Direct

1   A.  They were paid in cash, and afterwards, around 2012 or '13,

2   they started to be paid by check.

3   Q.  Who was responsible for that?

4   A.  Mr. Juan Almonte.

5   Q.  Why do you say that?

6   A.  Because he was the one who used to pay us.

7   Q.  Did Santiago Almonte have a role with pay?

8   A.  That would be a question for Mr. Juan Almonte.

9   Q.  During the time that Mr. Java worked for you, did there

10  ever come a time that you could not locate him during the work

11  hours, during his scheduled work hours?

12          MS. ISAACSON:  Objection, leading.

13  A.  Yes.

14          THE COURT:  Just one second.  Don't answer yet.  Let

15  me see the question.

16          Overruled.  You may answer.

17  A.  Would you please repeat the question?

18          THE COURT:  The question is:  During the time that

19  Mr. Java -- you keep calling him Mr. Java, but he was referring

20  to himself as Mr. Mendoza, I think, but I assume we're talking

21  about the same person.

22          During the time that Mr. Java worked for you, did

23  there ever come a time that you could not locate him during the

24  work hours, during his scheduled work hours?

25  A.  Yes.

131QJAV1                          Pichardo - Direct

1    Q.  Tell us about those times, please.

2    A.  Sometimes when he would finish cleaning the hall, you know,

3    which is the area where the customers are, and then he would go

4    downstairs to the basement to set something up or to organize

5    something, and then there was a delivery or something like

6    that, and then I would go downstairs looking for him, and I

7    couldn't locate him, he would leave through the back door.

8    Q.  How many times in a -- when did this behavior begin?

9    A.  It started around 2010, 2011, 2012, 2013.  He would leave

10   out the back.  He would leave without saying anything, without

11   notifying me.

12   Q.  How long would he be missing or unaccounted for?

13   A.  About an hour.  He would say that he was downstairs, and

14   then I thought that he was downstairs and he'd go down there

15   around 12:00, but then an hour and an a half -- interpreter

16   correction -- over an hour would go by, and then I would look

17   for him and he wasn't there.

18   Q.  Did you try to contact him during that time period that you

19   were looking for him?

20   A.  No, I would not call him on the phone because I did not

21   have his number.  I would just look for him, you know, on the

22   yard because in the back there's a yard, a parking lot, but I

23   couldn't find him.

24   Q.  Was there work that needed to be done that he should have

25   done that he was not able to do because you could not find him?

1   A.  There might have been a delivery and he wasn't there, so I

2   would do it myself.

3   Q.  Would he eat his meals -- would he have a lunch break

4   during the days that he disappeared?

5   A.  I'm sorry.  I did not understand the question.

6   Q.  Sure.  Did Mr. Mendoza -- during his regular workday, did

7   he tend to have a lunch break?

8   A.  Yes.

9   Q.  On the days that he disappeared and was unaccounted for,

10   did he also take a lunch break as well?

11   A.  It was during that period of time, 11 -- well, he had a

12   half hour break, so it was sometimes from 11:30 to 12:00,

13   sometimes around 11:30.

14   Q.  Did you see him eat in the restaurant?  That's what I'm

15   asking.  Did you see him eat in El Aguila on the days he

16   disappeared for about an hour or so?

17   A.  He almost never ate.

18   Q.  How many days a week would he disappear for about an hour

19   or so during his scheduled workday?

20   A.  Almost -- it was during his break.  He would take his

21   break, he would go downstairs to the basement, he would spend a

22   half hour there, then he would go out, and so you'd be looking

23   for him, I'd be looking for him, and I wouldn't find it -- find

24   him.  Interpreter correction.

25   Q.  How many times a week would this occur?

131QJAV1                         Pichardo - Direct

1   A.  About three teams a week.

2   Q.  And this between 2014 three days a week?  Did I say 2010

3   through 2014, did it occur at least three times a week.

4   A.  More or less.

5   Q.  Did you tell anyone in management about the fact that

6   Mr. Mendoza was unaccounted for for at least an hour a day

7   three times a week?

8   A.  Mr. Juan Almonte.

9   Q.  Was any action taken as to your conversation with Mr. Juan

10  Almonte?

11  A.  I don't know, whatever he might have told him.

12         MR. COSTIN:  One moment, your Honor, please.

13         (Pause)

14  Q.  Mr. Pichardo, did employees sign in when -- sign into some

15  type of book when they arrived at work?

16  A.  No.

17  Q.  Do you know if management had any method of keeping track

18  of the hours that employees worked in the restaurant between

19  2010 and 2014?

20  A.  That I remember?  I don't believe so.

21  Q.  Do you know if Mr. Mendoza ever took a vacation while you

22  worked with him?

23  A.  Yes.  He was given a week, if I'm not mistaken.

24  Q.  Do you know if he ever took any sick days?

25  A.  Sick days.  Well, he did miss some days of work because he

131QJAV1                         Pichardo - Direct

 1    would call in that he -- that he was drunk.

 2    Q.  How often --

 3            THE COURT:  Mr. Pichardo, when you said that he took a

 4    week of vacation, is that one week in the period of time

 5    between 2010 and 2014?

 6            THE WITNESS:  I believe so.  I am not certain, but I

 7    believe so.

 8            THE COURT:  All right.  Go ahead.

 9    BY MR. COSTIN:

10    Q.  About how many times did he call out sick because he was

11    hung over?

12    A.  I would not be able to give you a specific amount.

13    Q.  More than five?

14    A.  Yes.

15    Q.  More than ten?

16    A.  Yes.

17    Q.  More than 15?

18    A.  Yes.

19    Q.  More than 20?

20    A.  Likely, more or less.

21    Q.  And this is in -- is this between the time period 2010 and

22    2014?

23    A.  Yes.

24    Q.  Was Mr. Mendoza late, ever late coming to work?

25    A.  Sometimes.  Not all the time.

131QJAV1                          Pichardo - Direct

1   Q.  When he was late, are we talking about like a few minutes

2   or are we talking about more than a few minutes?

3   A.  Sometimes he would get there at 8:30.  I wasn't there, but

4   the female cook who was the one that would open the restaurant,

5   she is the one that would tell me.

6   Q.  That's Josephina, right?

7   A.  Josephina, uh-huh.

8           MS. ISAACSON:  Move to strike as hearsay.

9           THE COURT:  Yes.  The sentence "I wasn't there but the

10  female cook who was the one that would open the restaurant, she

11  is the one that would tell me," that is considered struck.  The

12  rest of the testimony remains.

13          Go ahead, Mr. Costin.  Let's see if we can wrap up

14  your direct before lunch.  You seemed to be almost finished

15  about five times, and you're taking a lot of pauses, and now I

16  know why you don't think you're going to finish today.  So

17  let's see if we can finish before lunch, OK?

18          MR. COSTIN:  Yes, your Honor.

19          Your Honor, I don't think I have any more questions.

20          THE COURT:  All right.  I assume your direct is longer

21  than five minutes.  I mean, your cross is longer than five

22  minutes.

23          MS. ISAACSON:  Yes, your Honor.

24          THE COURT:  We will take a lunch break now and return

25  promptly at 2:00.

131QJAV2                          Pichardo - Cross

1          (Luncheon recess)

2                         AFTERNOON SESSION

3                            2:10 p.m.

4          THE COURT:  Mr. Pichardo, would you please come back

5  to the witness stand.

6  Pedro Pichardo, resumed.

7          THE COURT:  Ms. Isaacson, you may proceed.

8  CROSS-EXAMINATION

9  BY MS. ISAACSON:

10  Q.  Good afternoon, Mr. Pichardo.

11  A.  Good afternoon.

12  Q.  Are you represented by Mr. Costin?

13  A.  Does he represent me?  I'm a witness.

14  Q.  Yes.  I asked if you were represented by Mr. Costin.

15          THE COURT:  He may not understand what you mean by

16  that question.

17  A.  I don't understand.

18  Q.  Is Mr. Costin, the individual sitting here, your attorney?

19  A.  No, he's Mr. Almonte's attorney.

20  Q.  Did you discuss your testimony with Mr. Costin before

21  coming here today?

22  A.  No.

23  Q.  Did you discuss your testimony today with Juan Almonte?

24  A.  No.

25  Q.  Did you discuss your testimony today with Santiago Almonte?

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

131QJAV2                          Pichardo - Cross

1   A.  No.

2   Q.  Are you being paid to testify today?

3   A.  No.

4   Q.  You were a manager of El Aguila Bar, correct?

5   A.  Manager.

6   Q.  So yes?

7   A.  Yes.

8   Q.  And you were a manager of El Aguila from 2008 to 2014,

9   correct?

10  A.  Yes.

11  Q.  And you were the day manager, correct?

12  A.  Day manager, yes.

13  Q.  Santiago Almonte was also a manager at El Aguila, correct?

14  A.  He was the general manager.  I hardly had anything to do

15  with him because -- I didn't really report to anybody because I

16  was doing my job.

17  Q.  That's not exactly my question.

18       I am asking if Santiago Almonte was the night manager

19  at El Aguila while you worked there?

20  A.  Yes.

21  Q.  And you didn't see Santiago Almonte often at El Aguila

22  because you worked the morning shift and he worked at night,

23  correct?

24  A.  Yes, I was living near El Aguila at the time, like about

25  20 feet away.

131QJAV2                          Pichardo - Cross

1    Q.  OK.  I just want to make sure you understand my question

2    because I'm not asking where you lived.

3            I just want to ask if you saw Santiago often at --

4    that you didn't see Santiago Almonte often at El Aguila because

5    he worked at night and you worked during the day, correct?

6    A.  I would see him every so often.  Sometimes, yes.

7    Q.  And now I'm going to ask you about Juan Almonte.

8            Juan Almonte was the owner of El Aguila, right?

9    A.  Yes.

10   Q.  And Juan Almonte was the person who could decide to hire

11   additional employees at El Aguila, correct?

12   A.  Yes.

13   Q.  And Juan Almonte was also in charge of hiring employees,

14   correct?

15   A.  Yes.

16   Q.  And Juan Almonte was also in charge of firing employees,

17   correct?

18   A.  I'm sorry, I didn't understand.

19   Q.  Juan Almonte was in charge of firing employees.  If someone

20   was going to be fired, it was going to be by Juan Almonte,

21   correct?

22   A.  Yes, he was the owner.  Yes.

23   Q.  And Juan Almonte determined how much employees were paid at

24   El Aguila, correct?

25   A.  I assume so because he was the owner.

131QJAV2                        Pichardo - Cross

1   Q.  OK.  And you testified earlier today that El Aguila opened

2   to the public at around 10:00 or 11:00 a.m. every day, correct?

3   A.  Yes.

4   Q.  And you worked at El Aguila for about six years, so you

5   know that information, correct?

6   A.  Yes.  Yes.

7   Q.  And do you recall being asked questions and giving answers

8   at your deposition in this case?

9   A.  I did not understand your question.

10  Q.  Do you recall when you were -- when Mr. Shawn Clark took

11  the deposition of you on February 13, 2018?

12  A.  Yes.

13  Q.  And at the deposition, you took an oath and swore to tell

14  the truth while testifying in the deposition, correct?

15  A.  Yes.

16  Q.  And after the deposition, the questions and answers were

17  typed up verbatim into a transcript that was given to you to

18  review, correct?

19  A.  Nothing was given to me, and I did not review anything.

20          THE COURT:  Do you have a copy for the Court of a

21  transcript?

22          MS. ISAACSON:  Yes.  May I approach?

23          THE COURT:  You may.

24          THE INTERPRETER:  If questions are going to be asked

25  from the transcript, the interpreter would also request a copy.

131QJAV2                         Pichardo – Cross

1              THE COURT:  Mr. Costin, do you have a copy of the

2    transcript?

3              MR. COSTIN:  Yes, your Honor.

4              THE COURT:  All right.

5    BY MS. ISAACSON:

6    Q.  I am now going to read the following questions and answers

7    of this witness taken on February 13, 2018, beginning on page

8    35, line 11.

9              THE COURT:  Well, just one second.  What I see there

10   has nothing to do with what you have just been asking him

11   about.

12             You can't just read questions and answers from a

13   deposition.  You can do it to impeach, but the last line of

14   questions have absolutely nothing to do with the hours that the

15   restaurant was open, Ms. Isaacson, so I don't understand why

16   you're starting on page 35, line 11.  That has nothing to do

17   with the questions you were just asking him about.

18             MS. ISAACSON:  I thought I just asked him when it was

19   open to the public, and he has said today it was from 10:00 to

20   11:00.

21             THE COURT:  Just one second.

22             OK, go ahead.

23   BY MS. ISAACSON:

24   Q.  The question was:

25   "Q.  When was it open is to the public?

131QJAV2                          Pichardo - Cross

1     "A.  It would open like around 9:00 a.m. to 11:00.

2     "Q.  9:00 a.m. to 10:00 p.m.?"

3             THE COURT:  You're going to have to read slowly and

4     read it this way:

5     "Q.  Question.  Answer.  Question.  Answer.  And read slowly.

6     OK?

7             Go ahead, start again.

8     Q.  "Q. When was it open to the public?

9     "A.  It would open like around from 9 to 10.

10    "Q.  9:00 a.m. to 10:00 p.m.?

11    "A.  No.  On my schedule, it would open in the morning for the

12    public from 9 to 10.  That was for the public.

13    "Q.  When you say 9, 9:00 a.m.?

14    "A.  In the morning.

15    "Q.  And then from 10:00 p.m.?

16    "A.  No, from 9:00 a.m. to 10:00 a.m.  That was the hours that

17    we would open for the public.  That was the hours that we would

18    open in the morning."

19    Q.  Do you recall being asked those questions and giving those

20    answers at your deposition?

21    A.  Yes.

22    Q.  And you normally worked every day at El Aguila from

23    9:00 a.m. to 5:00 p.m., correct?

24    A.  Yes.

25    Q.  And you testified that aside from night shift, Mr. Mendoza

1    Java came in every day at 8:00 a.m., correct?

2    A.  His work schedule on the days he was working would start at

3    8:00 a.m. until 4:00 p.m.

4              THE COURT:  Ms. Isaacson, just a point of practice:  I

5    don't like when lawyers on cross-examine say, "you testified on

6    direct that X," OK?  Whatever he testified on direct, he

7    testified and the record will reflect it.  If you want to say

8    and re-confirm some fact, you are absolutely free to do that on

9    cross.  But I would prefer that you not formulate your question

10   by suggesting that the testimony was a certain thing.  The

11   testimony is whatever it was.

12             So you can ask the question, but it would be, "You say

13   that he worked from," not "you testified that" because his

14   testimony is whatever it was, and I don't want you

15   characterizing it because you may be right or you may be wrong.

16   OK?

17             MS. ISAACSON:  OK.

18             THE COURT:  Go ahead.

19   BY MS. ISAACSON:

20   Q.  You never actually observed what time Mr. Mendoza Java came

21   in to work each day because you came in after him, correct?

22   A.  Yes.

23   Q.  And Mr. Mendoza Java stopped working each day at 4:00 p.m.,

24   correct?

25   A.  Yes.

131QJAV2                         Pichardo - Cross

1   Q.  And you left work each day at 5:00 p.m., correct?

2   A.  Yes, that was my end time.

3   Q.  And you would see Mr. Mendoza Java at 6:00 drinking beer at

4   the bar, correct?

5   A.  I'm sorry, I did not understand.

6   Q.  You would frequently see Mr. Mendoza Java drinking beer at

7   the bar around 6:00 p.m., correct?

8   A.  Sometimes I said.

9   Q.  And you would sometimes see Mr. Mendoza Java at 7:00 p.m.

10  drinking at the bar after work, correct?

11  A.  Sometimes.  Sometimes.

12  Q.  But you would leave work at 5:00 p.m., correct?

13  A.  Yes.

14  Q.  When Mr. Mendoza Java started working at night, he would

15  work until 4:00 a.m., correct?

16  A.  That would be a question for Mr. Almonte because I wasn't

17  working at that time, and I wasn't there then.

18  Q.  OK.  And you never recorded when Mr. Mendoza Java left work

19  each day, correct?

20  A.  No.

21  Q.  And there was no time clock or punch-in system at El Aguila

22  when you worked there to record when Mr. Mendoza Java left work

23  each day?

24  A.  No.  That was all implemented after 2014, after I was no

25  longer there.

131QJAV2                        Pichardo - Cross

1   Q.  So you never observed this system being implemented,
2   correct?
3   A.  Not during the time I was there.  During the time that we
4   were working there, we always had the same regular schedule
5   starting at 8:00.  That is to say, starting from 8:00 till 4:00
6   Mr. Mendoza had his schedule, and all the employees had their
7   own schedule and their own starting times and end times.
8   Q.  And Mr. Mendoza Java took 30 minute lunch breaks throughout
9   his employment, correct?
10  A.  Yes.
11  Q.  And those 30 minute lunch breaks would always start between
12  11:00 a.m. and 12:00 p.m., correct?
13  A.  Yes.
14  Q.  And Mr. Mendoza Java would go down to the basement for 30
15  minutes and then escape out the back door, correct?
16  A.  Yes.  He would always -- practically you could say that.
17  He would always go downstairs to take his break, and then
18  sometimes you wouldn't think about it until he had gone
19  downstairs to take his break and it was already 12:00, and you
20  would go down there and look for him and he wasn't there.
21  Q.  So you never actually observed him escape out the back
22  door, correct?
23  A.  No, but the conclusion is that he was leaving because I
24  would go downstairs to the basement and he wouldn't be there.
25  Q.  So you assumed he escaped out the back door, correct?

1    A.  If he wasn't downstairs in the basement, where else would

2    he be?

3    Q.  Mr. Mendoza Java was never given anything in writing when

4    he was hired about how much he was going to be paid, correct?

5    A.  I don't know about Mr. Juan Almonte when he hired him what

6    they did because they decided amongst themselves what he would

7    be paid when he was hired, and I wasn't involved in that

8    because I did not pay Mexico.

9           THE COURT:  Just for the record, when you say

10   "Mexico," you're referring to Mr. Mendoza Java?

11          THE WITNESS:  Yes.  We never called him by his true

12   name.  We always used to call him Mexico.

13   Q.  You testified that Mr. Mendoza Java didn't drink very much

14   in 2010, correct?  Mr. Mendoza Java didn't drink very much in

15   2010, correct?

16   A.  Yes.  He didn't drink that much, but he did drink.

17   Q.  And he didn't drink very much in 2011, correct?

18   A.  Yes.

19   Q.  I'm going to turn back to the deposition transcript where

20   you had previously stated you recalled being asked questions

21   and giving answers at the deposition.  I'm going to read the

22   following questions and answers from the deposition taken on

23   February 13, 2018 beginning at page 59, line 5.

24          We'll start at line 2, actually.

25   "Q.  OK.  So you're saying he started drinking in 2010.  Am I

1    understanding that correctly?

2    "A.  Yes, he drank a lot in 2010, 2010.  Yes, to 2014.  And

3    during the time that I was working there, he drank every day.

4    Every day."

5    Q.  Do you recall being asked those questions and giving those

6    answers at your deposition?

7    A.  Yes.  Yes --

8              THE COURT:  No, Mr. Pichardo, there is no question

9    pending.

10             THE WITNESS:  OK.

11             THE COURT:  Next question, please.

12   Q.  Mr. Mendoza Java would go to the bathroom and hide

13   drinking, correct?

14   A.  Yes.

15   Q.  But you never actually observed him drinking in the

16   bathroom, correct?

17   A.  Yes.

18   Q.  And Mr. Mendoza Java -- you sent Mr. Mendoza Java home for

19   being drunk on the job less than 20 times over the course of

20   four years, correct?

21   A.  Uh-huh, between 20 to 25 times on down, yes.  It's not a

22   specific number.

23   Q.  And there is never any record of these suspensions in

24   writing, correct?

25   A.  No.

131QJAV2                      Pichardo - Cross

```
 1    Q.  And there was also never any record of discipline of

 2    Mr. Mendoza Java in writing, correct?

 3    A.  I would just simply tell Mr. Juan Almonte, and I don't know

 4    what he said or did to Mr. Java.  I don't know if he said

 5    anything or do anything to discipline Mr. Mendoza Java.

 6    Q.  And you didn't have the power to fire Mr. Mendoza Java,

 7    correct?

 8    A.  No.  If I had had it, I would have done it.

 9    Q.  And each time that you sent Mr. Mendoza Java home, you

10    would tell Mr. Juan Almonte that you sent him home because he

11    was drunk, correct?

12    A.  Yes, and for being disrespectful.

13    Q.  To your knowledge, despite telling Juan Almonte about these

14    incidents, Mr. Juan Almonte never fired Mr. Mendoza Java during

15    the time that you worked there, correct?

16    A.  No.

17    Q.  And Mr. --

18            THE COURT:  Just to be clear, because we use these

19    formulations.  You said "is it correct" and he said "no."  But

20    I think by saying "no," he is agreeing with you that what you

21    said is correct.

22            Just so that the record is clear, let's confirm that.

23    Q.  So is it correct that despite telling Juan Almonte about

24    these incidents, he never fired Mr. Mendoza Java during the

25    time you worked there?
```

131QJAV2                          Pichardo - Cross

1    A.   That is correct.

2    Q.   And you also told Juan Almonte that Mr. Mendoza Java would

3    be missing three times a week for an hour and a half, correct?

4    A.   More or less.

5    Q.   To your knowledge, did Mr. Juan Almonte --

6            THE COURT:  Hold on a second.  I'm sorry but precision

7    is important.

8            When you say "more or less," is more or less related

9    to three times or more or less whether you told that to

10   Mr. Almonte or not?

11           THE WITNESS:  Twice, sometimes three times.  I would

12   just find out about it when he would go downstairs to the

13   basement and I couldn't find him.  I would assume that he was

14   there, and then he wasn't there.

15           THE COURT:  Would you always tell Mr. Almonte when he

16   was not there?

17           THE WITNESS:  Yes.  Not always but almost always.

18           THE COURT:  All right.  You may proceed.

19   BY MS. ISAACSON:

20   Q.   To your knowledge, despite telling Juan Almonte that

21   Mr. Mendoza Java was missing for an hour at a time, did he ever

22   fire -- strike it.

23           To your knowledge, despite telling Juan Almonte about

24   these incidents of Mr. Mendoza Java leaving for an hour at a

25   time two to three times a week, Mr. Almonte never fired

1    Mr. Mendoza Java for that, correct?

2    A.  Yes, and I never understood why.

3    Q.  Mr. Mendoza Java drank at work every day from 2010 to 2014,

4    correct?

5    A.  He would, yes.

6          MS. ISAACSON:  No further questions.

7          THE COURT:  Redirect, Mr. Costin?

8          MR. COSTIN:  Yes.  Just one small area, your Honor.

9          THE COURT:  Be careful when you say that.  I'm going

10   to hold you to one small area.

11         MR. COSTIN:  It's all relative.

12         THE COURT:  Exactly.  So be careful what you're

13   proffering.

14   REDIRECT EXAMINATION

15   BY MR. COSTIN:

16   Q.  Mr. Pichardo, there was a discrepancy between what you

17   testified --

18         THE COURT:  No.  No.  No.  No.  Ask a question.  No

19   commentary, please.

20         MR. COSTIN:  Sure.

21   Q.  Did Mr. Mendoza drink heavily between 2010 and 2014 as you

22   testified to in your deposition?

23   A.  He would drink every day between 2010 and 2014, but between

24   2012 and 2014, he would drink more.  That is to say he did

25   drink every day between 2010 and 2014, but beginning in 2012 he

131QJAV2                           S. Almonte - Direct

```
 1   started to drink more heavily because he was drinking at the
 2   restaurant.
 3             MR. COSTIN:  Nothing further, your Honor.
 4             THE COURT:  All right.  Mr. Pichardo, you may step
 5   down.
 6             Do you have any recross?
 7             MS. ISAACSON:  No, your Honor.
 8             THE COURT:  All right.  You may step down.
 9             (Witness excused)
10             THE COURT:  Mr. Costin, call your next witness,
11   please.
12             MR. COSTIN:  Mr. Santiago Almonte.
13             THE COURT:  Just to remind everyone, his testimony is
14   limited to what I will characterize as damages testimony, not
15   liability testimony, so we have to be careful about the line of
16   questioning you are going to pursue so because I'm going to cut
17   you off if you go beyond the line.  So let's see where you go
18   we'll see if there are objections, and we'll see if I have my
19   own objections.  Let's swear the witness, please.
20    SANTIAGO VALENTIN ALMONTE,
21        called as a witness by the Defendant,
22        having been duly sworn, testified as follows:
23   DIRECT EXAMINATION
24   BY MR. COSTIN:
25             THE COURT:  You may proceed.
```

1    Q.  Mr. Almonte, when did you work with El Aguila -- work for

2    El Aguila?

3    A.  Since 2008.

4    Q.  What was your job title?

5    A.  General manager.

6    Q.  What were your duties?

7            MS. ISAACSON:  Objection.

8            THE COURT:  Overruled.

9            We have to have some predicate here, OK?  So I'm going

10   to use common sense.  It's a non-jury trial.  Think of it as

11   the equivalent of an affidavit.  If this was the second

12   paragraph of the affidavit in which he's describing his

13   responsibilities, I don't think you would move to strike that

14   paragraph.

15           We will know when Mr. Costin is treading beyond the

16   line, and I'm sure you will be on your feet.

17           Go ahead.  That can be answered.

18           what were your duties, Mr. Almonte?

19   A.  I would hold meetings with certain people who would look

20   for work.  I would hold events to rent the business.  I would

21   reach the agreements.  I would take notes, and I would give

22   those to Mr. Almonte.  If there was a list that employees were

23   needed, such was given to me, I would then interview the

24   persons that were looking for work and then I would give that

25   to Mr.  Almonte.

1          THE COURT:  When you say "I would give it to

2     Mr. Almonte," you mean Juan Almonte?

3          THE WITNESS:  Yes, sir, that's correct.

4          THE COURT:  And Juan Almonte is your brother?

5          THE WITNESS:  Yes.

6     BY MR. COSTIN:

7     Q.  Who was the owner of El Aguila?

8          MS. ISAACSON:  Objection.  I think this is beyond the

9     scope of setting the damages.

10          THE COURT:  I think it's still what I will

11     characterize as introductory in nature.

12          So it's overruled.  You may answer.

13          THE INTERPRETER:  Your Honor, the interpreter will

14     interpret the answer given.

15     A.  The only owner on record is Mr. Almonte.

16          THE COURT:  You mean Mr. Juan Almonte?

17          THE WITNESS:  Mr. Juan Almonte.

18     BY MR. COSTIN:

19     Q.  Were there any owners not on record?

20     A.  Not that I know of.

21     Q.  Were there shifts at El Aguila?

22          THE COURT:  OK.  Here, Mr. Costin, is where I think

23     you are starting to cross the line.  Let me tell you what I

24     have in mind as far as what I think is proper.

25          MR. COSTIN:  Sure.

131QJAV2                              S. Almonte - Direct

1            THE COURT:  The issue here in the case as far as

2    damages is concerned is if liability is established, how would

3    one calculate Mr. Mendoza Java's damages.  The way damages are

4    calculated in these cases, as you well know, involve what hours

5    did someone work, what they were paid, whether that changed,

6    who paid it, in what form, etc.  That's damages-related subject

7    matter.

8            It seems to me the last question you were starting to

9    ask was in terms of different shifts.

10           MR. COSTIN:  Yes.

11           THE COURT:  I'm not sure why that is going to be

12   relevant to any testimony with respect to damages here.

13           MR. COSTIN:  Understood, your Honor.

14           THE COURT:  OK?  Now, Mr. Juan Almonte, obviously, is

15   going to be free to testify in a more free-ranging fashion.  So

16   what you're frustrated in not being able to elicit from this

17   particular witness, I suspect you can pursue more

18   comprehensively, if you will, with Mr. Juan Almonte, but just

19   keep in mind my prior ruling which I'm going to hold you to.

20           MR. COSTIN:  Understood, your Honor.  Thank you.

21           THE COURT:  This is the equivalent of an inquest, if

22   you will.

23           MR. COSTIN:  Yes.

24           THE COURT:  And I'm trying to give you some latitude

25   to set a foundation, if you will, but I feel like I've now

131QJAV2                        S. Almonte – Direct

1    given you that.  I don't know if there is anything else that

2    falls into that category; otherwise, it seems to me his

3    testimony is going to be somewhat circumscribed.

4              MR. COSTIN:  Your Honor, I appreciate what you are

5    saying, and I will do my utmost to comply.

6              THE COURT:  I'm sure you will, and I'm sure

7    Ms. Isaacson will let me know if she disagrees with whether

8    your utmost sufficient consistent with my legal ruling.

9              MR. COSTIN:  Understood.

10   BY MR. COSTIN:

11   Q.  Mr. Mendoza's schedule, do you recall his schedule during

12   the time that he worked at El Aguila?

13             THE INTERPRETER:  For the interpreter, the last part

14   "during the time that"?

15             MR. COSTIN:  He worked for El Aguila.

16   A.  He started working from 8:00 to 4:00 five days a week.

17             THE COURT:  What year was that, to your knowledge?

18             THE WITNESS:  He started in 2008.

19             THE COURT:  How many years is it your understanding he

20   worked those hours when you said "he started working those

21   hours," what are you talking about?

22             THE WITNESS:  I do not recall exactly because I wasn't

23   quite in charge of those schedule concerns, but I do believe

24   that it was in 2010.

25             THE COURT:  Go ahead, Mr. Costin.

1

2    BY MR. COSTIN:

3    Q.  Did Mr. Mendoza ever work overtime for El Aguila?

4            MS. ISAACSON:  Objection.  I think that's beyond the

5    scope of damages.

6            THE COURT:  I think that particular question as you

7    have phrased it, I will sustain the objection.

8            MR. COSTIN:  I will rephrase.

9    Q.  Did Mr. Mendoza ever work more than 40 hours per week

10   during his employment with El Aguila?

11   A.  Not that I recall.

12   Q.  Why?

13   A.  Because at that time, 40 hours was the week of work at a

14   minimum wage.

15   Q.  Between 2010 and 2016, Mr. Mendoza work more than five days

16   in the course of one week?

17   A.  No, never more than 40 hours.  As a matter of fact, it was

18   less because he had way too many appointments that according to

19   him they were medical appointments or he had accidents.

20           THE COURT:  Or he had, what was the last thing you

21   said?

22           THE INTERPRETER:  Accidents.

23   Q.  What do you mean by accidents?

24   A.  A loose bullet, as he explained it to me, which cut him in

25   one of the legs.  He was absent for a couple of weeks.  I went

131QJAV2                         S. Almonte - Direct

1   to his house to visit with him and to drop off his check.

2   Q.   When was this, sir?

3   A.   I do not recall exactly, but in 2015, at the end of 2015.

4   Q.   Approximately how much time did he miss from work due to

5   the accident?

6   A.   I do not recall exactly.

7   Q.   Was he ever out of work for at least a week due to the

8   bullet?

9   A.   More.

10  Q.   What about two weeks?

11  A.   I do not quite recall, as I already said, but I believe

12  that two or three weeks.

13  Q.   Did he have any other medical appointments besides dealing

14  with the bullet?

15  A.   He took a document for my signature.  Since I was a general

16  manager, I asked him what he needed this for and that's when he

17  started to do --

18          THE INTERPRETER:  The interpreter needs

19  clarification --

20  A.   Then he started to create certain records because he told

21  me that what he needed that for was for him to be provided with

22  an ITIN number.

23          MS. ISAACSON:  I move to strike.  That wasn't

24  responsive to the question.  It doesn't have to do with any

25  time he took off of work.

1        THE COURT:  Yes, I agree, it's not responsive to the

2   question.  The last part of the answer is struck.

3   Q.  Do you know when Mr. Mendoza received an ITIN number?

4        MS. ISAACSON:  Objection.

5        THE COURT:  Sustained.  Next question.

6   Q.  Did El Aguila keep track of the hours that Mr. Mendoza

7   worked?

8   A.  No.

9   Q.  Why?

10  A.  He had a schedule from 8:00 to 4:00, and later on it was

11  changed to 10:00 to 6:00, and we did have that record because

12  it was his regular schedule.

13  Q.  When did his schedule change from 10:00 a.m. to 6:00 p.m.?

14  A.  I do not quite remember, but it was when there was some

15  remodeling done.

16  Q.  What role, if any, did you have with payroll?

17  A.  Well, my role is, or was, because the company -- because

18  the business has now closed down -- it was to keep or gather

19  data of hours or schedules that were worked, give them to

20  Mr. Juan Almonte.  And then Mr. Almonte went ahead and

21  conducted the payments or the checks.  And then also with ADP,

22  the hours were sent to them at the time that the official work

23  started with them signing in and punching in.  And it is at

24  that time that Mr. Mendoza started to report or create a record

25  because then a new contract was drawn up.

131QJAV2                        S. Almonte - Direct

1          THE COURT:  Let's have another question, Mr. Costin.

2    Q.  You indicated that you would keep track of the hours worked

3    by Mr. Mendoza.  How did you do that?

4    A.  Because, as I said, his regular schedule was 8:00 to 4:00.

5    Q.  How would you know if Mr. Mendoza came to work?

6    A.  There was -- that was his schedule, and I didn't receive

7    any complaints from the manager during that shift.

8    Q.  Would you see Mr. Mendoza in El Aguila during his work

9    schedule?

10   A.  Yes.

11   Q.  And how many times a week would you say you saw him at work

12   during his work hours?

13   A.  Perhaps three to four times a week during his work week,

14   but I would just come in to attend certain meetings, then I

15   would leave.

16   Q.  Was Mr. Mendoza ever scheduled to work -- withdrawn.  After

17   Mr. Mendoza completed his working schedule, would you see him

18   still in El Aguila?

19   A.  Sometimes.

20   Q.  Would he be engaged in any work for El Aguila during that

21   time period?

22          MS. ISAACSON:  Objection.  Leading.

23          THE COURT:  Sustained and confusing.

24          You said would you see him after he finished his work,

25   and then you asked him if he would be engaged in any work after

1  he wasn't working, so I don't understand what you mean.  So the

2  objection is sustained.  Either rephrase it or ask a different

3  question.

4          MR. COSTIN:  I will move on.

5  Q.  Did El Aguila ever have a specific book that kept --

6  withdrawn.  Withdrawn.  Withdrawn.

7          Did Mr. Mendoza work at Las Banderas?

8  A.  No.

9  Q.  Did he ever perform at work at Las Banderas?

10  A.  He would go there to help out once he would get out of

11  El Aguila.

12          THE COURT:  I'm a little confused.  Your first

13  question was did he work there.  The answer was no.

14          Then the next question was did he ever perform work

15  there.  So if he didn't work there, what does performing work

16  as opposed to work -- what does the distinction mean,

17  Mr. Costin.  I don't understand that.

18          MR. COSTIN:  Well, it got an answer, your Honor.

19          THE COURT:  What's that?

20          MR. COSTIN:  It engendered an answer.

21          THE COURT:  I don't really understand the answer.

22          He would go there to help once he would get out of

23  El Aguila.  What does that mean?

24          He would go to help, meaning he was helping as a

25  worker who should have been paid for work or something else?

1    The whole record is completely unclear on the point.

2                 MR. COSTIN:  I understand, your Honor.  I'm trying to

3    get a clarification.  I asked him if he worked.  Then I asked

4    him -- I'm trying to get a clarification of that, your Honor.

5                 THE COURT:  Well, if he didn't work -- either he

6    worked there or he didn't work there, right?

7                 What does it mean as you then asked:  "Did he perform

8    work?  If he didn't work, is there some distinction that is

9    lost on me.

10                MR. COSTIN:  Your Honor, I think the distinction is

11   with this witness.  That's why I'm trying to get a

12   clarification.  That's why I rephrased that question in that

13   manner.

14                THE COURT:  Mr. Almonte, did Mr. Mendoza perform work

15   at Las Banderas of any kind:  Cleaning, waiting, cooking or

16   anything else?

17                THE WITNESS:  Yes.

18                THE COURT:  What did he do?

19                THE WITNESS:  On Saturdays he would go there from

20   4:00 p.m. to 6:00 to receive deliveries, and if there was any

21   time left for him, then he would do some cleaning, but I see it

22   as help because it was during the -- his work hours at

23   El Aguila.

24                THE COURT:  I could ask many follow-up questions, but

25   that's not really my job in the first instance.

1          I will let you do that, Mr. Costin, as long as I could

2     understand what you're asking.

3          MR. COSTIN:  Understood.

4     BY MR. COSTIN:

5     Q.  Did you pay him for the time that he spent at Las Banderas?

6     A.  I would give him $40 as a tip.

7     Q.  How often did he come -- during what time period did he

8     come and work or perform work at Las Banderas?

9     A.  On Saturdays during a time frame between four to eight

10    months.

11    Q.  In what year or years?

12    A.  2015, the end of 2015.

13         THE COURT:  I'm confused now.

14         Mr. Almonte, what is your understanding of the normal

15    days of the week that Mr. Mendoza worked for El Aguila?

16         THE WITNESS:  Five days, eight hours, and then in the

17    latter years, he would work, do some work and he had Sundays

18    off, Tuesdays, and that is while -- on Saturdays after

19    4:00 p.m. it is that he would accept deliveries, as he

20    mentioned previously, and do some cleaning.

21         THE COURT:  Are you saying that there was a period of

22    time in which of the five days that he worked, one of them was

23    Saturday?

24         THE WITNESS:  That's correct, yes, sir.

25         THE COURT:  Are you saying that during that period,

1    the hours were from 10:00 to 6:00 p.m.?

2            THE WITNESS:  That's correct.

3            THE COURT:  And are you saying that instead of working

4    the last two hours on a Saturday at El Aguila, as he would have

5    on the other days, he instead was working those two hours at

6    Las Banderas, the 4:00 to 6:00 you've been talking about?

7            THE WITNESS:  Yes, that's correct.

8            THE COURT:  So, in other words, it wasn't in addition

9    to his work at El Aguila; it was instead of his work at

10   El Aguila.  Is that your testimony?

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  And yet you have testified that you paid

13   him $40 as a tip for these two hours beyond his regular wages?

14           THE WITNESS:  That's correct.

15           THE COURT:  What's the reason for that?

16           THE WITNESS:  The reason why I would give him that

17   extra money or the tip, it was based on his willingness to go

18   from El Aguila to help me at the other location to accept

19   deliveries.

20           THE COURT:  How far apart are the two restaurants

21   geographically.

22           THE WITNESS:  Two full blocks.  170th --

23           THE INTERPRETER:  The interpreter is repeating

24   phonetically.

25           THE WITNESS:  Ogden to 172nd, 171st University.

131QJAV2                              S. Almonte - Cross

1          THE COURT:  All right.  You may proceed, Mr. Costin.

2          MR. COSTIN:  Thank you.

3          Just for the record again, O-G-D-E-N.

4          THE COURT:  It's not a question.  He's just stating it

5    for the record.

6          Anything else, Mr. Costin?

7          MR. COSTIN:  Nothing further, your Honor.

8          THE COURT:  Ms. Isaacson.

9    CROSS-EXAMINATION

10   BY MS. ISAACSON:

11   Q.  Good afternoon, Mr. Almonte.

12   A.  Good afternoon.

13   Q.  Are you represented by Mr. Costin?

14   A.  No.

15   Q.  Did you discuss your testimony with Mr. Costin before

16   coming here today?

17   A.  No.  I didn't even know that I'd be testifying.

18   Q.  You've been aware of this lawsuit since at least

19   November 2016, correct?

20         MR. COSTIN:  Objection, your Honor.

21         THE COURT:  What's the objection?

22         MR. COSTIN:  It's beyond the scope of cross -- excuse

23   me -- beyond the scope of direct, and it also goes beyond

24   issues of damages which is what he is here to testify about.

25         THE COURT:  I mean, he's in default.  If you're trying

1    to prove he is in default, he is in default, and I already said

2    as much this morning, so I will sustain the objection because

3    I'm not really sure what he's advancing.

4                MS. ISAACSON:  OK.

5                THE COURT:  Ask your next question, please.

6    BY MS. ISAACSON:

7    Q.  Mr. Mendoza Java worked at El Aguila, correct?

8    A.  Yes.

9    Q.  You were a night manager at El Aguila, correct?

10   A.  General.

11   Q.  That's not exactly responsive to my question.  Were you --

12               THE COURT:  Don't argue with him, please.  Just ask

13   another question, with all due respect.  It's not for you to

14   say that.  Just ask another question.

15   Q.  Mr. Mendoza Java worked for you at Las Banderas, correct?

16   A.  On Saturdays starting at 4:00 while working his shift as I

17   just explained.

18   Q.  You paid Mr. Mendoza Java solely in cash until 2015

19   correct?

20   A.  I did not understand that question.

21   Q.  You paid Mr. Mendoza Java his wages in cash until the end

22   of 2015, correct?

23   A.  No, that's not correct.  I would give him a tip whenever he

24   would go to work at Las Banderas because the one that would

25   make the payments was Mr. Juan Almonte.

1   Q.  Mr. Mendoza Java was paid solely in cash until the end of

2   2015, correct?

3              MR. COSTIN:  Just objection.  As to El Aguila or

4   Las Banderas.  That's my objection.  I'm confused that's all.

5              THE COURT:  Objection on the basis of confusion?

6              MR. COSTIN:  Yes, your Honor.

7              THE COURT:  Is the word "confusion" in the Federal

8   Rules of Evidence.  I think it's objectionable because there's

9   a lack of foundation, so I'll sustain it on that basis, but not

10  on the basis of confusion.

11             Ask another question, Counselor.

12  BY MS. ISAACSON:

13  Q.  You rarely worked at El Aguila during the day, correct?

14  A.  That's correct, very rarely.

15  Q.  Mr. Mendoza Java worked from 8:00 a.m. to 4:00 p.m. at

16  El Aguila, correct?

17  A.  That's correct.

18  Q.  But you were rarely there to observe that, correct?

19  A.  I would go there three to four times a week to hold

20  meetings, as I just explained, and I would see him then.

21  Q.  Mr. Mendoza Java worked at El Aguila at a certain point

22  from 10:00 a.m. to 6:00 p.m., correct?

23  A.  That's correct.

24  Q.  And you kept track of Mr. Mendoza Java's hours, correct?

25  A.  Yes, he had a regular schedule, and that's how that was

131QJAV2                          S. Almonte - Cross

1    determined.

2    Q.  But you did not have any documentation reflecting

3    Mr. Mendoza Java's entrance and exit times for his work days,

4    correct?

5    A.  Please repeat that question for me.

6    Q.  But you did not have any documentation reflecting

7    Mr. Mendoza Java's entrance and exit times for his work days at

8    El Aguila, correct?

9    A.  There was documentation.  He was given his salary based on

10   the time he worked.

11   Q.  So you kept employment records connected to Mr. Mendoza

12   Java's work, correct?

13   A.  Five days, eight hours, that's how he was paid.  That's how

14   the records were sent to Juan Almonte.

15   Q.  And you have documentation, correct?

16   A.  He explained it that he had to have his payment correct.

17           THE COURT:  I don't understand that answer.

18           THE INTERPRETER:  Interpreter's correction.

19           He just explained that he received the correct

20   payment.

21           THE COURT:  The question was:  You have documentation.

22   You, Mr. Almonte as an employer, as the general manager, you

23   have documentation that shows the hours that Mr. Mendoza

24   worked, correct?

25           THE WITNESS:  I just explained that he was working

131QJAV2                              S. Almonte - Cross

 1  five days, and I would pass on that information to Mr. Juan

 2  Almonte.

 3          THE COURT:  Mr. Almonte, are there any pieces of paper

 4  that you have that reflect the hours that Mr. Mendoza worked

 5  for any point in time during his employment?

 6          THE WITNESS:  In the final years when he was working

 7  30 hours and being paid in cash, there are records, there are

 8  some records.

 9          THE COURT:  What period of time are you talking about?

10          THE WITNESS:  The final years.

11          THE INTERPRETER:  Interpreter's correction, the final

12  year when he began reporting.

13          THE COURT:  You mean 2015-2016?

14          THE WITNESS:  No -- yes, because before that there

15  wasn't -- well, the schedule was just made with the regular

16  hours.

17          THE COURT:  Go ahead, Ms. Isaacson.

18  BY MS. ISAACSON:

19  Q.  During the time that Mr. Mendoza Java worked from 8:00 a.m.

20  to 4:00 p.m., you rarely observed him arrive in the morning,

21  correct?

22  A.  Practically never, that's correct.

23  Q.  And during the time that Mr. Mendoza worked from 8:00 to

24  4:00 p.m. you never observed when he would leave work,

25  correct -- you rarely observed when he would leave work,

1    correct?

2    A.  I was not there at specific times.

3    Q.  And during the time that Mr. Mendoza Java worked from

4    10:00 a.m. to 6:00 p.m., you rarely observed when he would

5    arrive in the morning, correct?

6    A.  Very rarely.  Perhaps once.

7    Q.  And during the time period that Mr. Mendoza Java worked

8    from 10:00 a.m. to 6:00 p.m., you rarely observed when he would

9    leave work at the end of the day, correct?

10   A.  He had his schedule when he would leave at 6:00.

11           THE COURT:  That wasn't really the question.  The

12   question was:  Did you see him when he left at 6:00?

13           THE WITNESS:  Yes, I did see him many times.

14           THE COURT:  You saw him when he'd leave work at the

15   end of the day?

16           THE WITNESS:  Sometimes, as I explained.

17   BY MS. ISAACSON:

18   Q.  And you never received any complaints from a manager about

19   Mr. Mendoza Java, correct?

20   A.  Were they received?  Yes, I did receive them.

21   Q.  You never gave Mr. Mendoza Java anything in writing when he

22   was hired about how much he was going to be paid, correct?

23   A.  I didn't really understand the question.

24   Q.  When Mr. Mendoza Java was hired, you never gave him

25   anything in writing like a piece of paper that would say how

1    much he was going to be paid, correct?

2    A.  He explained just now, and I recall, that it went according

3    to the minimum wage.  I don't remember how much it was right

4    now.  I don't know whether it was 60 -- $60.

5             THE COURT:  The question was:  When Mr. Mendoza Java

6    was hired, you never gave him anything in writing like a piece

7    of paper that would say how much he was going to be paid,

8    correct?  That's the question.

9             THE WITNESS:  I do not recall having given him a piece

10   of paper, but we did reach an agreement.

11   Q.  In 2010, you paid Mr. Mendoza Java a fixed salary, correct?

12            THE INTERPRETER:  Mixed salary?

13            THE COURT:  Fixed.

14   A.  A fixed salary.

15            THE COURT:  Do you understand what the lawyer means?

16            THE WITNESS:  I didn't understand that correctly.

17            THE COURT:  Why don't you explain to him what you mean

18   by saying a fixed salary.

19   Q.  You paid Mr. Mendoza the same amount of money, a daily

20   rate; meaning, each day he received the same amount of money,

21   correct?

22   A.  We agreed on a salary, that was passed along to Mr. Juan

23   Almonte, and he took care of the payment, the hourly payment

24   that he was going to receive.

25            THE COURT:  OK.  For some reason Mr. Almonte doesn't

1    seem to be listening to the questions or the interpreter is not

2    making it clear in the translation.

3            The question was:  "Did you pay Mr. Mendoza the same

4    amount of money, a daily rate; meaning, each day he received

5    the same amount of money, correct?

6            The answer is yes or no.  Did you pay him the same

7    amount of money every day, or not?  That's the question.

8            THE WITNESS:  Yes, but keep in mind that he -- one day

9    he would work nights, and then he would be paid a little bit

10   more.

11           THE COURT:  Go ahead.

12   BY MS. ISAACSON:

13   Q.  Mr. Mendoza Java was paid $80 for the night shifts,

14   correct?

15   A.  That's correct.

16   Q.  Until December 2015, you never gave Mr. Mendoza Java any

17   kind of wage statement with his payment of wages, correct?

18   A.  I didn't understand the question.

19           THE COURT:  He may not understand what you mean by

20   "wage statement."

21   Q.  Up until December 2015, Mr. Mendoza Java was never given a

22   pay stub or any other document along with his wages, correct?

23   A.  I got mixed up again.

24   Q.  From 2010 until December 2015, when Mr. Mendoza Java was

25   given his wages, there was never anything that he was given in

131QJAV2                            S. Almonte - Cross

1    addition to his wages, such as a pay stub or any other document

2    explaining how much he was going to be paid or any other

3    information on it, correct?

4    A.   That is correct, but his payment was determined based on

5    the sign, the sign that was on the door that got changed every

6    year explaining wages.

7              THE COURT:  Mr. Almonte, do you know what a pay stub

8    is?

9              THE WITNESS:  Yes.

10             THE COURT:  Were there any pay stubs given to

11   Mr. Mendoza Java before 2015?

12             THE WITNESS:  No.  He was paid in cash.

13             THE COURT:  Were there any pay stubs given to him in

14   2015?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  And in 2016?

17             THE WITNESS:  During the last two years, that's what I

18   recall.

19             THE COURT:  All right.  Go ahead.

20   BY MS. ISAACSON:

21   Q.   And throughout Mr. Mendoza Java's employment you never gave

22   him any kind of wage notice or piece of paper indicating what

23   his hourly and overtime rates were, correct?

24   A.   That comes directly from the paper from the sign that the

25   City sends which he would read every day when he would clean

1      it.

2                MS. ISAACSON:  No further questions.

3                THE COURT:  Redirect.

4      REDIRECT EXAMINATION

5      BY MR. COSTIN:

6      Q.  You indicated, sir, that there were some complaints about

7      Mr. Mendoza.  Is that correct?  Complaints from managers?

8      A.  Yes, the managers gave me complaints.

9      Q.  Did you ever take any actions against Mr. Mendoza that

10     impacted the hours that he worked?

11     A.  Repeat the question?

12     Q.  Did you ever suspend him as a result of that?

13     A.  The shift manager, as I had just explained, was the one who

14     was in charge of him, and he would make suggestions to Mr. Juan

15     Almonte?

16                THE COURT:  Mr. Almonte, did you ever suspend

17     Mr. Mendoza for any reason?  You.  Did you?

18                THE WITNESS:  No.

19                THE COURT:  OK, that was the question.  Just answer

20     the question, please.

21                MR. COSTIN:  Nothing further, your Honor.

22                THE COURT:  All right.  You may step down,

23     Mr. Almonte.

24                (Witness excused)

25                THE COURT:  We're going to take an afternoon recess.

131QJAV2                        J. Almonte - Direct

1              Is Mr. Juan Almonte the next witness?

2              MR. COSTIN:  The last and final witness for the day,

3    your Honor.

4              THE COURT:  Then after that, it's Ms. Carasquillo who

5    is the only remaining witness?

6              MR. COSTIN:  Unfortunately, yes.

7              THE COURT:  We will talk about that at the end of

8    this.

9              Ms. Isaacson, do you anticipate a rebuttal case of any

10   kind?

11             MS. ISAACSON:  Not today.

12             THE COURT:  Not today, but when?

13             MS. ISAACSON:  If we come back for Ms. Carasquillo,

14   then potentially.

15             THE COURT:  We'll talk about that.  We'll take our

16   afternoon recess for ten minutes.  By my watch, it's 3:33.

17   We'll make it 12 minutes.  3:45 we're starting, OK?

18             (Recess)

19             THE COURT:  Call your next witness, please.

20             MR. COSTIN:  Call to the stand Mr. Juan Almonte.

21    JUAN ALBERTO ALMONTE,

22        called as a witness by the Defendant,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25             MR. COSTIN:  May I inquire, your Honor?

131QJAV2                          J. Almonte - Direct

1              THE COURT:  You may.

2   BY MR. COSTIN:

3   Q.  Mr. Almonte, are you the former owner of El Aguila Bar and

4   Lounge located in the Bronx?

5   A.  Yes.

6   Q.  When were you the owner of that business?

7   A.  From the time it was opened in 2008 until it was closed

8   down in 2016.

9   Q.  Were there any other owners of that business, El Aguila,

10  during that time period?

11  A.  Absolutely none.

12  Q.  Did you have -- can you tell the Court a little bit about

13  the shifts that you had for your employees who worked at

14  El Aguila?

15  A.  There was one shift that was from 8:00 in the morning until

16  4:00 in the afternoon.  And then there was a small waiting

17  shift from 4:00 to 11:00, but generally the shift was then from

18  8:00 p.m. to 4:00 in the morning.

19  Q.  How many employees did you have working in El Aguila in

20  2010?

21  A.  I don't remember exactly, but it was around 12 or more.

22  Q.  Did you have the minimum wage sign posted in your business?

23  A.  Of course, I did.  In English and Spanish.

24  Q.  Where?

25  A.  It was close to the cash register and on the wall at the

1    bar.

2    Q.  How many posters did you have?

3    A.  I had several posters because several posters come in from

4    the labor department.

5    Q.  Were these posters present in your business between 2010

6    and 2016?

7    A.  All the time, even before.

8            THE COURT:  Even before what?

9            THE WITNESS:  2010.

10   Q.  Who hired Mr. Mendoza?

11   A.  He was interviewed by Mr. Santiago who was the general

12   manager.  He told me that he needed an employee, and so I

13   approved it.  I approved his employment.

14           THE COURT:  You're talking about your brother now?

15           THE WITNESS:  My brother, yes, sir.

16   Q.  Did anyone other than you have the authority to hire an

17   employee?

18   A.  No.  It was only I who would approve it.

19   Q.  What did you hire Mr. Mendoza to do?

20   A.  Cleaning and deliveries, and to provide some help to the

21   female cook, to bring her whatever tools she might need.

22   Q.  Did you expect him to sign in and out to keep track of his

23   hours?

24   A.  Not at the beginning.  We did not have such -- we did not

25   keep such a record.  We didn't have those requirements when he

131QJAV2                            J. Almonte - Direct

1    just started working there.

2    Q.  Did you ever have those requirements?

3    A.  Yes, sir, and all the employees used to sign that paper,

4    that record that was there, but he never wanted to sign it.

5    Q.  Why not?

6    A.  As far as I understand, it was because he used to say that

7    he was going to be the owner of the place; that he was an

8    important person there, and that he -- it was not necessary for

9    him to sign in, and that he was not going to do it.

10   Q.  Other than Mr. Mendoza, who else did not sign in and out?

11   A.  After that record was established, I don't remember that

12   anybody else would not sign.  It was very hard not to.  It was

13   only him.

14   Q.  Well, now you're the owner of the business.  Did you tell

15   him, hey, you need to sign; it's your responsibility?

16   A.  No.  Because I was almost never there, and I was not the

17   one in charge of whether he signed in or out or not at the

18   time.  I was never there at the time.

19   Q.  And what time period are you talking about?

20   A.  During the day.  During Mr. Florencio's work schedule.

21   Q.  Now, the book that you mentioned, where is that book?

22   A.  I have many records on paper of the latter times there, but

23   then a lot of them were stolen -- people came in and they stole

24   them or damaged them or they got wet.

25   Q.  When did this occur?

1   A.  That happened after I was shut down, several months after,

2   a few months after.

3   Q.  So where were the records kept?  Where did you house the

4   records?

5   A.  In the office.

6   Q.  The office at El Aguila?

7   A.  Of course.

8   Q.  Did you contact any -- did you contact the police to

9   indicate that your records had been damaged or destroyed in any

10  way?

11  A.  They came in to do a general investigation of what had been

12  lost or damaged.  They were not exactly told about the loss of

13  records or damaged records.

14  Q.  And what other damage was done to El Aguila after you

15  closed?

16  A.  During that robbery, a lot of bottles were broken and they

17  damaged a lot of the things that were there.

18  Q.  What type of things are we talking about?  Be more

19  specific, if you would.

20  A.  For instance, I had checks, checkbooks there near those

21  records, and they were either torn or taken or damaged, but the

22  checks were no longer usable because I had already closed down

23  that account.  So the business, the business had been closed

24  down, it had been shut down already.

25  Q.  And the records that were destroyed or missing, what time

131QJAV2                          J. Almonte - Direct

1    periods are we talking about?

2    A.  We are referring to after 2012, it must be that those --

3    the records were there.

4    Q.  Did you have records between 2010 and -- for 2010 and 2011?

5    A.  Keep in mind that back then, you used to be told that you

6    could dispose of any paperwork or purchase receipts or anything

7    of the sort after four years, and, you know, after that it was

8    destroyed.

9              THE COURT:  OK.  A little instruction to the witness.

10             Mr. Almonte, the question was did you have records

11   between 2010 and -- for 2010 and 2011."  That's the question.

12             The answer to that question is yes, I did, or, no, I

13   didn't.  That's the answer, one of those two.  You just gave a

14   four line answer that didn't answer the question.  OK?

15             So listen carefully to the question.  It will be

16   interpreted for you, and then answer precisely what's being

17   asked and nothing more.

18             THE WITNESS:  Yes, your Honor.

19   Q.  Mr. Almonte what happened to your records that you had for

20   the year 2010?

21   A.  They were lost.  They had disappeared.

22   Q.  When?

23   A.  It was likely --

24             THE INTERPRETER:  Interpreter correction.  It is

25   likely that when those purchase receipts that were no longer

131QJAV2                              J. Almonte - Direct

1   necessary were thrown out, that they might have gone among

2   those.

3   Q.  What about your records from 2011, do you know where they

4   are?

5   A.  No, not those either.

6   Q.  And do you know the last time you saw those records?

7   A.  I wouldn't have had to review them for any reason.  I do

8   not recall when I might have seen them last.

9   Q.  Do you recall Mr. Mendoza's schedule beginning August 2010?

10  A.  I have some idea of what it was even though I was not the

11  person in charge of staying on top of his schedule, but I have

12  some idea.

13  Q.  What -- I'm going to backtrack.  Before we get into his

14  schedule, I'm going to ask you -- I'm going to go into payments

15  of Mr. Mendoza.  We'll talk about that first, and then we'll

16  talk about his schedule.  Tell me who is responsible for paying

17  employees at El Aguila?

18  A.  Myself as the owner.

19  Q.  Can you please tell the Court the procedure that you had

20  for making payments to your employees, let's say, in the year

21  2010.

22  A.  OK.  Well, I was given the hours worked or the days worked

23  by the employees.  These were given to me by the managers, but,

24  see, it would be passed on from one to the other.  For

25  instance, Pedro would give that to Santiago as the general

1    manager, then we would sit down have a talk, and that's how it

2    was determined for what hours each person would be paid.

3    Q.  If someone worked fewer than their regularly scheduled

4    hours, would they be paid the same amounts?  Would they be paid

5    for the full day or would the hours be reduced?

6    A.  To many people, regardless of whether they worked their

7    full schedule, I would pay them the full day even if, let's

8    say, they had worked for a day a half day or a few hours, I

9    would still pay them their regular schedule.

10   Q.  Why would you do that?

11   A.  I would do that because I liked to pay the employees at

12   least the minimum wage so that -- or they'd have their full

13   salary, I used to like to keep them happy.

14   Q.  What would have happened if you didn't pay, you know, if

15   you docked somebody for hours that they -- for time that they

16   missed?

17        THE INTERPRETER:  For time they missed?

18   Q.  For time they missed at work.

19   A.  If they were docked, it was because perhaps they hadn't

20   worked an hour and if they complained, then I had the

21   indication that they had not worked.

22   Q.  Did you have long-term employees at your business?

23   A.  I don't quite understand the question.

24        MR. COSTIN:  I'll move on.

25        THE COURT:  Long-term employees.  You all have to ask

131QJAV2                                    J. Almonte - Direct

1    questions in plain English.  You are asking, you know, my

2    example is:  Why do prosecutors also ask FBI agents why they

3    exit vehicles instead of get out of cars.  You're asking a lot

4    of "exit the vehicle questions" instead of "get out of the car

5    question."  Especially in this case where we have interpreters,

6    you all are asking fixed wages and long-term employees, you are

7    talking like the labor lawyers you are, but we have witnesses

8    who are lay people who don't speak the same language, so try

9    and speak in plain English.

10              MR. COSTIN:  Thank you, your Honor.

11   BY MR. COSTIN:

12   Q.  Did the business benefit by paying their employees for a

13   full day even if they didn't work a full day?

14   A.  My understanding was that yes because they had to realize

15   that I was not deceiving them.

16   Q.  Was that important to you?

17   A.  Of course, it was.

18   Q.  Why?

19   A.  For the business to be successful, it was necessary for me

20   to keep the employees happy.  They needed to be happy, so I

21   would try to keep them happy.

22   Q.  Do you recall if anybody, if any of your employees called

23   you deceitful?

24   A.  Never.

25   Q.  Were your employees happy?

1  A.  I believe so.  Even Florencio himself just said that he was

2  happy at his job.

3  Q.  Do you know why he said he was happy at his job?

4  A.  He had nothing to complain about.  We used to pay him his

5  minimum wage or even more, so that's it.

6  Q.  Let's get back to Mr. Mendoza's schedule.  Back in 2010, do

7  you recall what his schedule was?

8  A.  Yes.  In 2010, as far as I can remember, he used to work

9  five days from 8:00 in the morning to 4:00 in the afternoon.

10 Q.  Did he have regular -- did he have days off?  Sorry --

11 A.  Yes.  Well, he only worked five days, so he was off two

12 days.

13 Q.  What were the days off?

14          MS. ISAACSON:  Objection.  Mr. --

15          THE COURT:  Just one second.  I don't know that I need

16 a speaking objection.

17          The objection is overruled.  You may answer.

18          The question is:  What were the days off?  I don't see

19 how that question could be objectionable.

20          What were the days off for Mr. Mendoza to your

21 knowledge in 2010?

22          THE WITNESS:  Sundays and Mondays.

23          THE COURT:  By the way, there were a lot of questions

24 before that you could have objected to that I would have

25 sustained, but you didn't object to any of those.  Try to

131QJAV2                         J. Almonte - Direct

1   listen carefully to the question because Mr. Costin just asked

2   a number of questions that I thought were objectionable but you

3   didn't object.

4            Next question, Mr. Costin.

5   BY MR. COSTIN:

6   Q.  What was Mr. Mendoza's -- how much was Mr. Mendoza paid in

7   2010?

8            THE COURT:  We're talking about 2010?

9            MR. COSTIN:  Yes.

10           THE COURT:  Be precise.

11           MR. COSTIN:  Yes, in 2010.

12  A.  In 2010 he was around -- he was close to $300.  I do not

13  remember exactly how much he was being paid.

14  Q.  Were you paying the minimum wage, a little bit more than

15  the minimum wage, or something else?

16           MS. ISAACSON:  Objection.  Leading.

17           THE COURT:  Overruled.  You may answer.

18  A.  Yes, they were all paid the minimum wage.  That's why I had

19  the current posters there.  In fact, they were even paid a

20  little bit more.  They were never paid right at the base.

21  Q.  And why did you pay them a little bit more than the minimum

22  wage?  What did you mean by that?

23  A.  It's for the same reason that I would make sure that it was

24  not the minimum, I would always add a little bit more.  They

25  could always end up with a little bit more.

1    Q.  Did there come a time that -- did his schedule change?

2    A.  Yes, it changed.

3    Q.  When did it change, sir?

4    A.  As of July 2012 the schedules changed.

5    Q.  What was Mr. Mendoza's schedule in July of 2012?

6    A.  Mendoza started working four days during the daytime and

7    one at night.

8    Q.  What day did -- when was his night shift?

9    A.  Sundays at night.

10   Q.  What days did he have off from work?

11   A.  Well, then his days off also changed.  Because now that he

12   was working Sunday at night, I gave him off Mondays and

13   Tuesdays.

14   Q.  How do you remember July of 2012 is the time that his

15   schedule changed?

16   A.  I had to remodel the business and then we also established

17   a schedule change.

18   Q.  I'm talking about July 2012.

19   A.  In July of 2012, an employee had left, and I needed help at

20   night with the beer, so I then transferred Mexico to the night

21   shift because it was busier and the daytime was not as busy.

22   Q.  Mexico is Mr. Mendoza, correct?

23   A.  Of course, yes.

24   Q.  What did you pay Mr. Mendoza in July of 2012?

25   A.  In July 2012, he was being paid around $325 to 30.  I

1    believe that's what it was.  I'm not quite sure.

2    Q.  Is that -- did you start to pay him more than that during

3    that time period as well?  Just for clarification, the time

4    period is July 2012 through December 2015.

5    A.  I don't remember the exact amount, but it was around that

6    time, yes, that his salary was raised.

7    Q.  Now, you said salary.  What do you mean by salary?

8    A.  By salary, I'm referring to the money that I was paying him

9    for his hours of work.

10   Q.  Did Mr. Mendoza ever work overtime?

11   A.  He had his hours established, eight hours starting at 8:00.

12   Those were the hours that he had established, and I never

13   required him to work overtime hours.

14   Q.  If he worked more than 40 hours in a week, would you know

15   about it?

16   A.  Of course I would have, because the hours he worked were

17   reported to me.

18   Q.  What would you have done if he had worked more than 40

19   hours in the course of one week?

20   A.  I would have paid him overtime for those hours he had

21   worked.

22   Q.  Why?

23   A.  Because those are overtime hours, and you're supposed to

24   pay overtime for those hours.

25   Q.  What is overtime?  Do you know how to calculate overtime?

1   A.  I have some idea.  When you work overtime hours, you're

2   paid the hour that you worked plus half of your hourly rate --

3   I'm sorry.  As a matter of fact, it's even explained in the

4   poster, on the poster.

5   Q.  Do you recall paying -- did Mr. Mendoza's schedule change

6   so that he no longer worked nights?

7   A.  Yes, his schedule was changed again beginning in 2015.

8   Q.  What month in 2015?

9   A.  I don't know the exact month, but it must have been toward

10  the end of 2014 -- of 2015, I believe.

11  Q.  And why do you remember that?

12  A.  Well, what happened was, I didn't want to do business with

13  the restaurant during the day, but things had really gone

14  downhill.  That is, there were employees, and there was no

15  money being produced.  And that's why I changed the schedule

16  and had them start work from 10:00 till 6:00.

17  Q.  What was Mr. Mendoza's schedule to when you changed it in

18  December 2015?

19  A.  He, along with all of the other daytime employees, were

20  working from 10:00 until 6:00 p.m.

21  Q.  What were his days off?

22  A.  At that time, he was off once again on Sundays and Mondays.

23  Q.  How much was he paid?

24  A.  Mexico was being paid -- I don't have the exact number, I

25  don't recall, but I believe $295, $295, from what I could

1    recall.  I don't recall exactly.  I don't have that in mind

2    right now.

3    Q.  You made sure, however, that you paid him to comply with

4    the minimum wage law.  Is that right?

5    A.  I certainly did.  I was paying him 95 in cash and the rest

6    by check.  I recall now that it was $260 plus $95.

7    Q.  I just want to go back to one thing just to help me

8    understand or help understand how you determined --

9            THE COURT:  I'm not interested in your understanding.

10   I'm just interested in you asking questions.

11           MR. COSTIN:  Yes, your Honor.  Understood.

12   Q.  You indicated that in 2010, Mr. Mendoza was paid 300 a

13   week.  Is that correct?

14   A.  That's correct.

15   Q.  If you paid him the minimum --

16           THE COURT:  Try not to lead.  Just ask the questions.

17   Q.  Yes.  Do you recall what the -- if I were to tell you that

18   the minimum wage was $7.25, would you be able to explain to the

19   Court how you were able to determine that you were going to pay

20   him 300 a week?

21           MS. ISAACSON:  Objection.

22           THE COURT:  It's a pretty inartful question, but at

23   the end of the day, I think it's not -- why don't you rephrase

24   it.  I don't really like that question.  I'd be surprised if he

25   understood exactly what you're asking the way you asked it.

131QJAV2                                        J. Almonte - Direct

1          MR. COSTIN:  Sure.

2          THE COURT:  Do you know what the minimum wage was at a

3    point in time.  Why don't you start with that.  Do it in

4    pieces.

5    A.  I was always aware and always up to date because of the

6    poster that was sent to me.  The accountant sent it to me.

7    ADP, which was the company that issued checks, sent it to me.

8    Sometimes the insurance company would send it to me.

9          MR. COSTIN:  Your Honor, I have a calculator.  May I

10   give it to my client to do some basic math?

11         THE COURT:  No.  We are not in math class here.

12         MR. COSTIN:  I understand.

13         THE COURT:  Can I ask you, Mr. Almonte, did you get

14   posters with the information related to the minimum wage every

15   year?

16         THE WITNESS:  Every year, and each time it was

17   changed, then there was a raise.

18         THE COURT:  All right.  Go ahead.

19         MR. COSTIN:  I'll come back to that one.

20   BY MR. COSTIN:

21   Q.  Did there come a time that you used ADP or -- did you use

22   ADP for your payroll?

23         MS. ISAACSON:  Objection.

24         THE COURT:  I mean, I'll sustain it because there is a

25   way to get where you are going, but it's not the way you're

131QJAV2                          J. Almonte - Direct

1    asking.

2    Q.  Did you use any companies to help you with payroll?

3    A.  ADP.

4              THE COURT:  "What was the name of the company?  ADP.

5              We'll be in the same place.  It's 20 after 4:00.  It

6    depends how late you want to stay.  I'm sure the interpreters,

7    the court reporter and my deputy don't want to stay, but we are

8    going to finish this witness tonight.  So we are going to try

9    and be as economical as possible.  So pick when you want to

10   object because you think it really substantively matters

11   because the end of the day, the fact that it was ADP is not

12   going to rock anybody's world, with all respect.  OK?

13             Next.

14   BY MR. COSTIN:

15   Q.  When did you start using ADP?

16   A.  I believe in 2014.

17   Q.  Why?

18   A.  I was trying to keep myself up to date, and I was trying to

19   do what was being demanded of me, and I was supposed -- I had

20   been paying in cash, and I wanted to get up to date because I

21   didn't think that was right, and I wanted to fix things.

22   Q.  Did you ever pay Mr. Mendoza using ADP?

23   A.  He gave me his PIN number immediately.

24             THE COURT:  So the answer is yes?

25   A.  Or could you please repeat the question for me then?

1              THE COURT:  I wish you would listen to it the first

2     time.

3              The question was:  Did you ever pay him using ADP?

4     The answer is yes or no.  Not he gave me his PIN number.

5              THE WITNESS:  Yes.  Yes.  Yes.

6     Q.  When did this happen, what year?  Do you recall?

7     A.  In 2015 when he gave me that document.  Excuse me, because

8     I couldn't report it before because he hadn't given me his

9     records.

10             MS. ISAACSON:  Move to strike.

11             THE COURT:  It's stricken.  Next.

12    Q.  Do you recall Mr. Mendoza taking any vacation time?

13             THE COURT:  Do you mean at any time during his

14    employment?

15             MR. COSTIN:  Actually, yes, between 2010 and 2016,

16    your Honor.

17             THE COURT:  Thank you.

18    A.  At least one week every year.

19    Q.  Do you recall approximately when he would take that one

20    week?

21    A.  I don't have that in memory right now because he would

22    either ask me to take vacation or I would automatically tell

23    him to take vacation, but I don't remember when.

24    Q.  Between 2010 and 2016, do you recall if Mr. Mendoza took

25    any time off because he was ill or sick?

131QJAV2                              J. Almonte - Direct

1    A.  He did not come in to work on several different occasions

2    because of illness.

3    Q.  Do you know approximately how many days he missed because

4    he was ill?

5            THE COURT:  Do you know?  Yes or no.  Do you know how

6    many?  Yes or no.

7            THE WITNESS:  Yes.

8            THE COURT:  How many, approximately?

9            THE WITNESS:  Approximately, well, like for three

10   weeks when he had the problem from being shot.  After that, he

11   had appointments every two -- well, he had appointments two

12   days a week for many weeks, many times.

13           THE COURT:  And were those appointments such that he

14   was not at work at all on those days?

15           THE WITNESS:  Sometimes he came back in.  Sometimes he

16   did not come back in.

17           THE COURT:  Was he paid on those days or not paid?

18           THE WITNESS:  He was paid for the full day.  He was

19   always paid for the full week.

20           THE COURT:  Even when he took sick leave?

21           THE WITNESS:  For sure.  It was sent to his house.

22   Many times my brother sent the check to his house.

23           THE COURT:  And was he paid when he was on vacation?

24           THE WITNESS:  They were paid also.

25           THE COURT:  "They" meaning who is they?  I'm asking

1    about this.

2                    THE INTERPRETER:  The interpreter's correction.  He

3    was paid.

4    BY MR. COSTIN:

5    Q.  Was your business closed during holidays?

6    A.  During the day it would be closed, but we almost never took

7    a vacation.  We never went to resort -- we never went --

8                    THE COURT:  Let's try this one more time.  This might

9    be the last time I do this, OK?

10                   The last question that Mr. Costin asked you, please

11   interpret, was:  Was your business closed during the holidays.

12   That's the question.

13                   The answer is yes or no.  Was it closed during the

14   holidays?  Yes or no.

15                   THE WITNESS:  Yes, but not all the time.

16                   THE COURT:  No.  No.  No.

17                   THE WITNESS:  Yes.

18                   THE COURT:  Yes, it was.

19                   Then you asked the next question.  When was it closed?

20   What holidays?  Was it closed the whole day?  Let's ask normal

21   questions and get normal answers.  I don't know why this is so

22   hard.

23                   MR. COSTIN:  Yes.

24   BY MR. COSTIN:

25   Q.  On what holidays was your business closed?

1    A.   July 4, December 25, January 1.  Those were the main days

2    that were closed.

3              THE COURT:  Were you closed completely or just for

4    part of the day?

5              THE WITNESS:  During the day.

6              THE COURT:  So you were open on Christmas night?

7              THE WITNESS:  Correct.

8              THE COURT:  And the night of 4th of July.

9              THE INTERPRETER:  The interpreter should correct

10   something.  By Christmas night, you mean not Christmas Eve?

11             THE COURT:  I mean Christmas night.

12             THE WITNESS:  We were closed during the day.

13             THE COURT:  What time would you open on a holiday like

14   Christmas?

15             THE WITNESS:  After 6:00 p.m.

16             THE COURT:  How late would you stay open?

17             THE WITNESS:  Until 4:00.

18             THE COURT:  Did Mr. -- I'm sorry?

19             THE WITNESS:  Sometimes I would get a permit for the

20   25th and the 31st, and sometimes I would get a permit to stay

21   open until 8:00 a.m.

22             THE COURT:  Did Mr. Mendoza work on these holidays?

23             THE WITNESS:  No, because he worked during the day.

24   No.

25             THE COURT:  So your testimony is he never worked on

J. Almonte - Direct

1     any holidays between 2010 and 2016?

2                THE WITNESS:  No.

3                THE COURT:  Go ahead.

4     BY MR. COSTIN:

5     Q.  If the holiday fell on a Sunday, would he work it, and he

6     was scheduled to work?

7     A.  I was closed if there was a holiday, then most everything

8     would be closed.

9                THE COURT:  I don't understand that answer.  I thought

10    he just said 4th of July, Christmas and New Year's were the

11    only holidays he was closed, and the testimony was that

12    Mr. Mendoza worked all the time on Sundays between 2010 and

13    2016.

14               You're muddying and making the record more and more

15    confusing, Mr. Costin.  You really are.  This is the kind of

16    case where precision matters, OK?  That's why I'm trying to

17    take over the questioning because you all are muddying this

18    record, and I need it to be precise for purposes of making

19    findings of fact.  So please ask questions that are laser-beam

20    focused.

21               MR. COSTIN:  Yes, sir.

22               THE COURT:  It is 4:30 and my patience is beginning to

23    be tried here.  Very concrete, discrete questions.

24               MR. COSTIN:  Yes, your Honor.  Actually, your Honor,

25    I'm going to move on.  I'm going to ask another question.

1    BY MR. COSTIN:

2    Q.   Were you informed by your managers that Mr. Mendoza was not

3    present at work during his scheduled hours?

4    A.   Yes.   I was informed about whatever happened.

5    Q.   Did you take any disciplinary actions towards Mr. Mendoza

6    regarding the allegations that he was missing from work?

7    A.   What I did was I advised him many times that if he didn't

8    stop doing those things, I would have to fire him.

9    Q.   Why didn't you fire him?

10   A.   Out of sympathy because I believe it is hard to be out of a

11   job when you have no papers and -- those were the reasons why.

12   Q.   Did you believe that -- were you informed when he was

13   suspended from work by Mr. Pichardo?

14   A.   Yes.

15   Q.   Did you ever suspend Mr. Mendoza?

16   A.   No.

17   Q.   Did you ever -- when did you learn -- did you ever learn

18   that Mr. Mendoza had a relationship with Margarita Carasquillo?

19            MS. ISAACSON:   Objection.

20            THE COURT:   Overruled.   The question requires a yes or

21   no answer.

22            Did you ever learn it?   Yes or no.

23            Did you ever learn that he had the relationship?   Yes

24   or no.

25            THE WITNESS:   Yes.   Yes.

1    Q.   When?

2    A.   After the business was closed, after the business had

3    stopped operating, I believe.

4            MR. COSTIN:   Nothing further, your Honor.

5            THE INTERPRETER:   Interpreter's correction and the

6    relationship was then over.

7            MR. COSTIN:   Nothing further, your Honor.

8            THE COURT:   Cross-examination, please.

9    CROSS-EXAMINATION

10   BY MS. ISAACSON:

11   Q.   Good afternoon, Mr. Almonte.

12   A.   Govern.

13   Q.   You're the owner El Aguila Bar Restaurant Corp., the entity

14   that operated El Aguila?  Yes or no.

15   A.   Correction.  I was the owner.

16   Q.   You were the owner of El Aguila Bar Restaurant Corp., the

17   entity that operated El Aguila?  Yes or no.

18   A.   Yes.

19   Q.   You were in charge of supervising employees at El Aguila?

20   Yes or no.

21   A.   No.

22   Q.   You paid employees at El Aguila?  Yes or no.

23   A.   Yes.

24   Q.   You determined employees' schedules at El Aguila?  Yes or

25   no.

131QJAV2                         J. Almonte - Cross

1     A.  Yes.

2     Q.  If an employee was not performing work properly, you had

3     the power to fire them?  Yes or no.

4     A.  Of course I did.

5     Q.  You paid Mr. Mendoza Java solely in cash until

6     December 2015?  Yes or no.

7     A.  Yes.

8     Q.  From December 2015 until July 2016, you paid Mr. Mendoza

9     Java in check and cash?  Yes or no.

10    A.  Yes.

11    Q.  And in 2010, you were paying Mr. Mendoza Java $300 per

12    week?  Yes or no.

13    A.  Yes.

14    Q.  And in July 2012, you were paying Mr. Mendoza Java $325 or

15    $330 per week?  Yes or no.

16    A.  I don't recall exactly, but yes, that was the amount more

17    or less, yes.

18    Q.  And starting in December 2015, you paid Mr. Mendoza Java

19    $260 per week in check and $95 per week in cash?  Yes or no.

20    A.  Please repeat that question.

21    Q.  And starting in December 2015, you paid Mr. Mendoza Java

22    $260 per week in check and $95 per week in cash?  Yes or no.

23    A.  Yes.  The only thing is I think that it was actually $262.

24    It's just a small difference.

25    Q.  OK.  And you were rarely at the El Aguila restaurant?  Yes

1   or no.

2   A.  No, not rarely.  Not rarely.

3          THE COURT:  When you use a word like "rarely," it

4   invites a lot of questions.  You could drive a truck through

5   rarely, so I would be a little bit more precise than rarely.

6   Q.  You weren't at the restaurant every day?  Yes or no.

7   A.  Almost every day.

8   Q.  And the hours that Mr. -- strike.

9          And you didn't have personal knowledge of the hours

10  that Mr. Mendoza Java worked, right?  Yes or no.

11  A.  Because of the schedule I gave him, I knew the schedule

12  that he was supposed to work, but I wasn't present to verify

13  it.

14         MS. ISAACSON:  Move to strike as non-responsive.

15         THE COURT:  That is not going to be done.  That

16  testimony will stand.

17  Q.  And you knew Mr. Mendoza Java's hours were based on what

18  the managers would tell you they were?  Yes or no.

19  A.  Correct.

20  Q.  And Mr. Mendoza Java worked in 2010 from 8:00 a.m. to

21  4:00 p.m., correct?

22  A.  Yes.

23  Q.  And you never observed when Mr. Mendoza Java would come

24  into work in 2010, correct?

25         THE COURT:  That's why he says he wasn't present to

131QJAV2                          J. Almonte - Cross

1    verify it, and that's why I allowed that testimony.  If you
2    want to go through it again, we can.  There is no jury here.  I
3    have two law clerks sitting there.  Maybe you're trying to
4    persuade them, but I'm the only one, and I already heard what
5    he said.
6              If you want to do it this way, you can, but it is
7    quarter of 5:00.  It's up to you.  I have all night.  I'm not
8    going anywhere.
9    Q.  And you don't have any documentation reflecting when
10   Mr. Mendoza Java entered and exit each day for work, correct?
11             THE COURT:  No.  No pero anything.
12             Yes or no, you have the document?
13             THE WITNESS:  No, but in 2015 -- well, up until 2015,
14   yes.
15             THE COURT:  Up until 2015, you didn't have any
16   documents, correct?
17             THE WITNESS:  No.
18             THE COURT:  And then you had documents beginning in
19   2015, correct?
20             THE WITNESS:  Yes.
21             THE COURT:  But as you testified on direct, they're
22   either lost or destroyed, and in any event, no longer
23   available, correct?
24             THE WITNESS:  Of all of the employees in common
25   whether or not Mexico was there, but it's of all the employees.

1          THE COURT:  Right, but the only employee I care about

2    is Mr. Mendoza Java, and you don't have any documents that

3    reflect any hours he worked.  At this moment in time as we sit

4    here today in this courtroom, you don't have any documents.  If

5    you did, you would have given them to Mr. Costin, I'm sure.

6    Isn't that correct?

7          THE WITNESS:  That's right.

8    BY MS. ISAACSON:

9    Q.  You never gave Mr. Mendoza Java anything in writing when he

10   was hired about how much he was going to be paid, correct?

11   A.  Correct.

12   Q.  In fact, throughout his employment, you never gave him any

13   kind of notice indicating what his hourly and overtime rates

14   were, correct?

15   A.  That's correct, but he did not work overtime, and we would

16   discuss it verbally.  Correct, no.

17   Q.  And you never gave Mr. Mendoza Java any paystub or document

18   with his payment of wages from 2008 until December 2015,

19   correct?

20   A.  Correct.

21   Q.  From 2010 to 2014, Mr. Pedro Pichardo told you under 20

22   times that he sent Mr. Mendoza Java home for being too drunk,

23   correct?

24   A.  Yes.

25   Q.  From 2010 to 2014, Mr. Pichardo also told you that

131QJAV2                          J. Almonte - Cross

1    Mr. Mendoza Java would be missing three times a week for an

2    hour at a time, correct?

3    A.  That's also correct.

4    Q.  From 2010 to 2014, did you ever give Mr. Mendoza Java an

5    award for his professionalism?

6    A.  In December, during an employee party he was given an

7    acknowledgment because he was greatly appreciated and he would

8    do his work.

9    Q.  December of what year?

10              THE COURT:  2014 is what he testified to.

11              MS. ISAACSON:  No further questions.

12              THE COURT:  Mr. Costin, you're up if you have anything

13   further.

14              MR. COSTIN:  Yes, I have one thing.  May I approach

15   the witness?  I have a document.

16              THE COURT:  Give it to Mr. Tam.

17              MR. COSTIN:  You already have a copy of it.

18              THE COURT:  Sure.

19              MR. COSTIN:  Your Honor, may I approach the witness?

20              THE COURT:  Sure.  Do you have a copy for me?

21              MR. COSTIN:  Yes, I do.

22              THE COURT:  I don't quite understand why you're

23   offering a document on redirect, something that should have

24   been offered on direct or something that the cross-examination

25   raised that would make it appropriate that would offer it on

1    redirect.  Or you're not offering it, so you're just showing it

2    to refresh him which you haven't given any basis to do yet.

3            What's happening with this document?

4            MR. COSTIN:  Your Honor, this could have been put in

5    on direct.  It could have been put in -- I'm putting it in on

6    cross --

7            THE COURT:  It's not on cross.  You are on redirect.

8    Ask a question.  Let's see what happens.

9    BY MR. COSTIN:

10   Q.  Mr. Almonte, I'd like for you to take a look at document

11   marked Defendant's B.  Do you recognize the document, sir?

12   A.  Yes, sir.

13   Q.  What is that, sir?

14   A.  This is a document that shows Mexico was reporting now or

15   what is called a W2 in order to prepare his income taxes.

16   Q.  Where did that document come from, please?

17   A.  From an ADP report, ADP which was the company that did the

18   payroll or that prepared the checks.

19   Q.  How did this document come into your possession?  How did

20   you get this?

21   A.  They would send a delivery man.  I can't quite recall if it

22   was UPS or Fed Ex, but every week they would send it with the

23   checks, and then this document was included in it.

24   Q.  Is this a fair and accurate of your original?

25   A.  This is the original because I never turned it into Mexico

1    because he never came back since, since the business is shut

2    down, so --

3              MR. COSTIN:  The document you're holding in your hand

4    is that a piece of paper that you got from ADP or is it a copy

5    of the document?

6              THE WITNESS:  I haven't made any copies of this.  A

7    copy is shown here.  Maybe he made copies of it, but I haven't

8    made copies.  Him.  Him, the lawyer.

9              MR. COSTIN:  Your Honor, I offer this in evidence as

10   Defendant's Exhibit's B.

11             THE COURT:  Any objection?

12             MS. ISAACSON:  Yes.

13             THE COURT:  What's the objection?

14             MS. ISAACSON:  It wasn't within the scope of cross.

15             THE COURT:  I'll overrule it for purposes of having

16   the record completed.  I'm not sure how much it really adds to

17   anything, but I'll accept it into evidence.

18             MR. COSTIN:  Thank you, your Honor.

19             (Defendant's Exhibit B received in evidence)

20             MR. COSTIN:  Nothing further at this time.

21             THE COURT:  Any recross?

22             MS. ISAACSON:  No, your Honor.

23             THE COURT:  Mr. Almonte, you may step down.

24             (Witness excused)

25             THE COURT:  Mr. Costin, any other witnesses?

1          MR. COSTIN:  No, your Honor.

2          Well, at this time I don't have any other witnesses

3     present, but I would like to call Margarita Carasquillo.

4          THE COURT:  Are you going to be able to call her

5     tomorrow?

6          MR. COSTIN:  No, your Honor.  That's definitely not

7     going to happen.

8          THE COURT:  That's because of her medical condition?

9          MR. COSTIN:  Because of her medical condition.  I

10    scanned some medical documents that I received from the

11    hospital, but she is not going to be able to come in.

12         THE COURT:  Make a proffer as to what her testimony

13    would entail.

14         MR. COSTIN:  Sure.  She would testify that --

15    Ms. Carasquillo would testify that if she were -- she would

16    testify that the defendant spent about --

17         THE COURT:  I know you do a lot of plaintiff's work,

18    but remember who you are representing in this case.

19         MR. COSTIN:  Yes, your Honor.

20         That Mr. Mendoza would come to her apartment at least

21    three times a week and spend up to an hour and a half with her

22    inside of the apartment.  He would stay there and he would come

23    there when he knew that Mr. Santiago Almonte was not in the

24    restaurant because he knew that he should have been at work.

25         THE COURT:  What period of time are we talking about?

131QJAV2                         J. Almonte - Cross

1              MR. COSTIN:  The entire time relevant to this case,

2      your Honor.

3              THE COURT:  2010 to 2016?

4              MR. COSTIN:  Correct.

5              THE COURT:  She's going to testify that Mr. Mendoza

6      came to her apartment, what did you say, three times a week for

7      six years?

8              MR. COSTIN:  Yes, they had a relationship, your Honor.

9              THE COURT:  For six years.

10             MR. COSTIN:  Yes.  Yes, and part of it -- yes, that's

11     what she's going to testify to, and the relationship ended

12     around the time that the restaurant closed, and also there were

13     some issues with his wife.

14             THE COURT:  Well, I don't know that the issues with

15     the wife have anything to do with the case, and I probably

16     would disallow anything related to that.

17             MR. COSTIN:  That's fine, your Honor.

18             THE COURT:  The only issue that's relevant here is he

19     claimed he worked up to 12 hours a day on many days, and you're

20     saying he not only didn't work 12 hours, he didn't even work

21     the eight hours because he was with her during one and a half

22     out of those eight hours.  Is that effectively what you're

23     going to be arguing as a result of what you're proffering her

24     testimony to be?

25             MR. COSTIN:  Plus, your Honor, after work, he would go

131QJAV2                           J. Almonte - Cross

1    to her apartment as well.

2            THE COURT:  After work is irrelevant to me.  I'm

3    trying to figure out -- my job is to make findings of fact.

4    The plaintiffs are arguing that he worked 12 hours a day, 8:00

5    to 8:00 on a lot of days.  You're arguing he worked 8:00 to

6    4:00, and my understanding is that this testimony would relate

7    to the fact that he didn't even work 8:00 to 4:00.  Isn't that

8    what you're arguing through her testimony, or something else?

9            MR. COSTIN:  That is what I'm arguing, your Honor.

10           THE COURT:  OK.  So what I propose is that you

11   submit -- and I assume that you could prepare an affidavit as

12   her direct testimony.

13           MR. COSTIN:  Yes.

14           THE COURT:  And then, Ms. Isaacson, you could

15   cross-examine her and you could conduct any redirect.  And that

16   could all happen probably within an hour.  Is that not right?

17   This is a pretty discrete witness and line of questions.

18           Ms. Isaacson, how much time do you think?  Given how

19   much time you took with the parties, I can't imagine you taking

20   more time with a non-party, especially when it's really one

21   issue, and it is what it is, so to speak.

22           MS. ISAACSON:  Yes, your Honor.  We don't anticipate

23   taking too long with Ms. Carasquillo on cross.  Mr. Clark did

24   take her deposition, and it was fairly short because it was a

25   limited issue.  We would object to her submitting an affidavit.

1   We would like her live testimony, and I don't think that

2   testimony would take much longer at all based on her deposition

3   and based on the scope of what she will be testifying about.

4          THE COURT:  I don't mind having live testimony, but I

5   hope it's better than the live testimony today in terms of the

6   precision of the questions.

7          MR. COSTIN:  Yes, your Honor.

8          THE COURT:  And I was advocating for an affidavit

9   because it then cabins the testimony in a discrete way and

10  makes it easier for you, but if you want to have what we've had

11  today, which is imprecise and far-ranging questioning beyond

12  what I think would have been appropriate, with all due respect,

13  we can do that.

14         When are we going to do that though because I don't

15  want to keep the record open for very much longer.  If this is

16  all we have, we should figure out how to shoehorn this in

17  sooner rather than later, mindful that she has some medical

18  condition that makes her unavailable tomorrow.

19         Do you have any sense of when she would be available,

20  Mr. Costin?

21         MR. COSTIN:  Your Honor, my understanding is that she

22  was released from the hospital on or about 22nd of February,

23  and that she needs about two to three weeks to fully recover

24  from her medical issue.  So, I would say two weeks on the safe

25  side.

1                  THE COURT:  Two weeks from now?

2                  MR. COSTIN:  Approximately, your Honor.

3                  THE COURT:  So we're talking about the earliest that

4        she could testify effectively would be the week of the 19th.

5        Next week is the week of the 5th, and then the week of the

6        12th, that's two weeks from now.  So I'm looking at week of the

7        19th.

8                  MR. COSTIN:  Your Honor, I think that's very safe.

9                  THE COURT:  And we need, effectively, an hour, let's

10       say, correct?

11                 MR. COSTIN:  Yes.

12                 THE COURT:  Let me ask this question:  Would it make

13       sense and be efficient to have the parties make any post trial

14       submissions they want to make during this interim period or do

15       you want to wait until her testimony, given that we know --

16       really given that she has been deposed and what the proffer is,

17       what it's going to be, and what your line of cross is going to

18       be.  I would be inclined to have you be working on any post

19       trial submissions you want to make.

20                 My concern about bench trials like this is the longer

21       you put them out, then the longer it becomes for me to have to

22       remember everything.  If we say we don't want to submit our

23       post trial submissions until after this testimony, I think it

24       just will delay things.  I mean, I don't know what post trial

25       submissions necessarily you're going to want to make, but I'm

1  happy to have anything you want to submit.

2              What are your thoughts, Ms. Isaacson?

3              MS. ISAACSON:  We are OK submitting it in the interim.

4              THE COURT:  Mr. Costin?

5              MR. COSTIN:  I concur, your Honor.

6              THE COURT:  So why don't we look toward the end of

7  that week just in an abundance of caution.  What do we have on

8  the 22nd or 23rd?

9              Wednesday, the 21st and Friday, the 23rd are open on

10  the calendar.  We could do those in the morning of either of

11  those days.  Do either or both of those work for counsel?

12              MR. COSTIN:  March 21, that Wednesday works fine, your

13  Honor.

14              THE COURT:  Ms. Isaacson, and Mr. Clark the 21st in

15  the morning at 10:00, does that work?

16              MS. ISAACSON:  Yes, I believe I might have an initial

17  conference with you in the afternoon.

18              THE COURT:  You have an initial conference with me?

19              MS. ISAACSON:  I think so.

20              THE COURT:  We'll spend the day together.

21              MS. ISAACSON:  OK.

22              THE COURT:  Is that right because we don't seem to

23  have anything listed right now.  What case is that?

24              MS. ISAACSON:  Patron.  Maybe it is before the

25  district judge.

1          THE COURT:  In any event, March 21st at 10:00.

2          MR. COSTIN:  Yes.

3          THE COURT:  How about this, can I ask you to make

4     whatever post trial submissions us want to make from tomorrow,

5     meaning the 16th?

6          MS. ISAACSON:  Yes.

7          MR. COSTIN:  Yes, your Honor.

8          THE COURT:  Then we will treat the 21st both as we'll

9     take the last witness and any closing arguments you want to

10    make and any questions I may have about your submissions, and

11    then the record will be closed at that time.

12         If I can make findings and conclusions on the record

13    then, I will.  If not, I will simply take it on submission and

14    try to get a decision out as promptly as possible.  I think

15    that's the most efficient way to proceed.

16         Do you anticipate, Ms. Isaacson, other than

17    Mr. Costin's remaining witness to having some sort of rebuttal

18    case and any witnesses for that?  Obviously, if there is, we

19    can accommodate that on the 21st, but what would that entail if

20    anything?

21         MS. ISAACSON:  It would basically just be the

22    plaintiff, if anything, as a rebuttal witness.

23         THE COURT:  OK.  Well, to the extent you are going to

24    call him again, that would obviously have to take place at that

25    time and you should prepare for that.

131QJAV2                           J. Almonte – Cross

1              MS. ISAACSON:  OK.

2              THE COURT:  Is there anything else we need to do for

3     today?

4              MS. ISAACSON:  No, your Honor.

5              THE COURT:  Mr. Costin.

6              MR. COSTIN:  No, your Honor.  Thank you very much.

7              THE COURT:  Thank you all very much.  Have a good

8     night.

9              Thanks to the witnesses.  Thank you to the

10    interpreters.  Thank you to the court reporter.  Thank you to

11    my staff.

12             Have a good night.  I'll see you all in a few weeks.

13             (Trial continued to March 21, 2018 at 10:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

131QJAV2                              J. Almonte - Cross

1                              DEFENDANT EXHIBITS

2       Exhibit No.                                    Received

3        B    . . . . . . . . . . . . . . . . . . . 141

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX OF EXAMINATION

2    Examination of:                                      Page

3    FLORENCIO MENDOZA JAVA

4    Direct By Ms. Isaacson . . . . . .7

5    Cross By Mr. Costin  . . . . . . 20

6     PEDRO W. PICHARDO

7    Direct By Mr. Costin . . . . . . 58

8    Cross By Ms. Isaacson  . . . . . 74

9    Redirect By Mr. Costin . . . . . 87

10   SANTIAGO VALENTIN ALMONTE

11   Direct By Mr. Costin . . . . . . 88

12   Cross By Ms. Isaacson  . . . . .101

13   Redirect By Mr. Costin . . . . .110

14   JUAN ALBERTO ALMONTE

15   Direct Mr. Costin  . . . . . .111

16   Cross By Ms. Isaacson  . . . . .134

17

18

19

20

21

22

23

24

25