USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __4/25/2018____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FLORENCIO MENDOZA JAVA,                      :
                                             :
                    Plaintiff,               :
                                             :         **OPINION & ORDER**
            - v. -                           :
                                             :         16-CV-6691 (JLC)
EL AGUILA BAR RESTAURANT CORP.,              :
*et al.*,                                    :
                                             :
                    Defendants.              :
-------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

In this wage-and-hour case, Plaintiff Florencio Mendoza Java has asserted

claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, New

York Labor Law ("NYLL"), §§ 190 and 650 *et seq.*, and regulations of the New York

Compilation of Codes, Rules and Regulations ("NYCRR"), Title 12, §§ 146-1.1 *et seq.*

The Court conducted a bench trial on March 1 and March 27, 2018.  This Opinion

and Order constitutes the Court's Findings of Fact and Conclusions of Law

pursuant to Federal Rule of Civil Procedure 52(a).

For the reasons set forth below, the Court concludes that Plaintiff is entitled

to $5,000 in statutory penalties for wage statement violations under NYLL, but to

no other damages, and to attorneys' fees and costs to be determined.

## I.    BACKGROUND

Plaintiff commenced this action by filing a complaint on August 24, 2016,

alleging that his former employers, defendants El Aguila Bar Restaurant Corp. ("El

Aguila"), Las Banderas Sports Bar Catering Lounge Corp. ("Las Banderas"), Juan

Almonte, and Santiago Almonte (1) failed to pay him minimum wage and overtime compensation as required by federal and New York law, (2) failed to pay him "spread of hours" wages as required by New York law, and (3) failed to provide him with wage notices and wage statements as required by New York law.  Dkt. No. 1 ("Compl."), ¶¶ 78–108.[1]

On February 23, 2017, defendants El Aguila and Juan Almonte (the "Appearing Defendants") answered the complaint.  Dkt. No. 23.  Defendants Las Banderas and Santiago Almonte (the "Defaulting Defendants") never filed an answer or otherwise responded to the complaint, and are thus in default.[2]  By notice of consent dated October 17, 2017, Plaintiff and the Appearing Defendants consented to the undersigned's jurisdiction for all purposes in this case, including trial, pursuant to 28 U.S.C. § 636(c).  Dkt. No. 35.

On January 4, 2018, Plaintiff and the Appearing Defendants submitted a proposed joint pre-trial order in which they stipulated to certain facts.  Dkt. No. 41

---

[1]  Plaintiff originally brought this case as a collective action under 29 U.S.C. § 216(b) but eventually proceeded only in his individual capacity.

[2]  Following a conference with Plaintiff and the Appearing Defendants on November 1, 2017, the Court issued an order directing Plaintiff not to take any action as to the Defaulting Defendants until after the proceedings against the Appearing Defendants concluded in order to ensure that there were no inconsistent results against the defendants.  Order dated November 2, 2017, Dkt. No. 39.

("Joint Stip.").[3]  That same day, each side also filed its respective pre-trial

submission.  Dkt. Nos. 44–46.[4]

The bench trial began on March 1, 2018.  Plaintiff testified and then rested

without calling any other witnesses.  The Court subsequently heard testimony from

three defense witnesses: Juan Almonte, Santiago Almonte, and non-party Pedro

Pichardo.[5]  On March 27, 2018, the Court heard testimony from another defense

witness, non-party Margarita Carrasquillo.  Plaintiff did not introduce any exhibits

into evidence during trial, and the Appearing Defendants entered a single exhibit

into evidence, Plaintiff's 2016 W-2 form.  Tr. at 140:10–141:17.  Following the first

day of trial, Plaintiff and the Appearing Defendants filed post-trial submissions.

*See* Dkt. Nos. 58, 59.

---

[3] Citations to the parties' stipulated facts refer to the paragraphs found under the heading "JOINT STIPULATIONS OF FACT" on page 5 of docket entry no. 41.

[4] In the parties' proposed joint pre-trial order, the Appearing Defendants identified nine potential trial witnesses, some of whom had not been disclosed to Plaintiff during the discovery period.  *See* Dkt. No. 41 at 6–7.  Plaintiff objected to the undisclosed witnesses on timeliness grounds.  *See* Dkt. No. 48.  The Court held a conference with the parties on January 11, 2018 and that same day issued an order directing that Plaintiff be given an opportunity to depose non-party witnesses Margarita Carrasquillo and Pedro Pichardo at defendants' expense.  *See* Dkt. No. 50.

[5] Santiago Almonte's testimony was limited solely to the issue of damages, as the Court had expressly precluded his testimony on the issue of liability due to his status as a defaulting defendant.  *See* Trial Transcript ("Tr.") at 2:20–4:19 (limiting scope of Santiago Almonte's testimony).

## II.    LEGAL STANDARD

"An employee seeking to recover unpaid wages 'has the burden of proving that he performed work for which he was not properly compensated.'" *Xochimitl v. Pita Grill of Hell's Kitchen, Inc.*, No. 14-CV-10234 (JGK) (JLC), 2016 WL 4704917, at \*5 (S.D.N.Y. Sept. 8, 2016) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)), *adopted by*, 2016 WL 6879258 (S.D.N.Y. Nov. 21, 2016). Under the FLSA, "[w]hen an employer fails to maintain accurate and complete records of the hours employees work and the amounts they are paid, the plaintiff-employee need only to submit 'sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred.'" *Gonzalez v. Masters Health Food Serv. Inc.*, No. 14-CV-07603 (VEC), 2017 WL 3835960, at \*16 (S.D.N.Y. July 27, 2017) (quoting *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997)). "The burden then shifts to the employer to come forward with evidence either to show 'the precise amount of work performed,' or to 'negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011)). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate." *Id.* (quoting *Anderson*, 328 U.S. at 688). "A similar standard applies to unpaid compensation claims under NYLL." *Id.* (citing *Canelas v. World Pizza, Inc.*, No. 14-CV-7748 (ER), 2017 WL 1233998, at \*9 (S.D.N.Y. Mar. 31, 2017)).

"Although a plaintiff's testimony regarding his recollection alone may be sufficient to establish a rebuttable presumption that he worked certain hours for which he was not compensated, such testimony only establishes such a presumption if the testimony is credible." *Romero v. Rung Charoen Sub, Inc.*, No. 16-CV-1239 (VMS), 2017 WL 4480758, at *4 (E.D.N.Y. Sept. 30, 2017) (citing *Daniels v. 1710 Realty LLC*, 497 F. App'x 137 (2d Cir. 2012) (summary order)). "It is within the province of the district court as the trier of fact to decide whose testimony should be credited. And as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (internal citations and quotations omitted).

Having reviewed the transcript of the trial, the parties' pre- and post-trial submissions, and having considered those materials in light of its own recollections of the trial and its perception of the credibility of the witnesses who testified, the Court now sets forth its findings of fact and conclusions of law.

## III. FINDINGS OF FACT

### A. Defendants

El Aguila was a restaurant and bar located in the Bronx. Tr. at 7:23–8:3, 112:3–5. It first opened for business in 2008 and closed in July 2016. *Id.* at 112:6–8. From 2010 through July 2016, El Aguila had a gross volume of sale and business of more than $500,000 per year and its employees handled and worked with goods and materials that have moved in, and been produced for, interstate commerce.

Joint Stip., ¶¶ 6-7. El Aguila had between 10 and 15 employees between 2008 and July 2016.[6]

Juan Almonte was the sole owner of El Aguila for the entire period of its operation. Tr. at 90:7–20, 112:3–11. He had authority to (1) hire and fire employees, (2) pay employees, and (3) manage and supervise employees. Joint Stip., ¶ 5. Santiago Almonte is the brother of Juan Almonte. Tr. at 90:1–5, 113:11–15. Santiago served as the general manager of El Aguila from 2008 until 2016. *Id.* at 75:13–20, 89:1–5.

Like El Aguila, Las Banderas was a restaurant and bar located in the Bronx. *Id.* at 8:16–19. The record is unclear as to who owned Las Banderas or whether it remains operational.[7]

## B. Plaintiff

Plaintiff is a former employee of the Appearing Defendants. Joint Stip., ¶ 3. He was hired in 2008. Tr. at 8:4–5, 92:15–18. Juan Almonte, who approved Plaintiff's hiring at El Aguila, did not provide Plaintiff at the time of his hiring with any document stating what wages Plaintiff would be paid. *Id.* at 19:21–20:7, 113:10–13, 138:9–16. Minimum wage posters issued by the Department of Labor

---

[6] This finding is based on Juan Almonte's testimony that El Aguila employed around 12 employees overall, Tr. at 112:19–21, which was roughly consistent with Plaintiff's testimony that approximately four employees worked at El Aguila during the day and 15 employees worked there at night. *Id.* at 25:18–20, 28:6–9.

[7] Plaintiff testified that Santiago Almonte was "in charge" of Las Banderas but did not provide any further information. Tr. at 11:11–12.

were posted every year at El Aguila, and Plaintiff was aware of these posters during his employment. *Id.* at 38:2–20, 39:4–7, 109:21–110:1, 112:22–113:9, 126:2–17.

Plaintiff's job duties at El Aguila included cleaning, making deliveries, and receiving purchase requests from customers. *Id.* at 22:8–10. His duties also included some cooking and assistance with food preparation activities, although these were not a significant part of his job. *Id.* at 8:8–9, 45:23–46:1, 61:5–17, 113:19–21. His employment with El Aguila ended in July 2016, when the restaurant shut down. *Id.* at 8:6–7.

Plaintiff worked at Las Banderas from December 2015 until July of 2016. *Id.* at 8:13–14, 8:25–9:6. His job duties at Las Banderas included cleaning and receiving purchase requests from customers. *Id.* at 8:20–21, 55:14–19, 98:14–23.

### C. Non-Parties Pichardo and Carrasquillo

Pedro Pichardo was the day manager of El Aguila from 2008 until 2014. *Id.* at 24:14–19, 58:22–59:3, 75:8–12. He supervised Plaintiff during Plaintiff's shifts. *Id.* at 61:1–4.

Margarita Carrasquillo was a regular customer at El Aguila. *Id.* at 50:13–18, 51:18–23, 155:2–4. Between 2010 and 2016, Carrasquillo would go to El Aguila in the afternoon to eat. *Id.* at 154:15–155:4. Carrasquillo and Plaintiff maintained a sexual relationship between 2010 and 2016. *Id.* at 157:8–10.

### D.    Recordkeeping of Wages and Hours

The witnesses offered differing accounts of whether Plaintiff's wages and work hours were documented in some fashion.  Before setting forth its findings, the Court summarizes the relevant portions of each side's trial testimony.

#### 1.    Plaintiff's Testimony

Plaintiff testified that he was not provided with any documentation concerning his wages at the time he was hired at El Aguila in 2008.  *Id.* at 19:21–20:7.  Plaintiff testified further that, for the duration of his employment at El Aguila, there was no system for employees to record or track their time.  *Id.* at 13:18–14:19.  According to Plaintiff, at no time was he provided with any kind of documentation of his weekly wages.  *Id.* at 19:6–12.

#### 2.    Juan and Santiago Almonte's Testimony

Juan Almonte admitted at trial that he did not provide Plaintiff with any documentation concerning his wages at the time Plaintiff was hired.  *Id.* at 138:9–11.  He also admitted that, throughout Plaintiff's employment at El Aguila, Plaintiff was not provided with any written notice of his hourly and overtime rates.  *Id.* 138:12–16.  Nor was Plaintiff provided with paystubs or other documents setting forth his wages until 2015.  *Id.* 138:17–20.

Juan and Santiago Almonte both testified that they began to document employees' work hours and wages in 2015, and that employees began receiving wage statements, or paystubs, around that time.  Tr. at 95:16–25, 105:3–16, 109:7–18.  However, no paystubs were entered into evidence at trial.  Juan Almonte

testified that El Aguila's business records had been stolen or damaged after the business shut down in 2016. *Id.* at 114:21–116:21. Nevertheless, in support of their contention that employees were provided with documentation concerning their wages starting in 2015, defendants entered a copy of Plaintiff's W-2 form for 2016 into evidence. *Id.* at 140:10–141:19.

### 3. The Court's Findings

The Court finds that Plaintiff was not provided with any documentation concerning his wages at the time he was hired at El Aguila in 2008. The Court finds further that, until 2015, Plaintiff's work hours at El Aguila were not recorded or tracked in any way. Based on Juan and Santiago Almonte's credible testimony, as supported by the W-2 form that was entered into evidence, the Court finds that from December 2015 until July 2016, El Aguila's employees, including Plaintiff, were provided with *some* form of documentation concerning their wages. However, given that none of these documents has been entered into evidence, and that neither Juan nor Santiago Almonte testified in detail as to the information contained in these documents (or the Department of Labor posters), the Court cannot make any findings as to precisely what information they contained. *See, e.g.*, *Marcelino v. 374 Food, Inc. d/b/a Tribeca Bagels*, No. 16-CV-6287 (KPF), 2018 WL 1517205, at *20 (S.D.N.Y. Mar. 27, 2018) (where Department of Labor poster was referred to at trial but not introduced as an exhibit, court concluded it "cannot tell" what information the poster may have provided).

### E. Plaintiff's Weekly Work Hours

Plaintiff and the defense witnesses presented sharply diverging accounts of the number of hours Plaintiff worked per week.

#### 1. Plaintiff's Testimony

Plaintiff testified as follows:

- From August 2010 to July 2012, Plaintiff worked six days a week at El Aguila from 8:00 a.m. to 8:00 p.m. each day, totaling roughly 72 hours a week. Tr. at 11:21–12:1;

- From July 2012 to July 2013, Plaintiff worked six days a week at El Aguila. On five of those days, Plaintiff worked from 8:00 a.m. to 8:00 p.m.; and on one day, Plaintiff worked a night shift from 7:00 p.m. to 5:00 a.m., totaling roughly 70 hours a week. *Id.* at 12:7–14;

- From July 2013 to December 2015, Plaintiff worked six days a week at El Aguila from 8:00 a.m. to 8:00 p.m. each day, totaling roughly 72 hours a week. *Id.* at 12:15–13:3; and

- From December 2015 to July 2016, Plaintiff worked six days a week at El Aguila. On five of those days, Plaintiff worked from 10:00 a.m. to 8:00 p.m. at El Aguila. And on one day, Plaintiff worked from 10:00 a.m. to 4:00 p.m. at El Aguila and then from 4:00 p.m. to 9:00 p.m. at Las Banderas, totaling roughly 61 hours a week. *Id.* at 9:7–10:7, 13:7–17.

Plaintiff was not aware of any other employee at El Aguila who worked more than 40 hours a week. *Id.* at 36:16–19.

### 2. Juan Almonte's Testimony

Juan Almonte testified that there were two main work shifts at El Aguila: a "day shift" of 8:00 a.m. to 4:00 p.m. and a "night shift" of 8:00 p.m. to 4:00 a.m. Tr. at 112:12–18.[8]

According to Juan Almonte, Plaintiff worked the following schedules:

- From 2010 until July 2012, Plaintiff worked five days a week at El Aguila from 8:00 a.m. to 4:00 p.m., totaling no more than 40 hours a week. *Id.* at 120:6–12;

- From July 2012 to December 2015, Plaintiff worked five days a week at El Aguila. On four of the days, Plaintiff worked the day shift (*i.e.*, from 8:00 a.m. to 4:00 p.m.) And on one day, Plaintiff worked the night shift (*i.e.*, from 8:00 p.m. to 4:00 a.m.). As such, Plaintiff's hours totaled no more than 40 hours a week. *Id.* at 122:1–9; and

- From December 2015 to July 2016, Plaintiff worked five days a week at El Aguila, in a shift that ran from 10:00 a.m. to 6:00 p.m. each day. Again, Plaintiff's hours did not total more than 40 hours a week. *Id.* at 124:5–20.

### 3. Santiago Almonte's Testimony

Consistent with Juan Almonte's testimony, Santiago Almonte testified that Plaintiff initially worked five days a week from 8:00 a.m. to 4:00 p.m., and that his work hours later became 10:00 a.m. to 6:00 p.m., never totaling more than 40 hours a week. Tr. at 92:11–24, 93:9–19, 95:6–12. Santiago also testified that, at the end of 2015, Plaintiff began working one day a week at Las Banderas from 4:00 p.m. to 6:00 p.m. In other words, from the end of 2015 until July 2016, Plaintiff worked one

---

[8] In addition, there was a "small waiting shift" from 4:00 p.m. to 11:00 p.m. Tr. at 112:15–18.

day a week from 10:00 a.m. to 4:00 p.m. at El Aguila and then from 4:00 p.m. to 6:00 p.m. at Las Banderas. *Id.* at 98:14–100:11.

### 4. Pichardo's Testimony

Pichardo, who supervised Plaintiff from 2008 to 2014, testified that Plaintiff worked five days a week and that his shifts began at 8:00 a.m. and ended at 4:00 p.m., totaling no more than 40 hours a week. Tr. at 62:7–20, 79:25–80:3. Pichardo testified further that, beginning in 2012, Plaintiff worked one night shift a week instead of a day shift. *Id.* at 59:19–60:3. He added that Plaintiff also had a half-hour lunch break every day. *Id.* at 70:9–13, 82:11–13.

Pichardo testified that Plaintiff would frequently drink beer and unwind at El Aguila's bar after his shifts ended and that Plaintiff would stay at the bar for several hours. *Id.* at 65:1–66:25, 87:3–5. Other employees would also drink after their shifts ended. *Id.* at 67:17–20. Pichardo testified that Plaintiff would also drink during work hours, as did other employees. *Id.* at 67:6–20. Notably, Plaintiff himself admitted that he would drink during work hours and also that he would drink beer after his shifts ended at El Aguila. *Id.* at 40:13–43:5.

Pichardo testified further that, "[a]bout three times a week," Plaintiff would disappear for "[a]bout an hour" around lunchtime and Pichardo would not know his whereabouts. *Id.* at 68:18–69:23, 70:18–71:4.

### 5. Carrasquillo's Testimony

Carrasquillo testified that she and Plaintiff maintained a sexual relationship between 2010 and 2016. *Id.* at 157:8–10. She testified that Plaintiff had told her

that he worked six days a week at El Aguila.  *Id.* at 158:24–159:8.  Carrasquillo also testified that, during their relationship, Plaintiff would "always" come to her apartment three times a week in the middle of the day and stay there for about an hour or hour and a half per visit.  *Id.* at 156:25–157:5, 166:6–8.[9]

### 6.    The Court's Findings

The Court credits the testimony of the defense witnesses regarding Plaintiff's weekly work hours.  Even though, given the absence of relevant employment records in this case, Plaintiff's reliance on his recollection alone "may be sufficient to establish a rebuttable presumption" that he worked the number of hours he claimed he did, *see Rung Charoen Sub, Inc.*, 2017 WL 4480758, at *4, Plaintiff has failed to establish such a presumption because his testimony on this issue was not credible.

The Court's finding on this issue is based on several considerations, the first of which is the Court's impression of the witnesses' demeanor at trial.  *See, e.g.*, *Hanming Feng v. Soy Sauce LLC, d/b/a Soysauce Glatt Kosher Chinese Take Out*, No. 15-CV-3058 (ENV) (LB), 2017 WL 6561160, at *1 (E.D.N.Y. Dec. 22, 2017) ("to determine what is believable and what is not," a trial judge must evaluate a "witness's demeanor") (citation and alterations omitted); *Mendez v. Int'l Food House Inc.*, No. 13-CV-2651 (JPO), 2014 WL 4276418, at *5 (S.D.N.Y. Aug. 28, 2014) (in assessing witness credibility, a trial court's findings of fact may be based on, *inter*

---

[9]  Plaintiff acknowledged having a sexual relationship with Carrasquillo.  *Id.* at 52:9–20.  However, he testified that he would stay "10 to 15 minutes" at Carrasquillo's apartment, and that their sexual relationship only existed in 2014.  *Id.* at 51:11–17, 52:9–24.

*alia*, "the demeanor of the witnesses"). Here, the Court observed that Plaintiff displayed stress and discomfort in parts of his testimony, during which he would gaze down and nervously rub his face. Plaintiff's demeanor suggested to the Court that he was not being truthful. *See, e.g.*, *Juarez-Cardoso v. La Flor de Santa Ines, Inc.*, No. 15-CV-6671 (VMS), 2017 WL 4357009, at *16 (E.D.N.Y. Sept. 29, 2017) (in assessing evidence concerning plaintiff's wages, court found plaintiff's "demeanor when testifying too evasive on this issue to be credible"); *Khurana v. JMP USA, Inc.*, No. 14-CV-4448 (SIL), 2017 WL 1251102, at *7 (E.D.N.Y. Apr. 5, 2017) (declining to adopt witness's testimony as to number of hours worked and pay rate where witness's "demeanor on the stand during this part of his testimony was not credible").

In contrast, the demeanor of the defense witnesses struck the Court as sincere. The Court especially credits the testimony of Pichardo, who, as a former employee of El Aguila and non-party to this action, did not evince any motive to be untruthful or to favor one side over the other.

Second, in light of Pichardo's testimony and Plaintiff's admissions about his own drinking habits, which involved drinking beer both during the workday and afterwards as well, the Court believes it is far more likely that even if Plaintiff physically remained at El Aguila after his regular shifts ended, he did so in order to drink and unwind at the El Aguila bar and not in order to work. As such, the Court believes that the weekly hours that Plaintiff claimed that he worked were considerably overinflated.

Third, it is of significance that Plaintiff did not identify any other employee at El Aguila who worked more than 40 hours a week. *See* Tr. at 36:16–19. Juan and Santiago Almonte and Pichardo uniformly testified that no employee worked more than 40 hours a week. It strains credulity that, over a period of eight years (*i.e.*, 2008 to 2016), in a restaurant employing 10-15 employees, only Plaintiff—but no one else—was ever required to work more than 40 hours a week (let alone 60 or 70 hours a week, as Plaintiff has claimed).

Finally, Plaintiff's credibility was diminished by other aspects of his testimony regarding the time he spent working at El Aguila. For instance, Plaintiff testified that he was not given a single day off for vacation during his eight years at El Aguila, Tr. at 48:18–20; that El Aguila was always open for business on Thanksgiving, Christmas, and New Year's, and that Plaintiff worked on all of those holidays, *id.* at 48:21–49:6; that between 2010 and 2016 the only time Plaintiff took off work was a single week in 2015, to deal with a medical condition, *id.* at 49:7–15; that Plaintiff was never late to work, *id.* at 50:4–5; and that, despite ample evidence of his drinking habits, Plaintiff was never sent home or suspended due to being intoxicated at work, *id.* at 47:4–6. These claims were not believable and, not surprisingly, the defense witnesses credibly responded to each of them. *See id.* at 128:12–18 (testimony by Juan Almonte that Plaintiff was given "at least" one week of vacation every year); *id.* at 130:5–132:2 (testimony by Juan Almonte that El Aguila was closed during the day, but would sometimes be open at night, on Thanksgiving, Christmas, and New Year's, but that Plaintiff did not work on the

holiday nights); *id.* at 72:24–25 (testimony by Pichardo that Plaintiff was "sometimes" late to work); *id.* at 71:24–72:23 (testimony by Pichardo that Plaintiff called out sick from work around 20 times because he was drunk or hung over); *id.* at 63:21–64:17, 84:18–22 (testimony by Pichardo that he had sent Plaintiff home around 20 times because he "sensed" that Plaintiff "was drunk" and because Plaintiff would become "somewhat aggressive" and "use foul language").[10]

Accordingly, consistent with the defense witnesses' testimony, the Court finds as follows:[11]

- From August 2010 to July 2012, Plaintiff worked five days a week at El Aguila, from 8:00 a.m. to 4:00 p.m. each day.

- From July 2012 to December 2015, Plaintiff worked five days a week at El Aguila. On four of those days, Plaintiff worked from 8:00 a.m. to 4:00 p.m., and on one day, Plaintiff worked a night shift from 8:00 p.m. to 4:00 a.m.

- From December 2015 to July 2016, Plaintiff worked five days a week. On four of those days, Plaintiff worked at El Aguila from 10:00 a.m. to 6:00 p.m. And on one day, Plaintiff worked from 10:00 a.m. to 4:00 p.m. at El Aguila and then from 4:00 p.m. to 6:00 p.m. at Las Banderas.

---

[10] The Court notes that Plaintiff, Juan Almonte, and Santiago Almonte all testified about a 2015 shooting incident involving Plaintiff that apparently caused him to miss some days of work. *See* Tr. at 49:18–24, 93:23–94:12, 129:3–16. However, the testimony about this incident was too vague to permit the Court to make any specific factual findings about whether, and how, it affected Plaintiff's work schedule.

[11] The Court recognizes that Carrasquillo testified that Plaintiff worked six days a week at El Aguila. Tr. at 158:24–159:8. However, because Carrasquillo's knowledge was based exclusively on what she had been told by Plaintiff, whose testimony on this particular issue is not credible, the Court does not attach any significance to Carrasquillo's testimony concerning Plaintiff's work schedule.

Furthermore, based on Pichardo's testimony, the Court finds that Plaintiff was given daily half-hour lunch breaks in the late morning / early afternoon. The Court also finds, based again on Pichardo's testimony, that Plaintiff would disappear at lunchtime "about three times a week" for "about an hour" each time, as corroborated by Carrasquillo's testimony that Plaintiff would visit her apartment three times a week in the late morning / early afternoon between 2010 and 2016 for about an hour per visit.

### F.     Plaintiff's Wages

The witnesses offered differing accounts of the wages Plaintiff was paid while employed at El Aguila.

#### 1.     Plaintiff's Testimony

Plaintiff testified that he was paid as follows:

- From August 2010 to July 2012, he was paid $60 a day in cash, totaling $360 a week for six days of work. Tr. at 15:9–17;

- From July 2012 to July 2013, he was paid $65 per day for his five day shifts, and $80 for his one night shift, all in cash, totaling $405 a week. *Id.* at 15:18–16:23;

- From July 2013 to December 2015, he was paid $65 a day in cash, totaling $390 a week for six days of work. *Id.* at 16:24–17:9; and

- From December 2015 to July 2016, he was paid for the first 30 hours of work by check at a rate of $8.75 per hour, and $95 in cash for all other hours, totaling $357.50 a week. *Id.* at 17:10–18:5.

Plaintiff also testified that he would occasionally receive tips from customers for deliveries, but that no one kept track of these tips. *Id.* at 18:11–19:2.

## 2.      Juan and Santiago Almonte's Testimony

Juan Almonte testified that his practice was to pay El Aguila's employees "a little bit more" than the minimum wage.  *Id.* at 121:14–25.  His knowledge of the applicable minimum wage was based on the posters he received from the Department of Labor every year.  *Id.* at 126:2–17.  He testified further that he paid employees "at least the minimum wage" in order to "keep them happy."  *Id.* at 118:10–13.  With regard to Plaintiff's wages, Juan Almonte testified as follows:

- From 2010 until July 2012, Plaintiff was paid $300 per week. *Id.* at 121:6–13, 125:12–14, 135:11–13;

- From July 2012 to December 2015, Plaintiff was paid either $325 or $330 per week.  *Id.* at 122:24–123:6, 135:14–17; and

- From December 2015 until July 2016, Plaintiff was paid $262 by check and $95 in cash, totaling $357 per week.  *Id.* at 124:17–125:6, 135:8–10, 135:21–24.

Santiago Almonte testified that he paid Plaintiff $40 for each two-hour shift that Plaintiff worked at Las Banderas between December 2015 and July 2016.  *Id.* at 99:5–6.[12]

## 3.      The Court's Findings

The Court again credits the defense witnesses' testimony over Plaintiff's testimony regarding his wages at El Aguila and finds that:

- From August 2010 until July 2012, Plaintiff was paid $300 per week;

---

[12]  Plaintiff did not testify about any wages he may have received for his work at Las Banderas.  After the defense rested its case, Plaintiff elected to forego any rebuttal case and thus did not challenge Santiago Almonte's testimony.

- From July 2012 to December 2015, Plaintiff was paid $325 per week; and

- From December 2015 until July 2016, Plaintiff was paid $357 per week.

Notably, the weekly wages testified to by Juan and Santiago Almonte were actually *lower* than the weekly wages testified to by Plaintiff, which suggests to the Court that Juan and Santiago Almonte offered their honest recollection of Plaintiff's wages and did not distort the facts in order to aid their defense.

The Court also finds that Plaintiff was paid $40 for each of his two-hour shifts at Las Banderas between December 2015 and July 2016.

## IV.    CONCLUSIONS OF LAW

### A.    Statute of Limitations

"The FLSA and the NYLL have different statutes of limitations. . . . The FLSA's statute of limitations 'is two years,' or three if an employer willfully violated the statute." *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 n.7 (S.D.N.Y. 2017) (citations omitted); *see* 29 U.S.C. § 255(a). "The NYLL's statute of limitations is six years." *Id.* (citing NYLL § 663(3)). In this case, Plaintiff filed his complaint on August 24, 2016. As such, any NYLL violations committed on or after August 24, 2010 are actionable. The FLSA, in contrast, would at most reach back to August 24, 2013.

### B.    Employer Status

"Under the FLSA, an employer is any 'person acting directly or indirectly in the interest of an employer in relation to an employee.'" *Gonzalez*, 2017 WL

3835960, at *13 (quoting 29 U.S.C. § 203(d)). The definition of "employer" under NYLL "is similarly broad." *Id.* (citing NYLL § 190).[13] Courts have found that "[t]he definitions of the term 'employer' under the FLSA and NYLL are coextensive." *Raymond v. Mid-Bronx Haulage Corp.*, No. 15-CV-5803 (RJS), 2017 WL 1251137, at *8 (S.D.N.Y. Mar. 31, 2017) (quoting *Jeong Woo Kim v. 511 E. 5th St., LLC*, 133 F. Supp. 3d 654, 665 (S.D.N.Y. 2015)). An individual may be held liable as an employer "if he or she had power to control the employees in question." *Gonzalez*, 2017 WL 3835960, at *14 (citing *Moon v. Kwon*, 248 F. Supp. 2d 201, 236 (S.D.N.Y. 2002)).

In this case, there is no dispute that El Aguila was Plaintiff's employer from 2008 until the business closed in 2016. *See* Joint Stip., ¶ 3. There is also no dispute that Juan Almonte "had power to control" Plaintiff's employment and that he should be considered Plaintiff's employer. *Gonzalez*, 2017 WL 3835960, at *14; Joint Stip., ¶¶ 3, 5. In short, the Appearing Defendants were Plaintiff's "employer" within the meaning of the FLSA and NYLL.

## C.     Joint Liability

In the complaint, Plaintiff has alleged that the Defaulting Defendants, together with the Appearing Defendants, constituted "joint employers" or, in the

---

[13] However, unlike NYLL, the FLSA requires that an employer qualify as an "enterprise" that is engaged in interstate commerce or in the production of goods for interstate commerce, with annual gross volume of sales made or business not less than $500,000. *See* 29 U.S.C. § 203(s)(1)(A)(i), (ii); *see also Gamero*, 272 F. Supp. 3d at 497 n.6 (discussing FLSA's "enterprise-value requirement"). Here, the parties have stipulated that El Aguila satisfies the FLSA's enterprise-value requirement. Joint Stip., ¶¶ 6–7.

alternative, a "single employer." Compl. ¶¶ 29-37. By virtue of their default, the Defaulting Defendants cannot contest these allegations. *See, e.g.*, *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) ("In light of [defendant's] default, a court is required to accept all of [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor[.]") (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

To the extent Plaintiff obtains judgment in his favor in this case, the Defaulting Defendants should be held liable for this judgment together with the Appearing Defendants. However, to the extent Plaintiff does not prevail on any or all of his claims against the Appearing Defendants, the Defaulting Defendants should be exonerated as well so as to avoid the risk of entry of inconsistent judgments. *See, e.g.*, *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 399 (S.D.N.Y. 2012) (adopting report and recommendation stating that "[i]f the remaining defendants prevail, the defaulting defendant would then be exonerated, whereas if the plaintiff prevails on the merits, judgment would be entered against all defendants, including the defaulting party") (quoting *Friedman v. Lawrence*, No. 90-CV-5584 (VLB), 1991 WL 206308, at *2 (S.D.N.Y. Oct. 2, 1991)).

### D. Minimum Wage Claims

#### 1. Applicable Law

The FLSA and NYLL require an employer to pay not less than a statutorily-set minimum wage for each hour of work. *See* 29 U.S.C. § 206(a)(1); NYLL § 652(1); 12 NYCRR § 146-1.2. Since 2009, the minimum wage under the FLSA has been

$7.25 per hour.  29 U.S.C. § 206(a)(1)(C).  During the relevant period, the minimum wage under New York law has been as follows:

- $7.15 from August 24, 2010 until December 30, 2013;

- $8.00 from December 31, 2013 until December 30, 2014;

- $8.75 from December 31, 2014 until December 30, 2015; and

- $9.00 from December 31, 2015 until December 30, 2016.

NYLL § 652(1).

In order to assess whether an employee has been paid minimum wage, a court must determine the employee's hourly rate, also called the "regular rate" of pay.  Under the FLSA, the "regular rate" is determined by "dividing an employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked."  *Romero v. Anjdev Enters., Inc.*, No. 14-CV-457 (AT), 2017 WL 548216, at *10 (S.D.N.Y. Feb. 10, 2017) (alteration omitted) (citing 29 C.F.R. § 778.109).  Similarly, under NYLL, the "regular rate" of pay of an employee in the hospitality industry (which includes restaurants) is calculated "by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked by that employee during the work week."  12 NYCRR § 146-3.5(b).

In determining an employee's "number of hours actually worked," bona fide meal breaks are not considered as compensable work time.  *See, e.g.*, *Marcelino*, 2018 WL 1517205, at *17 ("Under both the FLSA and NYLL, 'all of the time worked during a continuous workday is compensable, save for bona fide meal breaks.'")

(quoting *Hernandez* v. *Jrpac Inc.*, No. 14-CV-4176 (PAE), 2016 WL 3248493, at *27 (S.D.N.Y. June 9, 2016))). "To qualify as a bona fide meal period, '[t]he employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period.'" *Id.* (quoting *Salinas* v. *Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015)).

Under both the FLSA and NYLL, once the Court determines the "actual number of hours worked" per week and calculates the "regular rate" based on those hours, the "regular rate" is then compared to the statutorily-imposed minimum wage to determine whether the employee has been underpaid.

Notably, "an employee may not receive a double recovery of back wages under both the FLSA and [the] NYLL." *Gamero*, 272 F. Supp. 3d at 498 (quoting *Jrpac Inc.*, 2016 WL 3248493, at *31 (internal quotations omitted)). "While 'plaintiffs may not recover under both the FLSA and NYLL for the same injury, courts allow plaintiffs to recover under the statute that provides for the greatest relief.'" *Pastor v. Alice Cleaners, Inc.*, 16-CV-7264 (JLC), 2017 WL 5625556, at *2 (S.D.N.Y. Nov. 21, 2017) (quoting *Ni v. Bat-Yam Food Servs. Inc.*, No. 13-CV-7274 (ALC) (JCF), 2016 WL 369681, at *1 (S.D.N.Y. Jan. 27, 2016)).

## 2.   Analysis

Here, Plaintiff's first and third causes of action assert violations of the minimum wage provisions of, respectively, the FLSA and NYLL. However, because it is evident that "NYLL allows for greater or equal recovery than the FLSA at all relevant times" during Plaintiff's employment at El Aguila, "the Court will apply

NYLL for all damages calculations." *Pastor*, 2017 WL 5625556, at *2; *Jrpac Inc.*, 2016 WL 3248493, at *31 (awarding plaintiffs damages under NYLL, not the FLSA, because NYLL's "higher minimum wage" and longer statute of limitations meant that "[p]laintiffs' damages award under the NYLL necessarily . . . subsume[d] their award under the FLSA").

To determine Plaintiff's "regular rate" of pay, the Court must first determine the actual number of hours he worked per week. The Court has credited the defense witnesses' testimony that, throughout his employment, Plaintiff was scheduled for 8-hour shifts at El Aguila. The Court has also credited Pichardo's unchallenged testimony that Plaintiff was given daily half-hour meal breaks in the late morning / early afternoon, which reduced his compensable work time by half an hour per day. Moreover, the Court has credited Pichardo and Carrasquillo's testimony that Plaintiff would leave work in order to visit Carrasquillo's apartment three times a week in the late morning / early afternoon for about an hour per visit. As such, on the days Plaintiff visited Carrasquillo, he worked a total of 7 hours per day; and on the days Plaintiff did not visit Carrasquillo, he worked 7.5 hours per day.[14] In sum, from August 2010 to December 2015, Plaintiff's actual number of hours worked per week at El Aguila was **36 hours** (*i.e.*, 7 hours on three days of the week, and 7.5 hours on two days of the week). From December 2015 to July 2016,

---

[14] Plaintiff's hour-long visits to Carrasquillo's apartment in the late morning / early afternoon would overlap with his daily half-hour lunch breaks, which would also take place in the late morning / early afternoon. Accordingly, on the days Plaintiff visited Carrasquillo's apartment, he would spend a total of one hour away from work.

Plaintiff's actual number of hours worked per week at El Aguila was **34 hours** (accounting for the two hours per week Plaintiff worked at Las Banderas instead of El Aguila during this period).

In light of these findings concerning Plaintiff's actual number of hours worked per week and the Court's aforementioned findings concerning weekly wages, Plaintiff's "regular rate" of pay during the relevant period is summarized as follows:

| Period of Employment at El Aguila | Plaintiff's Weekly Wages | Plaintiff's Weekly Work Hours | Plaintiff's Regular Rate of Pay | NYLL Minimum Wage |
|---|---|---|---|---|
| Aug. 2010 to July 2012 | $300.00 | 36 | $8.33 | $7.15 |
| July 2012 to Dec. 2013 | $325.00 | 36 | $9.03 | $7.15 |
| Dec. 2013 to Dec. 2014 | $325.00 | 36 | $9.03 | $8.00 |
| Dec. 2014 to Dec. 2015 | $325.00 | 36 | $9.03 | $8.75 |
| Dec. 2015 to July 2016 | $357.00 | 34 | $10.50 | $9.00 |

As evidenced by this table, at no time did Plaintiff's "regular rate" of pay fall below the minimum wage rate required by NYLL. Consequently, Plaintiff is not entitled to damages under the minimum wage provisions of NYLL.[15]

### E. Overtime Claims

"Both the FLSA and the NYLL also require employers to pay overtime. The requirement under both statutes is the same: Once an employee works 40 hours in a

---

[15] Of course, because Plaintiff is not entitled to unpaid wages under NYLL's minimum wage provisions, he also cannot recover liquidated damages and pre-judgment interest.

week, he must be paid 'one and one-half times his regular rate' for all excess hours."
*Gamero*, 272 F. Supp. 3d at 499 (alteration omitted) (quoting *Dejesus v. HF Mgmt.*
*Servs., LLC*, 726 F.3d 85, 88 (2d Cir. 2013)); *see also* 29 U.S.C. § 207(a)(1); 12
NYCRR § 146-1.4.

Plaintiff's second and fourth causes of action assert violations of the overtime
provisions of, respectively, the FLSA and NYLL. In its findings of fact, the Court
has determined that Plaintiff's weekly work hours never exceeded 40 throughout
his entire period of employment at El Aguila. Therefore, Plaintiff is not entitled to
overtime compensation.

### F. "Spread of Hours" Claim

Under NYLL, an employee is entitled to an extra hour's pay at the minimum
wage rate for any day for which "the spread of hours exceeds 10." 12 NYCRR § 146-
1.6(a). "The 'spread of hours' measures 'the interval between the beginning and end
of an employee's workday' and 'includes working time plus time off for meals plus
intervals off duty.'" *Gonzalez*, 2017 WL 3835960, at *17 (quoting 12 NYCRR § 146-
1.6). Employers are required to pay spread of hours wages for "all employees in
restaurants . . . regardless of a given employee's regular rate of pay." 12 NYCRR
§ 146-1.6(d).

Plaintiff's fifth cause of action asserts a violation of NYLL's "spread of hours"
provision. At trial, Plaintiff testified that he regularly worked more than 10 hours a
day and was thus purportedly entitled to an extra hour's pay at the minimum wage
rate. However, in its findings of fact, the Court has determined that Plaintiff did

not work more than eight hours a day throughout his entire period of employment at El Aguila.[16]  Accordingly, as Plaintiff's "spread of hours" never exceeded 10 hours in a day, he is not entitled to any "spread of hours" wages.

### G.    Wage Notice Requirement

#### 1.    Applicable Law

"NYLL requires employers to provide employees, at the time of hiring, with a wage notice containing basic information such as rate of pay; prior to February 27, 2015, employers were required to provide employees with these notices annually." *Pastor*, 2017 WL 5625556, at *5 (citing NYLL § 195(1)(a)).  "Since February 27, 2015, an employee who was not provided a wage notice within ten business days of the first day of employment can recover damages of $50 for each workday that a violation occurs or continues to occur, not to exceed $5,000[.]"  *Id.* (citing NYLL § 198(1-b)).

Notably, however, "[v]iolations of Section 195(1) did not always result in money damages.  It was not until April 9, 2011, when New York's Wage Theft Prevention Act ("WTPA") took effect, that employers were subject to damages for not providing wage notices.  As many judges in this District have held, the WTPA does not apply retroactively."  *Gamero*, 272 F. Supp. 3d at 510 (citations omitted).  "Thus, 'an employee who began working before the WTPA took effect on April 9,

---

[16]  As previously explained, although there was substantial testimony that Plaintiff would often physically remain at El Aguila after his shifts ended, thus suggesting he may have been at the restaurant in total for more than 10 hours, the Court has found that he did so in order to drink and unwind and not in order to work.

2011, may not bring a claim for an employer's failure to provide wage notices.'" *Id.* (quoting *Canelas* v. *A'Mangiare Inc.*, No. 13-CV-3630 (VB), 2015 WL 2330476, at *5 (S.D.N.Y. May 14, 2015)).

### 2. Analysis

Plaintiff's sixth cause of action asserts a violation of the wage notice requirement under NYLL § 195(1). Although it is undisputed that Plaintiff was not provided with any sort of written notice concerning his wages at the time of his hiring, it is equally undisputed that Plaintiff was hired in 2008, prior to when the WTPA became effective. Because Plaintiff was hired before the WTPA took effect, and the WTPA does not apply retroactively, he is not entitled to relief under NYLL's wage notice provision. *See, e.g.*, *Gamero*, 272 F. Supp. 3d at 510–11 (denying wage notice claims brought under NYLL § 195(1) by employees hired in 2009 and 2010).

## H. Wage Statement Requirement

### 1. Applicable Law

In addition to the wage notice requirement, "[e]mployers are also required to provide employees with a wage statement with each payment of wages." *Pastor*, 2017 WL 5625556, at *5 (citing NYLL § 195(3)). Each wage statement must list, *inter alia*, the dates of work covered by that payment of wages, the employer's address and phone number, the applicable rate or rates of pay, applicable deductions, and any allowances claimed as part of the minimum wage. NYLL § 195(3).

From April 9, 2011 until February 27, 2015, "an employer's failure to provide proper wage statements 'was a violation for which plaintiffs could receive $100 per work week in damages, with a cap of $2,500.'" *Gamero*, 272 F. Supp. 3d at 511 (quoting *Hernandez*, 2016 WL 3248493, at *29). Since February 27, 2015, "an employee can recover $250 for each workday that a wage statement violation occurs or continues to occur, not to exceed $5,000." *Pastor*, 2017 WL 5625556, at *5 (citing NYLL § 198(1-d)).[17]

## 2. Analysis

Plaintiff's seventh cause of action asserts a violation of the wage statement provision under NYLL § 195(3). In its findings of fact, the Court has determined that Plaintiff's work hours and wages at El Aguila were not recorded or tracked in any way until 2015. The Court further determined that from December 2015 until July 2016, El Aguila's employees, including Plaintiff, were provided with some form of wage documentation. However, as none of this documentation was entered into evidence at trial (aside from a single W-2 form for 2016), and as neither Juan nor Santiago Almonte testified in detail as to the information contained in this documentation (or the Department of Labor posters), the Court concluded that it could not make any findings as to what information was contained in the documentation provided to El Aguila's employees. Consequently, based on the

---

[17] As with wage notice violations, "an employee may not recover for wage statement violations that occurred before April 9, 2011." *Kone v. Joy Constr. Corp.*, No. 15-CV-1328 (LTS), 2016 WL 866349, at *6 (S.D.N.Y. Mar. 3, 2016) (quoting *A'Mangiare Inc.*, 2015 WL 2330476, at *5).

record presented, the Appearing Defendants have failed to demonstrate that they provided Plaintiff with wage statements that included all of the required informational items specified in NYLL § 195(3). Plaintiff is thus entitled to damages on this claim.

Specifically, Plaintiff is entitled to recover $250 for each workday that a wage statement violation occurred between February 27, 2015 and July 2016, when his employment with El Aguila ended. *See* NYLL § 198(1-d). Because this period spanned more than 20 days, Plaintiff is entitled to damages in the full statutory amount of $5,000.[18]

## I. Attorneys' Fees and Costs

"Under both the FLSA and the NYLL, a prevailing plaintiff may recover his or her reasonable attorney's fees and costs." *Cabrera v. 1560 Chirp Corp.*, No. 15-CV-8194 (TPG) (DF), 2017 WL 1289349, at *9 (S.D.N.Y. Mar. 6, 2017) (alteration and citation omitted), *adopted by*, 2017 WL 1314123 (S.D.N.Y. Apr. 6, 2017); *see*

---

[18] Plaintiff may not recover liquidated damages for the Appearing Defendants' violation of the wage statement provision, NYLL § 195(3). Liquidated damages under NYLL are calculated based on the "total amount of *wages found to be due*." NYLL § 198(1-a) (emphasis added). Thus, by its express terms, this provision limits an award of liquidated damages to unpaid wages and does not encompass "notice" violations under NYLL §§ 195(1) or 195(3). *See, e.g.*, *Martinez v. Alimentos Saludables Corp.*, No. 16-CV-1997 (DLI) (CLP), 2017 WL 5033650, at *23 & n.13 (E.D.N.Y. Sept. 22, 2017) (NYLL allows plaintiffs to recover liquidated damages for all wage claims "but not wage notice claims"). Similarly, Plaintiff is not entitled to an award of pre-judgment interest for the Appearing Defendants' violation of the wage statement provision. *See, e.g.*, *Pastor*, 2017 WL 5625556, at *6 ("Pre-judgment interest applies only to the actual, compensatory damages, and not to liquidated damages or to damages recovered due to violations of wage statement or wage notice provisions.") (citing *Salustio v. 106 Columbia Deli Corp.*, No. 15-CV-6857 (GWG), 2017 WL 3736695, at *14 (S.D.N.Y. Aug. 30, 2017)).

*also* 29 U.S.C. § 216(b); NYLL §§ 198, 663.  Having ruled that Plaintiff established the Appearing Defendants' liability for violation of NYLL's wage statement provision by a preponderance of the evidence, the Court concludes that Plaintiff is entitled to a reasonable award of attorneys' fees and costs.  However, the Court notes that Plaintiff's degree of success was extremely limited, and therefore a reduction of the fees may well be appropriate.  *See, e.g.*, *Sanchez v. I&A Rest. Corp.*, No. 14-CV-0726 (DF), 2017 WL 2537814, at *6 (S.D.N.Y. May 22, 2017).

The Court encourages the parties to reach an agreement on attorneys' fees and costs.  In the event the parties cannot do so, Plaintiff shall file a motion for attorneys' fees and costs no later than **May 9, 2018**.  The Appearing Defendants shall file any opposition no later than **May 23, 2018**.  Plaintiff may not file a reply brief.  If briefing is necessary, the parties shall specifically address the issue of whether Plaintiff's counsel's fees should be circumscribed, reduced, or otherwise limited in some way, given Plaintiff's modest recovery.

## J.      Payment of Judgment

Pursuant to NYLL, "if any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent."  *Gamero*, 272 F. Supp. 3d at 516 (quoting NYLL § 198(4)).

## V.     CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff is entitled only to a judgment against all defendants in the amount of $5,000 in statutory penalties for wage statement violations under NYLL, and to attorneys' fees and costs to be determined.

**SO ORDERED.**

Dated: April 25, 2018
         New York, New York

_____
JAMES L. COTT
United States Magistrate Judge